David L. Mazaroli
Attorney for Plaintiff
11 Park Place – Suite 1214
New York, NY 10007-2801
Tel. (212)267-8480
Fax. (212)732-7352
e-mail: dlm@mazarolilaw.com

-----------------------------------------------------------------x
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | | |
|---|---|---|
| MITSUI SUMITOMO INSURANCE CO. LTD. | : | |
| Plaintiff, | : | 07 Civ. 3874 (CM) |
| - against - | : | **PLAINTIFF'S RULE 56.1 STATEMENT OF** |
| EVERGREEN MARINE CORPORATION; UNION PACIFIC RAILROAD COMPANY; | : | **UNDISPUTED MATERIAL FACTS** |
| | : | |
| Defendants. | | |

-----------------------------------------------------------------x

PLEASE TAKE NOTICE that pursuant to Civil Rule 56.1(a) of the United States District Courts for the Southern and Eastern Districts of New York, plaintiff Mitsui Sumitomo Insurance Co. Ltd. ("Mitsui"), in support of its motion for partial summary judgment against the captioned defendants, respectfully submits that there are no genuine issues to be tried with respect to the following material facts.

Each statement of fact is supported with a reference to the evidentiary record, including the following sworn testimony: Affidavit of David L. Mazaroli ("Maz. Aff."); Declaration of David Clifton ("Clifton Decl."); Declaration of Chikara Yokoi ("Yokoi Decl."); Deposition of Daniel Hartmann ("Hartmann Dep.").

PLEASE TAKE FURTHER NOTICE that each statement by defendants pursuant to Rule 56.1(b) must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

1. This action involves derailment damage to a shipment of motors and motor parts for automobiles ("the shipment") which moved in international intermodal transportation from Shimizu, Japan, to Statesville, North Carolina. (Maz. Aff. Ex. 2 ¶, Ex. 3 ¶ 9)

2. The transportation was considered intermodal (also referred to as "multimodal") because it included ocean carriage from Shimizu to the port of Los Angeles and rail carriage from the discharge port to the North Carolina destination. (*Id.*; Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 57-58)

3. Asmo North Carolina, Inc. ("Asmo-NC"), plaintiff's subrogor, was the owner of the shipment, having purchased it from Asmo Co. Ltd. ("Asmo Japan") on FOB terms. (Clifton Decl. ¶¶ 4-7)

4. On or about March 14, 2006 defendant Evergreen Marine Corporation ("Evergreen") contracted to provide the subject intermodal transportation. (Clifton Decl. ¶¶ 8-9 and Ex. 4; Maz. Aff. Exs. 12 and 15)

5. Although the booking with Evergreen was made by or on behalf of Asmo Japan, the freight charges for the transport were paid by Asmo- NC who as FOB purchaser had risk of loss and title to the shipment during the international transport. (*Id.*)

6. Evergreen was at all material times engaged in the business of providing, for compensation, intermodal (also referred to as multimodal) transportation services for international cargo shipments. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 14-16; 31-32; 57-

58; 61, 73-74; Maz. Aff. Exs. 12, 16, http://www.evergreen-marine.com/tbi1/html/CorporateProfile.pdf)

7. The intermodal transportation services provided by Evergreen for such international shipments include ocean transportation from foreign ports to ports in the United States. (*Id.*)

8. The intermodal transportation services provided by Evergreen for such international shipments include railroad transportation from the United States port of ocean vessel discharge to inland destinations in the United States. (*Id.*)

9. At all material times defendant Union Pacific Railroad Company ("UP") was engaged in the business of providing rail transportation services for compensation, including interstate rail carriage for international intermodal cargo shipments. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 12, 73-74; Maz. Aff. Ex. 1 ¶¶ 7, 8; Ex. 2 ¶¶ 7, 8)

10. Evergreen provided shipping containers TRIU5559381 and UGMU8062288 for the entire transport of the shipment from the place of receipt to the place of intended delivery and the motors and motor parts in question were loaded into said containers in good order and condition and without evidence of damage. (Maz. Aff. Ex. 1 ¶¶ 12, 14; Ex. 3 ¶¶ 12, 14)

11. Evergreen issued Sea Waybill EISU025643005523 dated on or about March 14, 2006. (Maz. Aff. Ex. 5 ¶ 22; Ex. 12; Clifton Decl. Ex. 4)

12. The Evergreen Sea Waybill describes the shipment as "165 Cartons, Motor & Motor parts for Automobile (sic)." It lists the place of receipt as Shimizu, CY, the port of lading as Shimizu, Japan, the port of discharge as Los Angeles, CA, and the place of delivery as Statesville, N.C., Door. (Maz. Aff. Ex. 12; Clifton Decl. Ex. 4)

13. The Evergreen Sea Waybill was an intermodal through bill, meaning that it contemplated multiple modes of transportation, including the ocean carriage from Japan to the United States and the interstate rail carriage from the port of discharge to final destination. (Maz. Aff. Ex. 12; Ex. 11 (Hartmann Dep.) pp. 57-58)

14. The shipment in question was an international shipment, i.e. it originated outside the borders of the United States. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 32 and 66)

15. The Evergreen Sea Waybill does not expressly refer to the Carmack Amendment[1] and it does not expressly state that the shipper has the option of full Carmack Amendment liability. (Maz. Aff. Exs. 12-13

16. The reverse side of the Evergreen Sea Waybill includes, *inter alia,* the following fine-print boilerplate text:

> **5. Clause Paramount and Responsibility of Carrier.**
> (A) Clause Paramount - as far as this Bill covers the carriage of Goods by sea either by the Carrier or its Sub-contractor, the contract evidenced in this Bill shall have effect subject to the Hague Rules, if and as enacted in the country of shipment, and any Legislation including COGSA which make those rules compulsory, applicable or effective. The Hague Rules and said Legislation shall be deemed contractually incorporated herein and made a part of this Contract regardless of whether it or they would otherwise be compulsorily applicable and nothing herein contained shall be deemed a surrender by the Carrier or its Sub-contractor of any of its rights and immunities or any increase of any of its responsibilities under said Rules and Act. Notwithstanding anything to the contrary, if the carriage called for in this Bill is a shipment to or from the United States, the liability of the Carrier or its Sub-contractor shall be exclusively determined pursuant to COGSA which is contractually incorporated into this Bill. The provisions cited in the Hague Rules and COGSA (except as may be otherwise specifically provided herein) shall also govern before the Goods are loaded on and after they are discharged from the Ship provided, however, that the Goods at said

---

[1] The Carmack Amendment to the Interstate Commerce Act of 1887 ("Carmack"), Act of June 29, 1906, ch. 3591, 34 Stat. 584 (1906) (current version at 49 U.S.C. § 11706). *See Sompo Japan Insurance Co. of America v. Union Pacific Railroad Co.*, 456 F.3d 54 (2d Cir. 2006).

4

times are in the actual custody of the Carrier or any Sub-contractor. When no such enactment is in force in the country of shipment, the Hague Rules will apply. If any terms of this Bill are repugnant to the Hague Rules or any other compulsorily applicable International Convention or National Law which cannot be departed from by private contract, then such provision shall be null and void to the extent of such invalidity without invalidating the remaining provisions hereof. The Carrier or its Sub-contractor shall not be liable in any capacity whatsoever for any delay, non-delivery or misdelivery, or loss of or damage to the Goods howsoever caused occurring while the Goods are not in the actual custody of the Carrier.

(B) Responsibility for Port to Port Shipments. Where loss or damage has occurred between the time of receipt of the Goods by the Carrier at the port of loading and the time of delivery by the Carrier at the port of discharge, or during any prior or subsequent period of carriage by Underlying Carriers or period of custody by Sub-Contractors, the liability of the Carrier shall be determined in accordance with the appropriate Hague Rules and /or other Legislation as provided in the provisions of Clause 5A above of this Bill .

(C) Responsibility for Through Transportation. Where the place of receipt or place of delivery as set forth herein are inland points or ports not directly served by the Carrier the responsibility of the Carrier with respect to the Through Transportation of the Goods shall be as follows:

(1) With respect to Through Transportation from, to or within the United States where the Goods are in the custody of a Sub-contractor such Through Transportation will be governed by the provisions of Clause 5B above.

(2) In the event Clause 5B is held inapplicable to such Through Transportation from, to or within the United States then Carrier's liability will be governed by and subject to the terms and conditions of the Sub-contractor's bill of lading or waybill and/or the ICC Uniform Bill of Lading together with the Subcontractor's Tariff which shall be incorporated herein as if set forth at length. Notwithstanding the foregoing, in the event there is a private contract between the Carrier and a Sub-Contractor, responsibility for such Through Transportation will be governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length and copies of said contract(s) shall be available to the Merchant at any office of the Carrier upon request.

\*\*\*\*

(6) With respect to inland transportation of the Goods other than as provided in subparagraphs (1) through (5) supra, then according to the provisions of any International Convention or National Law which is compulsorily applicable in the country where the inland transportation took place or, if no such law or convention is applicable, then according to the Sub-contractor's tariff or any contract existing between the Sub-contractor and the Carrier.

    (D) Extent of Liability for Through Transportation. In any event, the liability of the Carrier shall under no circumstances whatsoever be greater than that of the Sub-contractor under said Sub-contractors' contract with the Carrier, and the Carrier shall be entitled to all the rights, defenses, limitations and exemptions from liability contained therein.

(Maz. Aff. Ex. 13)

    17.    The following text is also included in the Evergreen Sea Waybill:

**7. Amount of Compensation and Limitation of Liability.**
(1) All claims for which the Carrier may be liable shall be adjusted and settled on the basis of the net invoice value of the Goods plus freight and insurance. Notwithstanding the foregoing it is agreed that in no event shall this clause operate to increase the extent of the Carrier's liability beyond the applicable market value at the port of discharge or place of delivery, if that be less than the net invoice value plus freight and insurance. In no event shall the Carrier be liable for any loss of profit or any consequential loss.

(2) In the event this Bill covers Goods moving to or from a port or final destination in the United States, the Carrier's limitation of liability in respect to the Goods shall in no event exceed US$ 500 per package or, when the Goods are not shipped in packages, US$500 per customary freight unit. In the event the foregoing would be held inapplicable under the local law of the jurisdiction in which legal proceedings are brought and if the Goods covered by this Bill are subject to the Hague Rules or any amendments thereto, including the Hague Visby Amendments, then Carrier's liability in no event shall exceed the greater of 2 SDRs per kilo of gross weight of the Goods lost or damaged or 667 SDRs per package. The Merchant agrees and acknowledges that the Carrier has no knowledge of the value of the Goods, and that higher compensation than that provided herein may not be claimed unless the nature and value of such Goods\ have been declared by the Merchant before shipment and agreed to by the Carrier and inserted in this Bill and any applicable Ad Valorem freight rate, as set out in Carrier's tariff, is paid.

(3) If the actual value of the Goods per package or per customary freight unit exceeds such declared value, the value shall nevertheless be deemed to be the declared value. Any partial loss or damage shall be adjusted pro rata on the basis of such declared value. In any case, if the declared value is higher than the actual value, the Carrier shall in no event be liable to pay compensation higher than the net invoice value of the Goods plus freight and insurance.

(Maz. Aff. Ex. 13)

18. Evergreen carried the shipment by ocean vessel, i.e. the M/V EVER UNION, from Shimzu, Japan, to Los Angeles, California. (Maz. Aff. Ex. 5 Admissions No. 1-3; Maz. Aff. Ex. 12)

19. At the port of Los Angeles the shipment was transferred from Evergreen's ship to Evergreen's designated rail carrier, UP, for the railroad transportation to North Carolina. (Maz. Aff. Ex. 4 Admissions No. 3-4; Ex. 5 Admissions No. 3-4)

20. The train assembled for the domestic land stage of the intermodal transport was a "dedicated" Evergreen train, i.e. although the locomotive units and rail cars were provided and/or operated by UP, the train was loaded by Evergreen and carried containerized shipments for Evergreen's customers. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 29-32)

21. UP formulated electronic waybills covering the interstate rail carriage of each container in the shipment to final destination. (Maz. Aff. Ex. 1 ¶ 15; Ex. 2 ¶ 15); Ex. 11 (Hartmann Dep.) pp. 50-52)

22. Copies of the waybills were stored in electronic form in UP's EDI system. However, the electronic waybills were internal UP documents and were not issued or otherwise transmitted to the actual shipper, consignee, or owner of the shipment. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 50-52)

23. Although Evergreen and UP contend that they were parties to an Exempt Rail Transportation Agreement ("ERTA"), a copy of which has been produced in discovery, the terms of ERTA were not disclosed to the actual shipper, consignee or owner the shipment. (Maz. Aff. Ex. 7 Admissions No. 3, 4, 7, 8; Ex. 8 Admission No. 47)

24.     Similarly, the terms of a Master Intermodal Transportation Agreement ("MITA-2A") were not disclosed to the actual shipper, consignee or owner of the shipment. (Maz. Aff. Ex. 7 Admissions No. 1, 2, 5, 6)

25.     Neither ERTA nor MITA-2A state that the shipper has the option of full Carmack Amendment liability for international intermodal shipments such as the subject shipment, i.e. shipments which originate outside the borders of the United States. ( Maz. Aff. Ex. 14 p. 7022, 7027)

26.     In fact, UP's MITA provides that "Carmack liability coverage is **not** available for shipments that originate outside the borders of the United States of America." (Maz. Aff. Ex. 14  p.  7027  (MITA-2A, Item 320 ¶ D (emphasis added)).

27.     On or about April 5, 2006, while UP was transporting the shipment by rail the subject motors and motor parts sustained damage as the result of a derailment which occurred at or near Higginson, Arkansas. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 25, 28, 41-42; Maz. Aff. Ex. 4 Admissions Njo. 7, 8, 10, 11, 12)

28.     As a  result of the derailment the rail cars carrying containers TRIU5559381 and UGMU8062288 left the tracks and the containers came to rest on their sides. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 38-40)

29.     As a result of the derailment containers TRIU5559381 and UGMU8062288 sustained damage. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 38-40; Maz. Aff. Ex. 4 Admission No. 1; Ex. 5 Admission No. 10)

30.     The  motors and motor parts carried in container TRIU5559381 sustained damage and loss as a result of the aforementioned derailment. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 41-42)

31. The motor and motor parts carried in container UGMU8062288 sustained damage and loss as a result of the aforementioned derailment of the UP train. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 41-42; Maz. Aff. Ex. 4 Admission No.8, 11, 12)

32. The derailment of the train was not caused by events which would give rise to a defense or exception to liability under the Carmack Amendment. (Maz. Aff. Ex. 4 Admissions No. 14-17)

33. The derailment was not caused by events which would constitute an "Act of God" defense or exception to liability. (Maz. Aff. Ex. 4 Admission No. 14)

34. The derailment was not caused by events which would constitute an "Act of Public Enemy" defense or exception to liability. (Maz. Aff. Ex. 4 Admission No. 15)

35. The derailment was not caused by events which would constitute an "Act of Public Authority" defense or exception to liability. (Maz. Aff. Ex. 4 Admission No. 16) (Maz. Aff. Ex. 4 Admission No. 16)

36. The derailment was not caused by the fault of the shipper or owner of the shipment. (Maz. Aff. Ex. 4 Admission No. 17)

37. As a result of the damage and loss caused by the derailment, part of the shipment in both containers was rendered unfit for intended usage. (Clifton Decl. ¶ 10; Yokoi Decl. ¶ 6 and Ex. 1 pp. 0102-0107)

38. As a result of the damage and loss to the shipment caused by the subject derailment, plaintiff's subrogor, Asmo-NC sustained damages in the amount of $382,415.06 based on the invoice value of the shipment. (Clifton Decl. ¶ 11; Yokoi Decl. ¶ 6 and Ex. 1 pp. 0104-0107)

39.   In addition, as a result of the damage and loss to the shipment caused by the subject derailment Asmo-NC incurred incidental expenses, including fees for storage, segregation, and X-Ray inspections, in the amount of $3,650.64. ((Clifton Decl. ¶ 11; Yokoi Decl. ¶ 6 and Ex. 1 pp. 0104-0107

40.   Plaintiff Mitsu was the insurer of the shipment pursuant to an open cargo policy which was in effect in 2006. At the time of the subject Shimuzu, Japan, to Statesville, North Carolina, intermodal transportation, Mitsui insured the Shipment against risk of loss and damage during transportation, including the type of damage and loss caused by the subject derailment. (Clifton Decl. ¶ 12; Yokoi Decl. ¶ 3)

41.   In or about April of 2006 Asmo-NC presented an insurance claim to Mitsui for damage and loss to part of the shipment caused by the derailment. (Clifton Decl. ¶ 12; Yokoi Decl. ¶ 4-5)

42.   The insurance claim of Asmo-NC was paid by Mitsui in the amount of $422,129.33. (Clifton Decl. ¶ 12, Ex. 5; Yokoi Decl. ¶ 7-8 and Exs. 2, 3)

43.   Mitsui, as subrogated cargo insurer, commenced this action against Evergreen and UP. (Maz. Aff. Ex. 1)

44.   Evergreen's defense was assumed by UP. (Maz. Aff. Ex. 10; docket No. 17 substitution of counsel)

45.   UP has admitted liability to plaintiff. (Maz. Aff. Ex 6 Admission No. 9; Ex. 7 Admission No. 9)

46.   UP admitted Paragraph 18 of the complaint and amended complaint which states that "plaintiff…sustained damages in the amount of $440,275.57, no part of which has been paid although duly demanded, and for which defendants are jointly and

severally liable as common carriers, bailees, forwarders and/or warehouseman for hire."

(Maz. Aff. Ex. 1 ¶ 18; Ex. 2 ¶ 18; see also UP answer to initial complaint ¶ 18 (docket no. 6))

Dated:  New York, New York
         February 4, 2008

                              LAW OFFICES,
                              DAVID L. MAZAROLI

                              */s/David L. Mazaroli*

                              _____
                              David L. Mazaroli (DM 3929)
                              Attorney for Plaintiff
                              11 Park Place - Suite 1214
                              New York, New York 10007
                              Tel.: (212)267-8480
                              Fax.: (212)732-7352
                              E-mail: dlm@mazarolilaw.com
                              File Nos.: 7MSI-1491