# EXHIBIT 11

MAZ. AFF.

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 6

Tell me if you can't hear my question, stop me if you don't understand the question and I'll be happy to repeat it or rephrase it.

MR. MAZAROLI: Ms. Reporter, just some logistics issues. Would you, please -- is there anyone else in the room other than the witness and Mr. Hasiak?

THE COURT REPORTER: Yes, there is.

MR. MAZAROLI: Would you inform us if anyone else enters the room?

THE COURT REPORTER: Yes.

MR. MAZAROLI: And would you inform us of any kind of off-the-record communication between the witness and anyone else in the room?

THE COURT REPORTER: Yes.

MR. MAZAROLI: Okay. Ms. Reporter, you have the caption I understand. We generally go by what's called usual stipulations. Do you know what that is?

THE COURT REPORTER: I will put down usual stipulations, and I will let you determine what that is.

MR. MAZAROLI: Okay.

BY MR. MAZAROLI:

Q. Mr. Hartmann, please state your full name

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 7

and your residence address for the record.

A. Okay. My name is Daniel Paul Hartmann. Resident address is 436 South 126 Street, Omaha, Nebraska, 68154.

Q. All right. Sir, what is your age?

A. I'm 42.

Q. Okay. And where are you sitting at the present time?

A. In a conference room at Union Pacific Center headquarter building.

Q. In Omaha, Nebraska?

A. In Omaha, Nebraska, that's correct.

Q. And do you personally have a domicile within 100 miles of New York City?

A. I do not.

Q. Okay. By whom are you presently employed?

A. Union Pacific Railroad.

Q. And how long have you been employed with Union Pacific Railroad?

A. For 12 years today actually.

Q. And Union Pacific Railroad is the same entity as Union Pacific Railroad Company, a defendant in this action, is that your employer?

A. My employer is Union Pacific Company. Railroad is part of that company, correct.

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 8

Q. Okay. Is Union Pacific Company the parent company for Union Pacific Railroad Company?

A. Yes, it is, to my knowledge.

Q. Okay. Unless otherwise indicated, reference herein to Union Pacific shall mean Union Pacific Railroad Company, the defendant in this action.

Would you briefly describe your employment history with Union Pacific since the start 12 years ago?

A. Certainly. I was hired on November 27th, 1995 in a position title of supervisor of operations. Actually was employed by the subsidiary company Union Pacific Distribution Services at that time.

I'm just referring to my transcript so I can give you the exact dates.

I was also then promoted to market analyst for Union Pacific Distribution Services in June of 1996. I was then changed positions to another department at Union Pacific Distribution Services as a market analyst. I was then promoted in August of '98 to a sales job for Union Pacific Distribution Services. Promoted again in November of 1999 to product manager international intermodal at which

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 9

time I moved from the subsidiary company to the railroad company.

And then during that period of time up to the present I've been in the same department, international intermodal, the entire time. Currently I'm business director international intermodal.

Q. So currently business director?

A. Yes, sir.

Q. International intermodal?

A. That's correct.

Q. Okay. Before being employed with Union Pacific Railroad, what was your prior employment?

A. I worked for ConAgra Company in Omaha.

Q. And what did you do at ConAgra?

A. I was in the customer service role working with several food service companies that were customers of ConAgra Foods.

Q. Okay. Did that involve transportation at all?

A. To some degree it did. I did arrange some trucking services and some basic rail services, but it was with several different railroads and trucking companies.

Q. Okay. What about your educational

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 10

background, would you give us an overview of that?

A. Sure. I have a Bachelor's of Science in business administration with -- from the University of Nebraska at Omaha. I graduated in 1990. And I have some limited credit hours I've obtained as a -- in my -- for my MBA program at University of Nebraska at Omaha.

Q. Okay. Your present position is business director of international intermodal; is that correct?

A. Yes, it is.

Q. And does that focus on certain accounts or are you across the board worldwide director of business for intermodal operations?

A. I actually am responsible for about roughly half of our business. I have one business manager that works for me that handles some of our accounts that are under my authority, and then I have direct responsibility as well for two accounts under my authority.

Q. Is that Costco and Evergreen?

A. That's correct.

Q. Do you have any direct responsibility for K Line?

A. No, I do not.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 11

Q. Where is your office on a day-to-day basis, is it at the Omaha headquarters?

A. Yes, it is.

Q. And do you have your own office?

A. I have a cubicle.

Q. Okay. And in preparation for today's deposition, did you review any documents to refresh your recollection of the events which are relevant to this court action?

A. Yes, I did.

Q. And what documents did you review?

A. I've reviewed Exhibits 1 through 11.

Q. All right.

A. Other than that, that's really the -- I think that covers everything I've reviewed.

Q. Okay. You just mentioned you were looking at a transcript I believe; is that some employment transcript?

A. That's correct.

Q. Okay. Your background does not include any scientific expertise with respect to operation of a railroad, does it?

A. No.

Q. Were you ever involved in investigations of derailments for Union Pacific?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 12

A. No.

Q. At the present time is that something you're involved in?

A. No, it's not.

Q. Okay. In other words, you don't go out to a derailment site and you did not go to the derailment site relevant to this court case, did you?

A. No, sir.

Q. Okay. What is the business of Union Pacific Railroad Company?

A. The business is to move cargo on our system from origin to destination by rail.

Q. What are your day-to-day duties with respect to intermodal operations?

A. The operations side I don't have a lot of involvement with since I'm on the marketing side, but I do, of course, work closely with our customer service center which does handle more of the operations side. I do get phone calls from time to time from customers asking questions that are probably operationally related, and I do get involved with train design, things like that if the need be. If a vessel rotation changes and they need a new train service, then I work with operations to

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 13

try to coordinate that to meet the needs of the customer.

Q. Okay. I mean, you're not out there making cold calls trying to get new customers, are you?

A. We do have customers that we don't do as much business with with -- as others, and so there are times where I will go and have, I guess, a cold call type of a meeting, but we don't go out and just knock on doors without having some prior history with the customer.

Q. With respect to what you do and your job position at Union Pacific, am I correct that there is a limited number of potential customers?

A. That's correct.

Q. And you're not -- you're not looking to have -- to start a direct relationship with Coca-Cola or ConAgra, are you, you're looking for the multimodal carriers; is that correct?

A. That's correct at this point, yes.

Q. And are most of such multimodal carriers foreign entities?

A. Most of them are foreign entities as far as their principal headquarters generally is located overseas, yes.

Q. Most of the work that -- or the services

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 14

that Union Pacific would provide to such customers would involve international shipments; is that correct?

A. International shipments would be the majority of the business. There are occasions where we move a domestic load to help a customer position a container back to the West Coast, for example.

Q. But most of the shipments, for example, for a customer such as the co-defendant, Evergreen Marine Corporation, would be international shipments; is that correct?

A. Most of them would be, yes.

Q. Okay. What is -- who is Evergreen Marine Corporation?

A. From my perspective, they are one of our international intermodal customers. We are a vendor of theirs to provide transportation services to move marine containers intermodally.

Q. Okay. And what does intermodal mean?

A. Intermodal is where we -- a customer brings us a container to one of our facilities or we load it at their facility. A 40-foot container generally, sometimes 20-foot container, sometimes 45-foot containers loaded on a railcar. Then we move the -- that railcar to one of our terminals via

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 15

train service where we unload it onto a chassis and then it's available for outgate by the customer.

Q. What does the word intermodal mean, does that mean -- well, what does it mean?

A. That means generally more than one mode of transportation.

Q. Such as ocean and rail?

A. From a railroad perspective it's more truck and rail.

Q. Okay. But with respect to your international customers such as Evergreen, would the word intermodal include ocean -- in the overall sense. I realize that UP, Union Pacific does not own ships, but when it's used in the context of a customer such as Evergreen Marine Corporation, would the word intermodal contemplate also ocean carriage?

A. I can't be certain of that. I don't know for sure how they would refer to a train move with us.

Q. Okay. Well, what is the business of Evergreen Marine Corporation?

A. To my knowledge, it's to transport cargo overseas from manufacturer to customer. It generally involves a voyage of some sort over the ocean, and in some cases it can be a local delivery

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 16

once it arrives at the port, or they may subcontract rail service or truck service to deliver it inland.

Q. Okay. So is it your understanding that Evergreen Marine Corporation provides multiple services, including ocean transport and rail transport to its customers?

A. That's correct.

Q. And you -- you and Union Pacific fit in in this multimodal scope by providing rail services; is that correct?

A. Yes.

Q. All right. How long have you been involved with Evergreen Marine Corporation personally?

A. Personally since about 2003.

Q. Okay. And how did that involvement begin, was there a predecessor whose job you took over?

A. That's correct.

Q. Okay. How long has Evergreen Marine Corporation been a customer of Union Pacific Railroad?

A. That I don't know.

Q. Okay. Did the relationship start in 2003?

A. No, it did not.

Q. Do you have any idea how long it had been

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 17

in existence before 2003?

A. I know it's been in existence at least ten years from now.

Q. Okay. You mentioned that you -- you have two accounts that you are directly responsible for, Costco and Evergreen; is that correct?

A. Yes, it is.

Q. Do you maintain a file for each of those companies?

A. I maintain several files for each one, yes.

Q. And what would those files be, what categories?

A. The categories would include contract negotiation material, it would include claims information, it could include some operational information, customer satisfaction survey information, those types of things.

Q. With respect to contract negotiation material, are you personally involved or have you been involved with contract negotiations with Evergreen?

A. Yes, I have.

Q. And how is that involvement, what exactly was your role?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)558-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 18

A. The way -- when we negotiate a contract, it tends to be several layers of marketing involved. Generally it's vice president, assistant vice president, and then the account manager which would be me in this case. So my involvement would be to help strategize what our pricing structure is going to be, what the terms and conditions of the contract are going to be, communicating that information with the customer. When we receive their response, counterproposal, if you will, then we will address that internally and then try to counter that and go through the negotiation process in that way.

Q. Okay. Do you get involved with the wording of contracts with customers such as Evergreen?

A. I do to some degree. And then it's always reviewed by our law department prior to submittal to the customer.

Q. Okay. Do the contracts, if you know, vary from customer to customer as far as substantive details, in other words, aside from the rates and volumes?

A. They vary to some degree between customers, yes.

Q. Okay. Are you involved in calculation of

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 19

freight charges for a customer such as Evergreen Marine Corporation?

A. Yes, I am.

Q. And how are freight charges negotiated, does UP call the shots or is the customer such as Evergreen insisting on a certain figure?

A. We negotiate back and forth so we -- it would be just like purchasing a vehicle in most cases where, you know, we have a price in mind, the customer may or may not agree to that price, they may offer us feedback, in which case we take that into consideration, and if we have what we would consider room in our pricing, then we may meet that customer's request to try to complete the negotiations.

Q. Okay. Have you been involved in drafting Evergreen Marine Corporation's bill of lading terms?

A. No, I have not.

Q. Does Evergreen Marine Corporation's bill of lading terms and conditions, is it relevant to what you do?

A. It's relevant in that our MITA agreement refers to that as far as the ocean bill of lading is part of our -- becomes part of our position if you will.

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 20

Q. You referred to MITA; is that what we have seen in this case as the Master Intermodal Transportation Agreement?

A. Yes, it is.

Q. What is that document?

A. That's a document of rules and guidelines that govern intermodal shipments on Union Pacific Railroad.

Q. Okay. Has it always been called Master Intermodal Transportation Agreement?

A. No, it has not.

Q. What was it called before it became what we will refer to as MITA, M-I-T-A?

A. Right. I believe it was called Circular 20.

Q. Okay. And was it referred to as anything else prior to being referred to as Circular 20?

A. Not to my knowledge, but I can't be certain.

Q. So from Circular 20 -- let me -- first there was Circular 20, and then there was the Master Intermodal Transportation Agreement, also known as MITA. Did anything come after MITA?

A. Today it's called MITA 2 or MITA 2.

Q. Okay. When did Circular 20 end?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 21

A. I can't be certain of that. I don't know.

Q. Do you know when MITA, M-I-T-A, began?

A. No, I don't know that. I don't know the exact date of that, no.

Q. All right. Do you know if there was a MITA 1 before MITA 2?

A. I don't know for certain.

Q. Okay. Do you know -- can you tell us the basic differences between what you refer to as Circular 20 and the Master Intermodal Transportation Agreement referred to as MITA?

A. From what I know, the document simply is -- evolves over time, and I don't believe there was a major change from Circular 20 to MITA. I believe that was just a name change that we did internally.

Q. Okay. Was there a major substantive change from Master Intermodal Transportation Agreement, or MITA, to MITA 2?

A. Not to my knowledge.

MR. MAZAROLI: Ms. Reporter, are you getting that; that's M-I-T-A?

THE COURT REPORTER: Yes, I am.

BY MR. MAZAROLI:

Q. Not to your knowledge?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 22

A. No.
Q. And you think that was just a name change as well?
A. I think so.
Q. Was the name change done in coordination with Evergreen or did Union Pacific do it on its own?
A. No, that was just done independently.
Q. By Union Pacific?
A. Correct.
Q. In other words, Union Pacific doesn't need Evergreen's permission to change Circular 20 or MITA?
A. That's correct.
Q. Does Union Pacific send a notice to a customer such as Evergreen for each and every change in rules such as Circular 20 or MITA or MITA 2?
A. I don't believe a notification is issued. We make a change and then it is updated on our website for customers to access.
Q. Okay. And customers would be intermodal carriers such as Evergreen; is that correct?
A. That would be one base of our customers, yes.
Q. Okay. What was the other base of your

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 23

customer?
MR. HASIAK: David, just for clarification, you're asking this question of him about our current practices or the practices in place at the time?
MR. MAZAROLI: Good point. I will try and clear that up. Thank you.
MR. HASIAK: Okay.
BY MR. MAZAROLI:
Q. Did your -- the procedure that you have discussed concerning changes that might be made from time to time in Circular 20, MITA or MITA 2 type contracts, did that also -- was that also how it was done in March and April of 2006?
A. I can't be certain. I believe that's true.
Q. Okay. What was your position with Union Pacific in March and April of 2006?
A. That was -- I was a business director intermodal at that time, my current position.
Q. All right. And you had the same day-to-day duties you just described; is that right?
A. Yes, sir.
Q. Okay. And Evergreen was one of your direct responsibilities?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 24

A. Yes.
Q. Okay. In April and March and April of 2006, which we'll refer to as the spring of 2006, do you recall if there was any change in title that came into effect at about that time with respect to these Circular 20 or MITA type contracts -- not contracts, rules you referred to?
A. Not that I'm aware of, no.
Q. With respect to your day-to-day activities with Evergreen Marine Corporation, who do you communicate with in the United States?
A. I communicate with their U.S. headquarters in Jersey City, New Jersey.
Q. And is there any individual in particular?
A. There are several. The main individual that I work with is a gentleman by the name of Patrick Chen.
Q. C-H-E-N?
A. That's correct.
Q. What is his title?
A. I don't know his title. Well, he's -- I do know his title, I take that back. He's a junior vice president, but I don't know of what division. I think it's intermodal logistics.
Q. And anyone else that comes to mind, sir?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 25

A. I work with Peter Wan, W-A-N, and he's an assistant manager in the logistics division. I work with Herbert Lin, L-I-N. He's a vice president.
Q. All right.
A. And I work with Roger Chern, C-H-E-R-N.
Q. Okay. What type of discussions do you have with these type of people; is it mostly sales, marketing, customer service type issues?
A. Yes, it is.
Q. Does it ever involve claims?
A. Very rarely.
Q. Rarely. Okay.
A. Yes.
Q. During the course of your employment with Union Pacific, have there been any major casualties, such as derailments, involving Evergreen Marine Corporation shipments?
A. There have been some, yes.
Q. Okay. Do you know them by name of derailment or could you just give us a brief rundown?
A. I don't have that information.
Q. All right. The present case involves a derailment on or about April 5th, 2006 at Higginson, Arkansas; are you aware of that?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 26

A. Yes, I am.
Q. And were you involved in any way with that derailment before today's deposition?
A. The only involvement I had was I was copied in on some of the correspondence between our Palestine claims office and Evergreen in regards to the condition of the containers that they had that were involved in the derailment.
Q. Okay. And you were copied in. Who were those communications from at UP?
A. Those were from our claims office in Palestine.
Q. Okay. And who were they addressed to at Evergreen?
A. I know that they were addressed to Patrick Chen and Peter Wan, among others, and I can't be certain who else would have been on that at that time.
Q. Okay. Now, that has to do with damage to equipment; is that correct?
A. It pertains -- I believe it's in one of the exhibits is an example of what I was partial to.
Q. Okay. I see what you mean.
A. Okay.
Q. Did you receive or transmit any e-mails

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 27

with text concerning the Higginson, Arkansas derailment?
A. Not that I can recall, no.
Q. Okay. Were you copied in on any communications that discussed the cause of the derailment?
A. No, I was not.
Q. Did Evergreen present, to your knowledge, any claims to Union Pacific Railroad for damage to equipment?
A. Not to my knowledge because I'm not involved in that side of it.
Q. Okay. Did Evergreen ask your assistance in terms of any particular customer's cargo that was involved in this Higginson, Arkansas derailment?
A. No, sir.
Q. Okay. And you at no time attended the derailment site; is that correct?
A. That's correct.
Q. And you did not personally see any of the cargo?
A. No, I did not.
Q. Is it your understanding that with respect to the Higginson, Arkansas derailment -- I withdraw that question.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 28

The derailment at Higginson, Arkansas, did that involve a Union Pacific train?
A. Yes, it did.
Q. How many Union Pacific trains?
A. One for sure. I don't recall the detail.
Q. Okay. The train that derailed, was that train ITIMNX 01?
A. Let me double check my documents real quick.
Yes, sir.
Q. Do you know how many intermodal containers were involved in the derailment; in other words, how many containers were damaged or upended in some way?
MR. HASIAK: And, David, just so we're clear, you're talking containers, not railcars or --
MR. MAZAROLI: Thank you, Ray, I'll clear that up.
MR. HASIAK: Okay.
THE WITNESS: What my understanding is is the Exhibit 11 is a document that would show all of the containers that were involved in the derailment.
MR. MAZAROLI: Okay. Let's look at that.
Reporter, would you mark Exhibit 11, that's two pages Bates No. A 00026 and A 00027.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 29

(Exhibit No. 11 marked for identification.)
BY MR. MAZAROLI:
Q. Mr. Hartmann, can you identify Exhibit 11?
A. Yes, sir. It's a derailment master spreadsheet identifying the containers involved with the derailment of the ITIMNX 01.
Q. Who prepared this document?
A. The claims office in Palestine, Texas.
Q. That's the claims office of Union Pacific?
A. Yes, sir.
Q. Okay. Do you know when it was prepared?
A. I do not know the exact date. It would be shortly after the derailment occurred.
Q. Okay. I notice on Exhibit 11 the shipper is shown as Evergreen throughout. Was train ITIMNX 01 a dedicated Evergreen train?
A. Yes, it was.
Q. What does that mean?
A. That means that the train originated -- well, was loaded and originated at Evergreen's Marine terminal in Los Angeles, California.
Q. Okay.
A. And it would carry predominantly Evergreen cargo. There could be occasions where we may put

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 30

other customers' cargo on there if there was enough room, but it tends to be primarily Evergreen when it's a train coming from the marine terminal.

MR. MAZAROLI: All right. Ms. Reporter, would you mark Exhibit 10, please.

(Exhibit No. 10 marked for identification.)

BY MR. MAZAROLI:

Q. Mr. Hartmann, can you identify Exhibit No. 10, which is a document paginated 1 through 35 and entitled Union Pacific Railroad Company train list, Issue No. 1?

A. Yes, I can.

Q. What is this?

A. This is a Union Pacific train consist showing the makeup of the train, designated train.

Q. What is the purpose of this document?

A. The purpose -- well, it's a multi purpose document I'm sure, but it basically identifies everything associated with the train as far as locomotives, cars, containers, types of things of that sort. It's an identifying document of that train.

Q. Am I correct that just scanning through the 35 pages, each of the shipments appears to be

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 31

identified as an Evergreen shipment?

A. Doing a quick scan, yes, I would agree, yes, sir.

Q. Now, you mentioned railcars and you mentioned containers, and I note that Exhibit No. 10 also refers to locomotives.

A. That's correct.

Q. Page 2, for example.

Were the containers Union Pacific equipment?

A. No, they are not.

Q. Whose equipment was it?

A. Those would be Evergreen Marine's container -- or equipment.

Q. Okay. Very good. And the railcars, were those Union Pacific's equipment?

A. Those are leased by Union Pacific in most cases.

Q. All right.

A. Yes.

Q. And what about the locomotives?

A. Those are owned or leased by Union Pacific.

Q. Am I correct that the container numbers referred to on the consist were intermodal units; is

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 32

that correct?

A. They would be intermodal containers, intermodal units, yes.

Q. And they originated someplace overseas?

A. Yes.

Q. Okay. So they were international shipments?

A. Yes.

Q. Okay. And while this train consist that's marked as Exhibit 10 relates to the makeup of the train which moved along the Union Pacific rail route in question, the shipments, the Evergreen shipments in question started someplace overseas; is that correct?

A. That's correct.

Q. Who loaded the containers onto the railcars for this train identified in Exhibit 10?

A. That would be Evergreen's marine terminal.

Q. Okay. In Los Angeles, sir?

A. Yes, sir.

Q. And does Evergreen do that on its own or is it in coordination with Union Pacific?

A. They do that on their own at the terminal.

Q. Okay. Is Union Pacific present when the containers are loaded onto the railcars?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 33

A. No, sir.

Q. Does Union Pacific verify the load plan for a train such as this one?

MR. GUTTERMAN: Are you talking about at the time of the incident?

MR. MAZAROLI: In general procedures.

THE WITNESS: I can't be certain of that. I do know we -- we do air tests, things of that sort, before the train is departed.

BY MR. MAZAROLI:

Q. Okay. In connection with a intermodal train movement such as train ITIMNX 01, who decides what intermodal container goes in which car?

A. The -- in this case the marine terminal would decide that.

Q. And who is the marine terminal acting for?

A. For Evergreen Marine.

Q. Okay. Who checks the weight of intermodal containers which are loaded on a train such as ITIMNX 01?

MR. HASIAK: Do you know?

THE WITNESS: I don't know, no.

BY MR. MAZAROLI:

Q. Do you know the procedure for inspecting containers which are loaded on a Union Pacific train

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 34

such as ITIMNX 01?

A. No, I do not.

Q. Does a dedicated train such as this one referred to in Exhibit 10 move at the direction of your customer Evergreen?

MR. GUTTERMAN: Are you talking about routing?

BY MR. MAZAROLI:

Q. One thing would be routing, the other thing would be speed. What about with respect to routing, sir?

A. Union Pacific would be responsible for routing the train to destination. Evergreen would not have any input in that.

Q. What input would Evergreen have with respect to the movement of a train such as ITIMNX 01?

A. They would have involvement as to when they would release the train to us at the LA terminal when the train is ready, and then they would call us to depart the train.

Q. Referring to Exhibit 10, and starting on Page 4, there is reference to XG077; what is that, sir?

A. I'm sorry, can you repeat that, please?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 35

Q. XG077 is referred to on Page 4 and the following pages.

A. On Exhibit 10?

Q. Yes, sir.

MR. GUTTERMAN: The bottom of each of the pages you'll see many pages where it mentions XG077.

THE WITNESS: Okay.

BY MR. MAZAROLI:

Q. Do you know what that refers to?

A. I believe that's a CIRC seven code designating a location on the railroad.

Q. Okay. And what does TOFC mean?

A. That's an acronym for trailer on flatcar.

Q. Okay. And what about LP1A?

A. I do not know what that is.

Q. Okay. And "do not hump," what does that mean?

A. Well, that's a designation that this train is not to go into a hump yard to be sorted or switched.

Q. What is a hump yard?

A. A hump yard is a gravity -- it's where you take a car or a train -- or train into a yard and they sort it by gravity so it will -- they sort it into various tracks, it's on a hill and it goes by

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 36

gravity into another track or into another train so they can build a train, sort a train. We do not hump intermodal trains by nature.

Q. Why not?

A. Because it can be damaging to goods, the jarring could be damaging to goods.

Q. When a train such as the train identified in Exhibit 10 is loaded by Evergreen, are the containers opened?

A. I don't know.

Q. Does Union Pacific ever open containers, intermodal containers?

A. Yes.

Q. When is that?

A. When they do a spot inspection, random inspection they may open a container.

Q. How often is that done as a matter of procedure?

A. I don't know.

Q. Is it your testimony that Union Pacific can do that whenever it wants?

A. Yes, sir.

Q. Okay. Exhibit 10 is a document generated by Union Pacific; is that correct?

A. Yes, it is.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 37

Q. A copy given to Evergreen, your customer?

A. I don't know if a copy was given to Evergreen.

Q. Sir, referring back to Exhibit 11, this court case involves shipments carried in containers TRIU 5559381 and container UGMU 8062288; are you aware of that?

A. Yes.

Q. And do you know what was contained inside those containers when it was carried on Union Pacific's train number ITIMNX 01?

A. The commodity description is auto parts.

Q. And do you know who the owner of the auto parts was?

A. I do not.

Q. Do you know who ASMO Limited is?

A. No, sir, I do not.

Q. Do you know who ASMO North Carolina is?

A. No.

Q. Does Union Pacific as a matter of procedure at present get involved with Evergreen's direct customers?

A. No, we do not.

Q. Union Pacific deals with Evergreen and Evergreen deals with its customers; isn't that

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 38

correct?

A. Yes, sir.

Q. And that was true in the spring of 2006 as well?

A. Yes, it is.

Q. Back to Exhibit 11, am I correct that containers UGMU 806228 is mentioned on the first page of the spreadsheet on line -- the second line 90?

A. Yes, sir.

Q. So that container was one of the containers damaged in the derailment?

A. Yes, sir.

Q. Okay. And on that line on Page 1 of Exhibit 11, the fourth column from the right it states "on side"; what does that mean?

A. I believe those are comments that were input by the claims office as a result of the inspection at the derailment site.

Q. Okay.

A. So my understanding is that that means the container was on its side at the site.

Q. So as a result of the derailment the container turned over or somehow ended up on its side?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 39

A. That would be my understanding, yes.

Q. And the next column to the right there is reference to another container number, EMCU 943524 under the column entitled transfer container. Do you have an understanding as to why that container is mentioned?

A. That would be -- yes. That's because they would have taken the goods from the container that was damaged and loaded those into this container for furtherance to destination.

Q. All right. So the auto parts that were originally carried in container UGMU 806228 were transloaded into a container EMCU 943524; is that correct?

A. That's correct.

Q. And who did that?

A. I don't know who did that.

Q. Okay. Is it your understanding that it was done by or on behalf of the railroad, Union Pacific?

A. That's my understanding, yes.

Q. And that's part of the what we call post derailment procedure; isn't that correct?

A. I would agree, yes.

Q. All right. Thank you. The second page of

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 40

Exhibit 11, sir, in slot -- the second slot 96, all the way to the left there is reference to container TRIU 555938; do you see that?

A. Yes, sir.

Q. Okay. And then again in the column for that container, fourth column from the right, it also states it's on side, door split open. Does that mean that this container as well as a result of the derailment was turned over on its side?

A. That would be my understanding.

Q. And the next column to the right for container TRIU 555938 refers to a transload container EMCU 100285; is that correct?

A. Yes, sir.

Q. So the auto parts in the TRIU container were also transloaded into a replacement container; is that correct?

A. That's correct.

Q. And your understanding is that would have been done by or on behalf of Union Pacific?

A. Yes, sir.

Q. Okay. And in connection with both of the containers that we -- which are the subject of this court case, is it your understanding that the contents of the original container were physically

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 41

removed from the derailment damaged containers into replacement containers for on carriage?

A. That would be my understanding, yes.

Q. And that would involve physically handling the cargo from the damaged container and placing it inside the replacement container?

A. Yes, it would.

Q. Now, referring to Exhibit 10, I'll guide you through this, at Page 27 of Exhibit 10, top third, there is reference to container UGMU 806228.

A. Yes, sir.

Q. Okay. And that is one of the two containers of auto parts which are the subject of this court case; is that correct?

A. That's correct.

Q. And that container, according to Exhibit 10, the consist, was carried on train ITIMNX 01?

A. That's correct.

Q. That train derailed at Higginson, Arkansas; is that correct?

A. Yes, sir.

Q. Now, Page 29 of Exhibit 10, sir, second line from the top --

A. Yes.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 42

Q. -- there is reference to container TRIU 555938; do you see that?
A. Yes, sir.
Q. And that is the second container of auto parts which is the subject of this lawsuit; is that correct?
A. That's correct.
Q. And according to this consist we've marked as Exhibit 10, that shipment of auto parts was also carried on train ITIMNX 01; is that correct?
A. Yes, it is.
Q. And train ITIMNX 01 derailed at Higginson, Arkansas; is that correct?
A. That's correct.
Q. And both of those two shipments of auto parts sustained some form of damage as a result of the derailment; is that your understanding?
A. Yes, sir.
Q. Is this -- Exhibit 10, it's a regular business record of Union Pacific Railroad?
A. It's more used in our operations side.
Q. But a consist is something that's generated when there is such an intermodal train as this one?
A. Yes, sir.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 43

Q. How many cars did train ITIMNX 01 have at the time of the derailment; can you tell from Exhibit 10, sir?
A. I cannot tell, no.
Q. Okay. How many containers was it carrying? And I direct your attention to Page 32.
A. Yes.
Q. There is some figures there.
A. Right.
Q. It says at the bottom, summary of car types, 97 double stack and one spine.
A. Right.
Q. What is a double stack car?
A. Double stack car is an intermodal car that allows for loading of two containers, one on top of another.
Q. Does each car carry a total of two 40-foot units, one stacked on top of the other?
A. That's a -- that would be a perfect what we consider slot utilization, yes, but it could also carry two, 20-foot containers on the bottom well and one 40-foot container on the top.
Q. All right. Got you. And how many containers were -- intermodal containers were carried on this train, can you tell from this?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 44

A. Well, I know the information is in here but I'm not real familiar with it. I believe it to be 147. I'm just referring to Page 32. The total says 147 at the top. I believe that's a container count.
Q. I see. Thank you. And that would be Evergreen intermodal containers?
A. Based on my scan of this document, yeah, if they are all Evergreen, yes.
Q. You are aware that Evergreen provides transportation services for companies in the automotive industry in the United States; are you aware of that?
A. Yes, sir.
Q. And how are you aware of that?
A. I'm aware of it through various communications I've had, phone calls, things like that.
Q. Okay. Does the fact that Evergreen has customers in the automotive industry come into play with respect to scheduling purposes for a dedicated Evergreen train?
A. We don't do anything special because of the fact that they carry auto parts unless they would ask us to do something.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 45

Q. In other words, the concept of just in time inventory for automotive assemblers or manufacturers, such as Toyota, for example, does that synchronize just in time inventory procedure relevant for Union Pacific's scheduling purposes?
A. If Evergreen asked us for a specific schedule to try to obtain or design a specific schedule to assist them in that effort, then we would make our best effort to do so.
Q. Would you speed up a train because a ship is late?
A. My -- I believe that answer to be no.
Q. All right. Referring to Page 30 of Exhibit 10, at the top there is reference to high value loads?
A. Yes, sir.
Q. What does that refer to?
A. Well, I can't be certain on the consist. That's the first time I've seen that. I can tell you what I know of a program we have that handles high value loads if that would be helpful.
Q. No, I was -- what I was focusing on was who would provide the information for the consist as to whether or not they are high value loads?
A. I can't be certain of that.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 46

Q. Okay. What information does Evergreen give Union Pacific before a train such as ITIMNX 01 is assembled?

A. They would give us information required by our MITA rules on a rail waybill.

Q. Okay. What is a rail waybill?

A. That's a -- I would describe it as a set of -- a set of information that is submitted by the customer to us designating container number, commodity code, various pieces of information that instruct us on what to do with that container.

Q. Okay.

A. How to move that container.

MR. MAZAROLI: Ms. Reporter, would you mark Exhibit 6 and Exhibit 7, each of which are two pages.

(Exhibit Nos. 6 - 7 marked for identification.)

BY MR. MAZAROLI:

Q. Mr. Hartmann, are you doing okay? If you ever want to take a break, tell us.

A. Thank you. I'm okay right now.

Q. Exhibit 6, can you identify that?

A. This is the first time I've seen this, so I'm not familiar with it, no.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 47

Q. What about Exhibit 7?

A. Same, I'm not aware of -- this is not a document I see in my day-to-day job.

Q. Can you identify what a -- the waybill you just mentioned looks like?

A. Well, we receive waybills from Evergreen via EDI --

Q. Okay.

A. -- a transmittal, so that's -- I've seen what that looks like. I believe this is a rail waybill.

MR. HASIAK: You believe or you know it?

THE WITNESS: I don't know that for sure.

BY MR. MAZAROLI:

Q. All right, sir, if you don't know.

Exhibit 6 pertains to container TRIU 555938, and Exhibit 7 contains -- pertains to container UGMU 806228; do you see that?

A. Yes.

Q. And those are the two shipments of auto parts we were previously discussing which are the subject of this court case?

A. Correct.

Q. Is it your understanding that Union Pacific generated waybills for these two shipments?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 48

A. Yes.

MR. MAZAROLI: Okay. Let's mark as Exhibit 8 and Exhibit 9 the two documents so designated, Ms. Reporter.

(Exhibit Nos. 8 and 9 marked for identification.)

BY MR. MAZAROLI:

Q. Mr. Hartmann, can you identify Exhibit No. 8, Bates No. A00131?

A. Yes. This is a -- what we call an online cycle inquiry.

Q. And what about Exhibit 9, which is Bates No. A00128; is that also an online cycle inquiry?

A. Yes, sir.

Q. And would you tell us what these documents are?

A. These documents are what we consider a trace or the movement record of a container on the railroad.

Q. I see. It's kind of a tracking record?

A. Yes, it is.

Q. And am I correct that Exhibit 8 refers to container TRIU 555938?

A. Yes, sir.

Q. And it refers to a WB NUMB 530157?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 49

A. Right.

Q. What --

A. That's abbreviation for waybill number.

Q. So that's a further indication that a waybill was generated for container TRIU 555938?

A. Yes.

Q. WB date; is that the waybill date?

A. Yes, sir.

Q. That's March 29, 2006?

A. Uh-huh.

MR. HASIAK: What did you say?

THE WITNESS: Yes.

BY MR. MAZAROLI:

Q. Okay. And Exhibit 9, that's the same similar information, a waybill number 530159, refer to for container UGMU 806228?

A. Yes.

Q. And it also has a WB date of 03/29/06?

A. That's correct.

MR. HASIAK: David?

MR. MAZAROLI: Yes, sir.

MR. HASIAK: I'm not the court reporter, but you're going through these numbers pretty fast.

MR. MAZAROLI: I'm sorry, Ms. Reporter.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 50

BY MR. MAZAROLI:

Q. This is -- Exhibits 8 and 9 are electronic document, electronic -- printouts of electronic data; is that correct?

A. Yes, sir.

Q. So they stay in the EDI system electronically; is that correct?

A. These documents are not part of our EDI system. These are electronic documents in another Union Pacific system that keeps track of that information.

Q. All right. But they are in the normal course stored electronically and can be viewed on a computer screen?

A. Yes, sir.

Q. Are they usually printed out if all goes as planned and there is no damage or derailment?

A. Generally not, no.

Q. And is that the same with respect to a waybill?

A. That's correct.

Q. Or is the waybill is generated electronically; is that correct?

A. I can't be certain as to what the -- how that -- what that process is. I know we receive the

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 51

waybill electronically from Evergreen and it's kept electronically in our system.

Q. All right. You don't know what such a waybill looks like?

A. An EDI version of the waybill?

Q. Yes, sir.

A. I do know what that looks like, yes.

Q. Okay. What information would be on it?

A. There would be the container number, generally the weight, the seal number, the pricing document that we are to refer to when pricing the container, origin, destination. Those are probably the main components.

Q. All right. And that is a waybill which governs the entire rail transportation during the domestic leg of the multimodal transport; is that correct?

A. Those are the instructions that we receive from the customer telling us what their wishes are with that container to move intermodally, yes.

Q. And the customer in the case of Exhibits 8 and 9 and the two containers we've been discussing would be Evergreen Marine Corporation?

A. Yes, sir.

Q. This waybill that -- electronic waybill

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 52

you just described, that's not something that's issued to the manufacturer of cargo carried in the container, is it?

A. Union Pacific would not issue that, no.

Q. Okay. But it is a Union Pacific document?

A. The internal waybill that we generate is an internal document, yes.

Q. So in this case the Union Pacific electronic waybill covered the intended rail carriage from California to North Carolina; is that correct?

MR. HASIAK: David, I'm sorry, I'm just not clear on your question. When you say "cover," do you mean it set up the route?

MR. MAZAROLI: Well, I mean it pertained to.

MR. HASIAK: Pertained in?

MR. MAZAROLI: In other words, it was not for a segment of the rail transportation, the electronic waybill is generated by Union Pacific covered the entire rail transportation.

MR. HASIAK: Covered the route of the transportation?

MR. MAZAROLI: In other words, it was a document that pertained to the time Evergreen loads

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 53

the containers onto the railcars to the time the containers are delivered -- are unloaded from the railcar at destination.

MR. HASIAK: I'm a little unclear and a little uneasy because I think what the testimony has been so far is that --

MR. MAZAROLI: Let's just say you have an objection to the form, right?

MR. HASIAK: Okay.

MR. MAZAROLI: Okay. Let me see if I can rephrase it.

BY MR. MAZAROLI:

Q. Referring to Exhibits 8 and 9, the online cycle inquiry, sir, what is the R -- well, withdraw that.

Okay. Let's move on.

MR. MAZAROLI: Ms. Reporter, would you mark Exhibits 1 and 2, both -- one, two and -- one and two, both under the Evergreen logo.

(Exhibit Nos. 1 - 2 marked for identification.)

BY MR. MAZAROLI:

Q. Okay. Mr. Hartmann, can you identify the document that's been marked as Exhibit 1?

A. Identified as an Evergreen Marine Sea

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 54

Waybill.

Q. Okay. And it's dated March 14, 2006 on the bottom; is that correct, in the little stamp, circle stamp?

A. Oh, yes, yes, sir.

Q. Okay. And have you seen this before?

A. I've seen this only in that it was given to me as an exhibit for this deposition.

Q. Okay. But in connection with your job experience, your day-to-day activities, you've seen an Evergreen Sea Waybill before, haven't you?

A. We do not get this information, no.

Q. So in the normal course of Union Pacific's business, you do not receive when handling -- when providing rail transportation services for Evergreen Marine Corporation shipments, you do not see the Evergreen bill of lading?

MR. HASIAK: Let me object to the form. When you say "you," do you mean you, Dan Hartmann, or you, Union Pacific?

BY MR. MAZAROLI:

Q. All right. Well, first you, Dan Hartmann.

A. No.

Q. Okay. To your knowledge, does anyone at Union Pacific receive such Evergreen Sea Waybills

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 55

during the course of providing transportation services for such shipments?

A. Not to my knowledge.

Q. So the Evergreen Sea Waybill for a particular intermodal shipment is not relevant to Union Pacific?

MR. HASIAK: Dave, come on. I'll object to form and foundation.

BY MR. MAZAROLI:

Q. Okay. Have you seen -- you are familiar with what a bill of lading is for multimodal transportation, aren't you?

A. Yes.

Q. Okay. And you've seen other bills of lading not necessarily Evergreen; is that correct?

A. Yes.

Q. Okay. Now, Exhibit 1, for example, do you see the top left as identification of a shipper, a consignee and a notifying party?

A. Yes.

Q. The shipper, ASMO Limited, do you know who that is?

A. No, I do not.

Q. The consignee is ASMO North Carolina; do you know who that is?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 56

A. No, sir.

Q. The place of receipt in Exhibit 1 is referred to as Shimizu, CY, and the port of loading is referred to as Shimizu, Japan; do you see that?

A. Yes.

Q. And there is a port of discharge shown as Los Angeles, California; do you see that, sir?

A. Yes, I do.

Q. And finally a place of delivery in Statesville, North Carolina?

A. Yes.

Q. Is it your understanding -- there is also an ocean vessel, Ever Union.

Looking at this document, Exhibit 1, is it your understanding that with respect to the description contained herein this was what we call a through bill of lading?

MR. HASIAK: I object to foundation. He's told you he's never seen this document before.

MR. MAZAROLI: And he's also said he's seen other documents in the course of his duties.

BY MR. MAZAROLI:

Q. Do you know what a through bill of lading is, sir?

A. We -- I know what a through bill is.

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 57

Q. What is that?

A. It's a bill that we receive from a shipper that asks us to take a container at origin and deliver it to a carrier. In most cases it's an eastern rail carrier for continuance to the final destination.

Q. But you're not familiar with whatever a multimodal through bill of lading would be?

A. I'm not familiar with that, no.

Q. With respect to the shipments we have been discussing, the shipment of auto parts carried in containers which are also identified on Exhibit 1, is it your understanding that those shipments moved in multiple modes of transportation, in other words, ocean and rail carriage?

A. Yes.

Q. Okay. And how do you know that?

A. Because it was loaded at the marine terminal in Los Angeles off of a vessel.

Q. And how do you know that?

A. We received billing to move it from their marine terminal.

Q. Okay. So you're familiar based on your normal course of activities with Evergreen that when it has multimodal shipments that you're

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 58

transporting, they usually involve an ocean leg either before Union Pacific carries the shipment or after Union Pacific carries the shipment; is that correct?

A. Usually, yes.

Q. Okay. And the shipments of auto parts carried in containers TRIU 5559381 and UGMU 8062288 moved aboard an ocean vessel before they reached the marine terminal at Los Angeles; is that correct?

A. That's what I would -- I would agree, yes.

Q. Okay. And at Los Angeles, California the shipment was -- the shipments referred to in Exhibit 1, the two containers we've been discussing, was then transferred from an Evergreen ship to Union Pacific for rail carriage to Statesville, North Carolina; is that correct?

A. It was -- we received instruction to move it from Los Angeles to Memphis, Tennessee.

Q. Okay.

A. And then interchange it to the Norfolk Southern, and then they would carry it to, I believe, Charlotte, North Carolina.

Q. And where does the derailment occur?

A. In Arkansas, Higgins --

Q. All right.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 59

A. Higginson.

Q. And that was for the final delivery in North Carolina?

A. Final delivery, yes, in North Carolina.

Q. Okay. Did Union Pacific bill Evergreen for the entire rail transport from Los Angeles to North Carolina for the two subject shipments?

A. No.

Q. Why not?

A. Because international -- our rules internally are that we bill customers for the portion of the movement that we are responsible for, which would be from Los Angeles to Memphis.

Q. Okay. And who bills the rest?

A. The Norfolk Southern would have billed the second piece.

Q. Is that done in any particular document?

A. Can you restate that question, I'm not sure I understand that?

Q. Does Norfolk Southern send a bill to Evergreen directly?

A. I can't -- I can't answer that.

Q. Okay. But the train that transported the load was still a Union Pacific train; is that correct?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 60

A. That transferred the load to Memphis?

Q. Yeah. I mean, it was a Union Pacific locomotive?

A. To Memphis, yes.

Q. For the benefit of the Court, the derailment occurred before the shipment reached Memphis; is that correct?

A. That's correct.

Q. Okay. So the derailment in question happened while it was being carried by Union Pacific?

A. That's correct.

Q. Sir, Exhibit 2 is before you. It is also a Sea Waybill, an Evergreen Sea Waybill for the two subject shipments which has certain additional information, and, as you can see, is not signed on the right. Do you see the -- have you seen this document before?

A. No.

Q. Okay. Exhibit 2, the bottom third there is freight and charges information; do you see that?

A. I do.

Q. Was Union Pacific involved in formulating those freight charges?

A. I'm not sure I understand.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 61

Q. Well -- go ahead, sir.

A. I can say that we are responsible for providing Evergreen what the intermodal rate is for the piece that we handle.

Q. Okay.

A. How that is incorporated into the Sea Waybill I can't -- I don't know.

Q. Okay. So, in other words, Union Pacific does not -- withdraw that.

Is it your understanding that Union Pacific bills Evergreen for the rail transport that Union Pacific provides, and Evergreen then bills its own customer, such as ASMO in this case?

A. That would be my understanding.

Q. Okay. So Union Pacific does not communicate its freight charges for the rail transport directly to Evergreen's customers, such as ASMO; is that correct?

A. That is correct.

MR. MAZAROLI: Would you mark Exhibit 2B, Ms. Reporter, which is Bates No. A00158 to A00171.

(Exhibit No. 2B marked for identification.)

BY MR. MAZAROLI:

Q. Sir, can you identify Exhibit 2B?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 62

A. It's the back of the Sea Waybill.
Q. And how do you know that?
A. I know that because of the -- some of the meetings we've had internally regarding the components of the exhibits.
Q. Okay. In other words, in preparation for today's deposition?
A. Correct.
Q. But other than in connection with this court case, can you identify this document?
A. No.
Q. Okay. This is not a document -- the Evergreen terms and conditions are not within your knowledge on a day-to-day basis; is that correct?
A. As a marketing representative of Union Pacific, no, they are not in -- I don't come into knowledge of this in my position.
Q. Okay. Do you know, does Union Pacific -- you mentioned that you have files for customers such as Evergreen, and one of those files includes contract negotiations. What contract negotiations were you referring to in that testimony?
A. I've negotiated contracts for Costco as well as Evergreen.
Q. What contract do you mean by that, is

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 63

there a title to it?
A. Yes.
Q. And what's it called?
A. Well, I negotiated the -- one of the exhibits in this testimony.
Q. Which one is that?
A. I negotiated the extension agreement.
Q. Okay.
A. Which is dated October 8 of 2003.
Q. All right.
A. I have some others, but I don't have those -- that information with me.
Q. And what are those others?
A. Like we negotiated a new contract with Evergreen in 2006 and a contract with Costco in 2006.
Q. When in 2006 with Evergreen?
A. The effective date is May 1st of 2006.
Q. Okay. The extension agreement you just referred to, are you referring to the addendum to a previously existing agreement?
A. Yes, sir.
Q. And what is the previously existing agreement?
A. The previous existing agreement is -- we

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 64

call it DER-UP-C-913-A.
Q. And what is that type of contract called?
A. It's an exempt rail transportation agreement.
MR. MAZAROLI: All right. Let's mark Exhibits 3 and 4, Ms. Reporter.
(Exhibit Nos. 3 - 4 marked for identification.)
BY MR. MAZAROLI:
Q. Can you identify Exhibit 3?
A. Yes, I can. Exempt rail transportation agreement between Evergreen America Corporation, Evergreen Marine Corporation, Lloyd Triestion, Hatsu Marine and Union Pacific Railroad Company.
Q. And it's Bates numbered A003 through A00016; is that correct?
A. That's correct.
Q. And what is Exhibit 4?
A. Exhibit 4 is the first addendum to exempt rail transportation agreement between Union Pacific and Evergreen. The purpose of that agreement is to amend the term.
Q. Okay. And were you involved in the negotiation of Exhibit 3?
A. No, sir.

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 65

Q. Is that because it was in effect before you took your present position?
A. That's correct.
Q. Exhibit 3 is basically an agreement between Union Pacific on one hand and the Evergreen companies on the other; is that correct?
A. That's correct.
Q. In Paragraph 1, the warranty includes a reference that the customer, Evergreen, controls the routing of the shipments covered under the agreement; do you see that?
A. Yes.
Q. What does that mean?
A. I don't know --
Q. Okay.
A. -- legally what that means.
Q. All right. And Exhibit 3, the scope of the services, it states in the first sentence, Railroad services provided hereunder shall be container double stack car and container conventional flatcar transportation and related operations.
What are those two categories?
A. Well, that just covers the car types that we would utilize to provide rail transportation

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.
(402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 66

services.

Q. Okay. In Paragraph 4, the third -- the third line -- the third subsection of that paragraph, international cargo.

A. Yes.

Q. It states, International cargo shall refer to cargo which has a point outside the continental U.S. -- United States as its ultimate point of origin or destination.

A. Yes.

Q. Okay. And that description would cover the shipments of auto parts carried in the two containers we have been discussing; is that correct?

A. That's correct.

Q. There is reference in Exhibit 3 to an Exhibit A, transportation rate.

A. Yes.

Q. Do you have that document with you?

A. I do.

Q. And you have it in the room?

A. I do, yes.

Q. How many pages is it?

A. One page.

MR. MAZAROLI: I called for production of that. I faxed, my office.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 67

MR. GUTTERMAN: I registered an objection as the rates are being -- considered to be confidential. It would also require approval of release of this information from Evergreen; is that correct?

THE WITNESS: Yes, it is.

MR. MAZAROLI: Okay. Why is that information confidential?

MR. HASIAK: Are you asking Barry?

MR. MAZAROLI: No, I'm asking the witness.

THE WITNESS: It's confidential to -- because we want to protect the market. We don't want the information being disclosed to the marketplace.

BY MR. MAZAROLI:

Q. Okay. In other words, you don't want your competitors to find out, for example?

A. That would be our primary concern, yes.

Q. Are these rates -- I mean, you said it's one page; is that correct?

A. Yes, sir.

Q. Does that cover the entire Union Pacific system insofar as Evergreen movements?

A. It covers the origin, destination pairs that Evergreen has asked for us to provide them

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 68

rates for.

Q. In other words, it covers the corridors that Evergreen is interested in?

A. That's correct.

Q. And is there a -- I'm not interested in the amounts so much as what it contains. Is there for each corridor a rate?

A. Yes, there is.

Q. And is there for each corridor a rate for a different type of shipment, or is there only one rate?

A. It is -- there are three types of rates. They are all considered international rates. They all pertain to what we call freight all kinds, F-A-K. We have eastbound loaded, westbound loaded, and westbound empty.

Q. Okay. Those are the three categories?

A. Yes, sir.

Q. And freight all kinds, I mean, that would include auto parts?

A. It would.

Q. Okay. As well as many other things; is that correct?

A. Right.

Q. Any other categories contained on that

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 69

Exhibit A?

A. No, sir.

Q. And when I say Exhibit A, I mean Exhibit A referred to in Deposition Exhibit 3.

So basically there are three categories of rates, one eastbound loaded, one westbound loaded and the other empties did you say?

A. Right.

Q. Okay. And there is no choice of rates offered to Evergreen within those three categories, is there?

MR. HASIAK: Do you understand the question?

THE WITNESS: Could you clarify that? I think I know what you're asking, but could you clarify that, please?

BY MR. MAZAROLI:

Q. I'm asking you just to describe what's on that document, the Exhibit B to Exhibit 3 -- Exhibit A to Exhibit 3.

A. For --

Q. The three categories you just described, eastbound loaded shipments, westbound loaded shipments and empty shipments, for the various corridors described therein, there is no other rate

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

described in that document, is there, for each of those categories?

A. No.

MR. MAZAROLI: Okay. Is there any reason we can't have that produced, Mr. Hasiak and Mr. Gutterman, without the prices? I'm not interested in the amounts.

MR. HASIAK: Yeah, I think we can confer internally, but if we just redacted the pricing amounts, I'm not sure there would be any problem with that.

MR. MAZAROLI: Okay. In other words, there is one price for each of those categories for each corridor; is that correct?

MR. HASIAK: It's a grid.

THE WITNESS: Yeah, if I could clarify. You know, for example, if you look at eastbound loaded, sir, there is a 20-foot rate.

BY MR. MAZAROLI:

Q. Right.

A. And there is a 40-foot, 45-foot rate.

Q. Okay.

A. Okay. So, for example, from Los Angeles to Chicago --

Q. Right.





A. -- you would have an eastbound -- you would have two loaded eastbound rates, one for 20 foot, one for 40/45, but that would be their only choice for a eastbound loaded rate from Los Angeles to Chicago.

Q. Okay. In other words, for a 40-foot container there would only be one rate stated in that schedule? A 40-foot container moving from Los Angeles to Memphis in April and May and -- March and April of 2006?

A. Correct.

Q. There would only be one rate designated on Exhibit B -- Exhibit A of Exhibit 3 for such an eastbound loaded 40-foot container?

A. That is correct.

MR. MAZAROLI: Okay. Yeah, I do call for production of that exhibit with the understanding that you will redact, for example, block out the amounts of the freight charges. I understand your concerns.

MR. HASIAK: As I indicated, we'll confer internally and I'll confirm that's okay. Right now I don't think there will be any problem, but for now the objection stands.

MR. MAZAROLI: Thank you.





Let me approach this from another way, Mr. Hartmann.

MR. HASIAK: While we're on this, why don't we take a ten minute break.

MR. MAZAROLI: Thank you.

(10:42 a.m. - Recess taken.)

BY MR. MAZAROLI:

Q. Does that Exhibit A referred to in Paragraph 4 of Deposition Exhibit 3 only refer to international intermodal shipments?

A. Yes.

Q. Okay. In other words, the transportation rates pertaining to the exempt rail transportation agreement do not apply to domestic shipments?

A. Correct.

Q. Okay. The rates are only for international shipments such as the shipments of auto parts that we -- which are the subject of this court case; is that correct?

A. Yes.

Q. All right. One moment. And is there a provision of the contract, the agreement that's marked as Deposition Exhibit 3 which refers to confidentiality of the transportation rates?

A. I don't know.





Q. Is it your understanding that Evergreen would not in the normal course send the list of transportation rates referred to in Paragraph 4 to its customers?

A. That's correct.

Q. Okay. I mean, is it your understanding that Evergreen bills its own customers for the transportation stage of multimodal transports, such as the shipments in question, at a higher rate than Union Pacific charges Evergreen?

A. I don't know.

Q. Do you understand Evergreen to be a for profit company?

A. Yes.

Q. So it would not be unusual for Evergreen to make a profit on the transportation services it bills its customers?

MR. GUTTERMAN: Objection as to form and relevancy.

BY MR. MAZAROLI:

Q. Is that correct, sir?

A. It's not unreasonable.

Q. No. I mean, let's -- I'm not trying to be argumentative, but Union Pacific is in the business of providing transportation services for a profit;

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 74

isn't that correct?

A. That's correct.

Q. Okay. And Evergreen provides transportation services to its customers, including the services which Union Pacific performs during the rail stage of international intermodal shipments; is that correct?

A. Yes.

MR. HASIAK: Mr. Mazaroli asked to know if anybody entered the room.

MR. MAZAROLI: Hi, Mr. Hasiak.

MR. HASIAK: Hi. I asked one of our law clerks if she was interested in listening into this deposition, so she's in -- she's currently in the room with us.

MR. MAZAROLI: All right. Let's just put her name on the record.

THE COURT REPORTER: Ma'am, what is your name, please.

MS. CIRONE: Liz Cirone, C-I-R-O-N-E.

BY MR. MAZAROLI:

Q. All right. Sir, when you negotiated -- you testified that Exhibit 4 is an extension of the agreement that we marked as Exhibit 3; is that correct?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 75

A. That's correct.

Q. You negotiated Exhibit 4?

A. Yes, sir.

Q. And Exhibit 4 essentially, other than as contained in the two pages marked as Exhibit 4, carries forward the terms of the agreement as stated in Exhibit 3; is that correct?

A. That's correct.

Q. Is there a -- the transportation rates referred to in Paragraph 4 of Exhibit 3, did that change when the first addendum to exempt rail transportation agreement marked as Exhibit 4 took effect?

MR. GUTTERMAN: Objection. There is absolutely no relevancy of the question, but he can go ahead and answer the question.

THE WITNESS: Exhibit 4 simply extended, like you said, the agreement, Exhibit B -- Exhibit 3 as it's stated. The rate document, Exhibit A, stayed intact.

BY MR. MAZAROLI:

Q. Okay. So the rate document, Exhibit A, that you and your counsel have indicated is confidential, that was the same at the time of the derailment in April of 2006; is that correct?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 76

A. The rate levels were different, but the structure of Exhibit A other than the rate levels stayed the same.

Q. Okay. So the structure in that you have the categories for loaded eastbound and loaded westbound and empty which varied only for the size of container that you described in detail previously was the same structure at the time of the derailment in question; is that correct?

A. That's correct.

Q. What do you have in front of you, the exhibit with transportation rates that was in effect after the addendum took effect or for the earlier agreement?

A. I have two versions. I have the version that was in the original agreement effective January 15th, 2002, and I have a version just with the rate levels that were in effect in April of 2006.

Q. You say the only difference between those two is the dollar amounts?

MR. HASIAK: I object to the form when you say these two.

MR. MAZAROLI: Well, those two schedules, two --

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 77

MR. HASIAK: They are two multi-page documents, so I'm not sure your question is clear.

MR. MAZAROLI: I thought the first one he referred to is one page; is that correct, Mr. Hartmann?

THE WITNESS: That's correct.

MR. HASIAK: The exhibit?

THE WITNESS: Exhibit A. Is it just Exhibit A you're referring to, sir?

MR. MAZAROLI: Yes, sir, the transportation rates.

MR. HASIAK: In Exhibit 3?

MR. MAZAROLI: Yes, referred to in Paragraph 4 of Exhibit 3.

MR. HASIAK: Which has how many pages?

THE WITNESS: One page.

MR. HASIAK: Exhibit 3?

MR. MAZAROLI: No, Exhibit 3 has multiple pages.

MR. HASIAK: My point finally.

MR. MAZAROLI: I'm referring to -- it's difficult since we don't --

MR. GUTTERMAN: Exhibit A to 3, to Exhibit 3.

MR. HASIAK: I was just looking for a

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 78

little clarity.

BY MR. MAZAROLI:

Q. How many pages are the transportation rate documents, Mr. Hartmann?

A. There is one page to Exhibit A which includes the rates.

MR. HASIAK: Why don't we just talk about the Bates number on the bottom right-hand corner and eliminate the confusion?

MR. MAZAROLI: The confusion is that you have a document that we don't have, Mr. Hasiak. I'm not referring to documents that we --

MR. HASIAK: Oh, this is the one we objected to the rates.

MR. MAZAROLI: Yes. I want to know how many pages each of the rate sheets that have not been produced.

MR. HASIAK: And the answer is the rate sheets are --

THE WITNESS: There is one rate sheet.

MR. HASIAK: On each agreement.

MR. MAZAROLI: On each agreement, and each one is one page?

THE WITNESS: Correct.

MR. MAZAROLI: Thank you. All right. We

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 79

would like production of both of those, and when you produce them with the redaction, please indicate which one pertains to Exhibit 3, exempt rail transportation agreement, and which one pertains to Deposition Exhibit 4, the first addendum to exempt rail transportation agreement.

MR. HASIAK: David, just to be clear, we're maintaining our objection. I told you we would discuss this internally.

MR. MAZAROLI: I understand.

MR. HASIAK: Well, the way you state that the record would tend to at least indicate that maybe we agreed to something we haven't agreed to yet.

MR. MAZAROLI: No, you're maintaining your objection, I'm maintaining my request.

MR. HASIAK: Okay.

MR. GUTTERMAN: So it's under advisement as to what we will do with this; is that correct, Ray?

MR. HASIAK: That's correct.

BY MR. MAZAROLI:

Q. Referring to Exhibit 3, Bates No. Page A00011.

A. Yes.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 80

Q. Paragraph B, loading, unloading?

A. Yes.

Q. The third sentence of Paragraph B of Paragraph 16 states, Railroad will not transport containers when the weight of the containers exceeds the railcar limitations.

What does that mean?

MR. HASIAK: If you know.

THE WITNESS: I don't know for certain, no.

BY MR. MAZAROLI:

Q. Okay. How is the weight of containers determined for Union Pacific Railroad's purposes in the context of this paragraph?

A. The customer submits the weight of the container in their waybill information.

Q. Okay.

A. And then we incorporate that into our load plan. And if -- if it meets the requirements or comes in under the weight limit, then we move the -- we move the car.

Q. Okay. What is a load plan?

A. A load plan is an instruction that the operating department uses to load out a train.

Q. And what is the substance of the

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 81

instructions, does it state which container goes where?

A. You're getting --

MR. HASIAK: David, No. 1, I think you're in an area where, you know, he's not from that department, and No. 2, what in the world does this have to do with this particular lawsuit as opposed to a different lawsuit that you're working on?

MR. MAZAROLI: Everything. It's in this contract. I don't know that this is in the other -- any other case.

MR. GUTTERMAN: It's the liability in this --

MR. MAZAROLI: Objection as to the form. I would rather not have speaking objections. Let me ask it another way, sir.

BY MR. MAZAROLI:

Q. Mr. Hartmann, is there a physical weighing of containers by Union Pacific Railroad before the containers are loaded onto a train?

A. No.

Q. Is there the capability of Union Pacific Railroad to weigh the content of railcars during the course of rail transportation?

A. I don't know.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 82

Q. Okay. Referring to Page A 00016 of Deposition Exhibit 3, it references a signing bonus of $500,000 to be paid to Evergreen America Corporation.
A. Yes.
Q. Was that signing bonus paid?
MR. GUTTERMAN: Objection as to relevance.
THE WITNESS: I don't know. Like I said, this contract was incorporated prior to my being on the position.
BY MR. MAZAROLI:
Q. Was there a signing bonus for the addendum to the exempt rail transportation agreement?
A. No, there was not.
Q. Sir, referring to Paragraph 3 of Exhibit 3, towards the bottom of that paragraph there is reference to Union Pacific Railroad Company Exempt Circular 20 series.
A. Yes.
Q. Was Exempt Circular 20 series in effect at the time of the derailment at Higginson, Arkansas?
A. I don't know that it was Exempt Circular 20 series or one of the successor issues --
Q. Okay.
A. -- i.e, MITA.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 83

Q. Do you know which was in effect on April 5th, 2006?
A. I don't know.
Q. Does Exhibit 3 -- you've seen Exhibit 3 before, haven't you, sir?
A. Yes.
Q. And in connection with your negotiation of the first addendum marked as Exhibit 4, you studied Exhibit 3, didn't you?
A. Yes.
Q. Does Exhibit 3 refer to a document entitled master intermodal transportation agreement?
A. No.
Q. Does Exhibit 4, the first addendum, refer to a document entitled master intermodal transportation agreement?
A. No.
MR. MAZAROLI: Ms. Reporter, would you mark Exhibit 5? It has Bates No. 7001 through 7109.
(Exhibit No. 5 marked for identification.)
BY MR. MAZAROLI:
Q. Mr. Hartmann, can you identify Exhibit 5?
A. Yes, I can.
Q. What is it?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 84

A. It's the Master Intermodal Transportation Agreement.
Q. Is it referred to by any other title?
A. Yes, it is. It's referred to by MITA or MITA 2-A.
Q. So what is this Exhibit 5, is it MITA or MITA 2-A as you would describe it in your day-to-day duties?
A. I would describe it as MITA.
Q. Having reviewed -- seen this document, does it refresh your recollection at all as to whether Circular 20 was in effect at the time of the derailment at Higginson, Arkansas or one of the MITA type rules documents?
A. Yeah, the bottom left of the MITA document shows issued February 22nd, 2006.
Q. And it also shows an effective date of March 1, 2006?
A. Right.
Q. So is it your understanding that the document marked as Exhibit 5 was in effect at the time of the derailment at Higginson, Arkansas on April 5th, 2006?
A. That's my understanding, yes.
Q. Were you involved in the drafting of this

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 85

document?
A. No, sir.
Q. What relevance, if any, does this document have to your day-to-day duties?
A. Very high level of relevance.
Q. Excuse me, sir?
A. A very high level of relevance.
Q. Okay. Is it relevant at all to Union Pacific's relationship with Evergreen Marine Corporation?
A. I don't understand that question.
Q. Referring to Page 7010 of Exhibit 5 --
A. Yes.
Q. Paragraph O states, Shipper agrees to notify any and all parties involved in this transaction of all the provisions, restrictions, and limitations contained in this MITA.
A. Yes.
Q. Who does the word shipper refer to?
A. Shipper is the party tendering a rail waybill to Union Pacific.
Q. And that would be -- in the context of this court case, would that be Evergreen?
A. That's correct.
Q. So according to Exhibit 5, the MITA 2-A

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 86

document, Evergreen agrees to notify any and all other parties involved in this transaction of the provisions of MITA; is that correct?

MR. HASIAK: I object to the form of the question. You asked him what the agreement says, not what Evergreen agrees to do.

BY MR. MAZAROLI:

Q. Okay. Well, that's what that sentence means, doesn't it?

MR. HASIAK: He doesn't control what Evergreen does or doesn't do.

MR. MAZAROLI: I didn't ask that question yet, Mr. Hasiak.

BY MR. MAZAROLI:

Q. According to sentence one of Paragraph O on Page 7010, the word shipper refers to Evergreen; is that correct?

A. That's correct.

Q. So that sentence means that Evergreen agreed to notify any and all parties of the terms of MITA; is that correct?

MR. GUTTERMAN: Objection, the sentence speaks for itself. He's already answered who the shipper was.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 87

BY MR. MAZAROLI:

Q. Okay. Do you know if before the movement of the shipments of auto parts which are the subject of this court case from the overseas origin ports, whether Evergreen notified the actual cargo owners of the terms of MITA?

A. No, sir, I don't know.

Q. Okay. Referring to Page 7024 --

A. Yes.

Q. -- Paragraph D-1.

A. Yes.

Q. It states, UPRR has the right to open units at any time to inspect, weigh or reject shipments at origin en route or at destination.

A. Yes.

Q. Was that provision in effect in April of 2006?

A. Yes, it was.

Q. And did that provision apply to Evergreen intermodal shipments?

A. Yes.

Q. The two shipments of auto parts that are the subject of this court case originated outside the borders of the United States; is that correct?

A. That's correct.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 88

Q. Is a Union Pacific Railroad representative or agent present at the overseas place where a multimodal carrier such as Evergreen would take custody of an intermodal shipment, to your knowledge?

A. Not to my knowledge.

MR. HASIAK: Hey, David, we only reserved this room for two hours. We didn't think it would go on as long as it has. How much more time do you think you're anticipating?

MR. MAZAROLI: It's hard to say. Not more than an hour I would say. Is that a problem?

MR. HASIAK: Well, we might get kicked out of the room. I guess we'll cross that when we get to it.

MR. MAZAROLI: All right. Let's keep working.

BY MR. MAZAROLI:

Q. After seeing Exhibit 5, sir, can you tell me if UP Exempt Circular 20 series, Item No. 142 B in effect at the time of the shipments in question?

MR. GUTTERMAN: Objection as to the question. He's already testified that --

MR. MAZAROLI: No speaking objections, please. Just objection to the form, Mr. --

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 89

MR. GUTTERMAN: Objection to the form. He's already --

MR. MAZAROLI: I don't want speaking objections, Mr. Gutterman, you're too good a lawyer for that.

BY MR. MAZAROLI:

Q. Having seen Exhibit 5, can you determine or testify as to whether or not UP Exempt Circular 20 series, Item No. 142 B was still in effect in March and April of 2006?

A. I don't know.

Q. When Union Pacific Railroad received the two shipments of auto parts which are the subject of this court case, did Union Pacific issue any other terms and conditions -- withdraw that.

Other than documents that are marked in today's deposition, are you aware of any other terms and conditions which might apply to the two shipments of auto parts which are the subject of this court case?

A. No.

Q. When Union Pacific Railroad billed Evergreen for the intermodal shipments carried on the subject train ITIMNX 01, how was that billing done, is it done electronically?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - DIRECT (BY MR. MAZAROLI) 90

A. I don't know if it's electronic or if it's paper at that time.

Q. Just one second. Sir, referring to 3, the exempt rail transportation agreement at Page A 00014.

A. Yes.

Q. Numbered Paragraph 22, electronic data interchange, subparagraph E; do you see that?

A. Yes, I do.

Q. The first sentence states, Customer shall endeavor to increase the utilization of EDI for the timely transmission of bills of lading for the movement of its equipment on the Railroad.

A. Yes.

Q. Who is the customer in that sentence, is it Evergreen?

A. It's Evergreen, that's correct.

Q. And what bills of lading does this sentence refer to; is it the electronic waybills we discussed previously?

A. It's the electronic rail waybills.

Q. Electronic rail waybills.

The next page, sir, A 00015. The notify party for the railroad is the business manager; is that you?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - CROSS (BY MR. GUTTERMAN) 91

A. That would be -- well, again, at the time I wasn't --

Q. Right.

A. -- involved in this, but the railroad business manager would be the account manager responsible for Evergreen at that time.

Q. Okay. And would that be you in April of 2006?

A. In April 2006 that would be me, yes.

Q. Do you know if Evergreen conducted an investigation as to the cause of the derailment?

A. I don't know.

Q. Do you know if Evergreen sent anyone to the derailment site?

A. I don't know that either.

MR. MAZAROLI: Let's go off the record.

(11:27 a.m. - Recess taken.)

CROSS-EXAMINATION

BY MR. GUTTERMAN:

Q. I just had a few questions then.

Would you take a look at Exhibit 3, Paragraph 3?

A. Yes.

Q. The sentence about fifth from the bottom, it says, Union Pacific Exempt Circular 20 series and

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - CROSS (BY MR. GUTTERMAN) 92

successor issues thereto.

What does that mean, successor issues thereto, would that include MITA?

A. Yes, it would.

Q. Now, with regard to Exhibit 6 and 7 --

A. Yes.

Q. Look at those.

A. Yes.

Q. Tell me who generated these two documents.

A. Union Pacific.

Q. And what are these two documents?

A. It's rail waybill information.

Q. Okay. Now, on the two documents is there any reference to a contract?

MR. MAZAROLI: Objection, the witness testified he was not familiar with these two documents.

BY MR. GUTTERMAN:

Q. Well, now the documents are in front of you. You saw these documents prior to the deposition today; is that correct?

A. They were in the exhibits, yes.

Q. Okay. Is there a reference in there to any contract?

MR. MAZAROLI: Objection to the form.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - CROSS (BY MR. GUTTERMAN) 93

BY MR. GUTTERMAN:

Q. Go ahead and answer.

A. Yes, there is.

Q. And what is that contract?

A. DER 913.

Q. And is that the reference to the ERTA agreement with Evergreen?

A. Yes, it is.

Q. Now, with regard to Exhibit 5 that Mr. Mazaroli had asked you some questions about, you also made mention of some item, I believe it was 142 and 143. Is there any reference in the MITA 2-A, which is Exhibit 5, to either of those two items?

A. Can you repeat that question, I'm sorry?

Q. Referenced in Exhibit 5, which is the MITA 2-A.

A. Yes.

Q. To any item such as 142 or 143 that Mr. Mazaroli had raised a question with you before, I believe it evolved out of Exempt Circular 20 B, is there any reference in the MITA 2-A to those provisions?

A. No.

Q. Now, do you have any knowledge as to the extent of the alleged damages to the cargo in issue?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 94

A. Only as to what's on Exhibit 11.
Q. And how about with regard to any containers?
A. I don't -- I don't have any knowledge as to what the damage to the containers itself is, just to the contents.
Q. Now, with regard to -- I think it was Exhibit 11, that was prepared by Union Pacific; is that correct?
A. Yes, sir.
Q. Would that have been prepared by someone in your Palestine office for the claims department?
A. Yes.
Q. Now, with regard Evergreen, do they disclose to Union Pacific who their customer is?
A. No, they do not.
MR. GUTTERMAN: I have no other questions.

REDIRECT EXAMINATION

BY MR. MAZAROLI:
Q. All right. Mr. Hartmann?
A. Yes.
Q. Exhibit 6 and 7.
A. Yes.
Q. You testified when I asked on direct what these were that you did not know what they were; is

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 95

that true?
A. I do not know what they are in the format that exists in Exhibit 6 and 7.
Q. So when you were answering Mr. Gutterman's questions concerning reference to a contract, you were basically reading what was before you; is that correct?
A. Well, I was reading what was before me, that's correct.
Q. And you had no independent knowledge of what went into the makeup of this -- these documents marked Exhibit 6 and 7; is that correct?
A. No, I'm familiar with the EDI information we receive from the customer, which is the same information in a different format.
Q. Is the document, to your knowledge -- to your knowledge, the document marked -- well, let me back up.
Why aren't you familiar with Exhibit 6 and 7?
A. Because when I look at waybill information on the system that I utilize day-to-day, it's not in this format.
Q. Where is it when you look at it?
A. It's in our TCS system which shows it in a

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 96

more raw format.
Q. It's still electronic when you look at it?
A. Yes, sir.
Q. And this information is intended to stay electronic; is that correct?
A. Yes, it would be.
Q. And what type of system is the waybill information generated on, is it the EDI system or another one you mentioned?
A. I don't know what system it's generated on. I just know what system I use to access the information.
Q. I mean, is it a Union Pacific proprietary system?
MR. HASIAK: Do you know?
THE WITNESS: I think so. I don't know for sure.
BY MR. MAZAROLI:
Q. Can I get access to it?
A. No.
Q. Why not?
A. Because you have to have a Union Pacific user ID and password.
Q. To get the waybill information; is that correct?

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 97

MR. HASIAK: Do you know?
THE WITNESS: No, I don't know. Yeah.
BY MR. MAZAROLI:
Q. Can Evergreen get access to the waybill information?
MR. HASIAK: If you know.
THE WITNESS: I don't know.
BY MR. MAZAROLI:
Q. We received by telefax two documents, one -- they look very familiar -- very similar. One does not appear to have an effective date, and the other one has an effective date of July 1, 2005. Can you tell us which of these two documents pertain to Deposition Exhibit 3?
A. Deposition Exhibit 3 --
MR. HASIAK: Just the Bates number in the bottom there.
THE WITNESS: The one at the bottom right dated 3/26/2002 would be the one that that one would pertain to.
MR. MAZAROLI: All right. Ms. Reporter, would you mark this document as sent to me by fax as Exhibit 3A.
(Exhibit No. 3A marked for identification.)

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 98

MR. MAZAROLI: Okay. And the other document which has an effective date of July 1, 2005 on the top right, would you mark that as Exhibit 4A, Ms. Reporter.

(Exhibit No. 4A marked for identification.)

BY MR. MAZAROLI:

Q. Mr. Hartmann, I just noticed on Exhibit 4A on the bottom right there is a date of 11/8/2007?

A. Yes.

Q. That's obviously not the effective date, is it, it's a printout date?

A. That's correct.

Q. So on Exhibit 3A, that date 3/26/2002, that might be a printout date as well?

A. Yeah, I don't know.

Q. Okay. And these were the two Exhibit A schedules referred to in Paragraph 4 of the exempt rail transportation agreement marked as Exhibit 3; is that correct?

A. That's correct.

Q. And these prices on the top space under the three categories of cargo have been redacted due to the confidentiality concern; is that correct?

A. That's correct.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 99

Q. On the top of Exhibit -- Exhibits 3A and 4A, it states international COFC rates; do you see that?

A. Yes, sir.

Q. What does COFC mean?

A. Container on flatcar.

Q. And the between points shown on each of Exhibits 3A and 4A, the first category of -- under the between column, it says TICTF, slash, ICTF, CA; what does that mean?

A. That means that a shipment moving to or from TICTF, which is Evergreen's on-dock marine terminal, slash, and/or ICTF, which is our intermodal terminal in Long Beach, the rate on that line would pertain to a shipment to either of those -- to or from either of those points.

Q. Now, how would it be determined whether it moved from Evergreen's on-dock -- did you say it was an Evergreen on-dock terminal?

A. That's correct.

Q. From that terminal or for the one you described as Union Pacific's terminal?

A. We would move -- the customer would submit billing to the way that they would like it to move, submit rail waybill billing designating where they

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 100

want it to move from or to.

Q. All right. And the shipments that are the subject of this court case, let's just see here, move from which of those two terminals?

A. They moved from the TICTF, T-I-C-T-F terminal.

Q. It's the Evergreen terminal?

A. Correct.

Q. And that's indicated on Exhibits 8 and 9, right?

A. Yes, sir.

Q. Okay. And what does T-I-C-T-F mean?

A. It stands for terminal island container transfer facility.

Q. That's an Evergreen facility?

A. Well, it's a shared facility by multiple ocean carriers, but they are one of the tenants that utilize that facility.

Q. Which other ones -- which other multi ocean carriers use them?

A. Well, there is terminal -- the TICTF is actually the yard or the loading area.

Q. Okay.

A. So you have NY K Line using that, Hapag Lloyd and Evergreen. Those are the three main ones

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037

D. HARTMANN - REDIRECT (BY MR. MAZAROLI) 101

that I can think of. There may be more, but I'm not aware of what those might be.

Q. And on-dock means it goes direct from the ship onto the railcar?

A. It goes from ship to railcar within the marine terminal.

Q. And referring to Exhibits 6 and 7, there is reference under the name Evergreen America Corp to shipper certified scale weights; what does that mean?

MR. HASIAK: If you know.

THE WITNESS: Yeah, I don't know the answer to that question.

BY MR. MAZAROLI:

Q. And there is reference further to do not weigh, shipper certified scale; do you know what that means?

A. No, sir, I don't.

Q. Thank you very much, Mr. Hartmann.

A. You're welcome. Thank you.

MR. GUTTERMAN: No further questions. What about signature, Ray?

MR. HASIAK: We would waive it.

MR. MAZAROLI: I may want him to sign it. I will let you know.

THOMAS & THOMAS COURT REPORTERS AND CERTIFIED LEGAL VIDEO, L.L.C. (402)556-5000 FAX(402)556-2037