Barry N. Gutterman, Esq. (BG6410)
Barry N. Gutterman & Associates, P.C.
Attorneys for Defendants
Union Pacific Railroad Company
and Evergreen Marine Corporation
60 East 42nd Street, 46th Floor
New York, New York 10165
(212) 983-1466
Email: Bngassc@aol

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MITSUI SUMITOMO INSURANCE CO., LTD.<br><br>                    Plaintiffs<br><br>v.<br><br>EVERGREEN MARINE CORPORATION and UNION PACIFIC RAILROAD COMPANY<br><br>                    Defendants. | **ECF Case**<br><br>**07 CV 3874**<br>**(Judge McMahon)** |

<u>**DEFENDANTS' RESPONSE TO PLAINTIFF'S 56.1 STATEMENT**</u>
<u>**AND DEFENDANTS' 56.1 STATEMENT**</u>

PLEASE TAKE NOTICE that pursuant to Civil Rule 56.1(a) of the United States

District Courts for the Southern and Eastern Districts of New York, in opposition to

plaintiff Mitsui Sumitomo Insurance Co. Ltd. ("Mitsui's") motion for partial summary

judgment, Union Pacific Railroad Company and Evergreen Marine Corporation

(collectively "UP") responds to Mitsui's Rule 56.1(a) statement below, followed by

additional facts numbers 47 through 85 which UP submits in opposition of Mitsui's

motion and in support of UP's cross-motion for summary judgment. UP's inclusion of

the facts stated by Mitsui in its Rule 56.1 statement herein are solely included in order to

respond to Mitsui's Rule 56.1 statement, not to support UP's cross-motion for summary

judgment which stands on fact numbers 47 to 85 submitted herein by UP.

The following abbreviations are used to identify the evidence submitted to support and oppose Mitsui's motion: Affidavit of David L. Mazaroli ("Maz. Aff."); Declaration of David Clifton ("Clifton Decl."); Declaration of Chikara Yokoi ("Yokoi Decl.");  Deposition of  Daniel Hartmann ("Hartmann Dep."); Affidavit of Terry D. Sheldon ("TDS");  Affidavit of Barry N. Gutterman ("BNG"); Affidavit of Patrick Chen from the Evergreen Marine Department ("EV-M"); Affidavit of Livia Kuo from the Evergreen Claims Handling Department ("EV-C") .

## I.

**DEFENDANTS' RESPONSES TO MITSUI'S 56.1 STATEMENT:**

Fact 1.            This action involves derailment damage to a shipment of motors and motor parts for automobiles ("the shipment") which moved in international intermodal transportation from Shimizu, Japan, to Statesville, North Carolina. (Maz. Aff. Ex. 2 ¶, Ex. 3 ¶ 9)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 1:**

1.       Undisputed.

Fact 2.            The transportation was considered intermodal (also referred to as "multimodal") because it included  ocean carriage from Shimizu to the port of Los Angeles and rail carriage from the discharge port  to the North Carolina destination. ( *Id.*; Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 57-58)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 2:**

2.       Undisputed.

Fact 3.        Asmo North Carolina, Inc. ("Asmo-NC"), plaintiff's subrogor, was the owner of the shipment, having purchased it from Asmo Co. Ltd. ("Asmo Japan") on FOB terms. (Clifton Decl. ¶¶ 4-7)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 3:**

3.        Undisputed.

Fact 4.        On or about March 14, 2006 defendant Evergreen Marine Corporation ("Evergreen") contracted to provide the subject intermodal transportation. (Clifton Decl. ¶¶ 8-9 and Ex. 4; Maz. Aff. Exs. 12 and 15)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 4:**

4.        Undisputed.

Fact 5.        Although the booking with Evergreen was made by or on behalf of Asmo Japan, the freight charges for the transport were paid by Asmo- NC who as FOB purchaser had risk of loss and title to the shipment during the international transport. (*Id.*)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 5:**

5.        Undisputed.

Fact 6.        Evergreen was at all material times engaged in the business of providing, for compensation, intermodal (also referred to as multimodal) transportation services for international cargo shipments. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 14-16; 31-32; 57-58; 61, 73-74; Maz. Aff. Exs. 12, 16, http://www.evergreen-marine.com/tbi1/html/CorporateProfile.pdf)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 6:**

6.        Undisputed.

Fact 7.        The intermodal transportation services provided by Evergreen for such international shipments include ocean transportation from foreign ports to ports in the United States. (*Id.*)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 7:**

7.        Undisputed.

Fact 8.        The intermodal transportation services provided by Evergreen for such international shipments include railroad transportation from the United States port of ocean vessel discharge to inland destinations in the United States. (*Id.*)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 8:**

8.        Disputed.  Although Evergreen arranged for the subcontracted rail carriage of the shipment by UP, Evergreen did not itself provide the actual rail carriage of the shipment, is not itself a rail carrier, owns no railroad tracks, owns no locomotives, operates no trains and is not licensed to operate as a railroad.  Evergreen is an ocean carrier, owning and operating seagoing vessels.  (EV-C, ¶ 7.)

Fact 9.        At all material times defendant Union Pacific Railroad Company ("UP") was engaged in the business of providing rail transportation services for compensation, including interstate rail carriage for international intermodal cargo shipments. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 12, 73-74; Maz. Aff. Ex. 1 ¶¶ 7, 8; Ex. 2 ¶¶ 7, 8)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 9:**

9.        Undisputed.

Fact 10.        Evergreen provided shipping containers TRIU5559381 and UGMU8062288 for the entire transport of the shipment from the place of receipt to the

place of intended delivery and the motors and motor parts in question were loaded into said containers as being in good order and condition and without evidence of damage. (Maz. Aff. Ex. 1 ¶¶ 12, 14; Ex. 3 ¶¶ 12, 14)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 10:**

10.     Disputed. Para.12, Evergreen Answer to Amended Complaint, Maz. Aff., Ex. 3. The containers were received sealed by Evergreen. Mitsui's evidence submitted does not sufficiently prove delivery to Evergreen of the contents of the containers in good condition.

Fact 11.     Evergreen issued Sea Waybill EISU025643005523 dated on or about March 14, 2006. (Maz. Aff. Ex. 5 ¶ 22; Ex. 12; Clifton Decl. Ex. 4)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 11:**

11.     Undisputed.

Fact 12.     The Evergreen Sea Waybill describes the shipment as "165 Cartons, Motor & Motor parts for Automobile (sic)." It lists the place of receipt as Shimizu, CY, the port of lading as Shimizu, Japan, the port of discharge as Los Angeles, CA, and the place of delivery as Statesville, N.C., Door. (Maz. Aff. Ex. 12; Clifton Decl. Ex. 4)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 12:**

12.     Undisputed.

Fact 13.     The Evergreen Sea Waybill was an intermodal through bill, meaning that it contemplated multiple modes of transportation, including the ocean carriage from Japan to the United States and the interstate rail carriage from the port of discharge to final destination. (Maz. Aff. Ex. 12; Ex. 11 (Hartmann Dep.) pp. 57-58)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 13:**

13.    Undisputed.

Fact 14.    The shipment in question was an international shipment, i.e. it originated outside the borders of the United States. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 32 and 66)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 14:**

14.    Undisputed.

Fact 15.    The Evergreen Sea Waybill does not expressly refer to the Carmack Amendment[1] and it does not expressly state that the shipper has the option of full Carmack Amendment liability. (Maz. Aff. Exs. 12-13)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 15:**

15.    Undisputed that the Waybill does not expressly reference the Carmack Amendment. However neither the Carmack Amendment nor the decision in *Sompo Japan Insurance Co. of America v. Union Pacific Railroad Co.*, 456 F.3d 54 (2d Cir. 2006) are applicable because UP's contract with Evergreen was made pursuant to 49 U.S.C. §10709. (TDS, ¶ 7, EX. C, Item 110(D), EV-M, ¶ 3, EX. 3, ITEM 110(D).) Defendants also dispute the contention that the Evergreen Waybill did not offer full value liability. The Evergreen Waybill offered its shipper the option of shipping under full value rates which are consistent with a full value under the Carmack Amendment. (EV-C, ¶8, Ex. B, ¶ 7(2).) Asmo declined that offer in favor of a cheaper freight rate, and procured insurance from Mitsui to protect its exposure. (EV-C, ¶ 8.)

---

[1] The Carmack Amendment to the Interstate Commerce Act of 1887 ("Carmack"), Act of June 29, 1906, ch. 3591, 34 Stat. 584 (1906) (current version at 49 U.S.C. § 11706). *See Sompo Japan Insurance Co. of America v. Union Pacific Railroad Co.*, 456 F.3d 54 (2d Cir. 2006).

Fact 16.    The reverse side of the Evergreen Sea Waybill includes, *inter alia,*

the following fine-print boilerplate text:

**5. Clause Paramount and Responsibility of Carrier.**
(A) Clause Paramount - as far as this Bill covers the carriage of Goods by sea
either by the Carrier or its Sub-contractor, the contract evidenced in this Bill shall
have effect subject to the Hague Rules, if and as enacted in the country of
shipment, and any Legislation including COGSA which make those rules
compulsory, applicable or effective. The Hague Rules and said Legislation shall
be deemed contractually incorporated herein and made a part of this Contract
regardless of whether it or they would otherwise be compulsorily applicable and
nothing herein contained shall be deemed a surrender by the Carrier or its Sub-
contractor of any of its rights and immunities or any increase of any of its
responsibilities under said Rules and Act. Notwithstanding anything to the
contrary, if the carriage called for in this Bill is a shipment to or from the United
States, the liability of the Carrier or its Sub-contractor shall be exclusively
determined pursuant to COGSA which is contractually incorporated into this Bill.
The provisions cited in the Hague Rules and COGSA (except as may be otherwise
specifically provided herein) shall also govern before the Goods are loaded on and
after they are discharged from the Ship provided, however, that the Goods at said
times are in the actual custody of the Carrier or any Sub-contractor. When no such
enactment is in force in the country of shipment, the Hague Rules will apply. If
any terms of this Bill are repugnant to the Hague Rules or any other compulsorily
applicable International Convention or National Law which cannot be departed
from by private contract, then such provision shall be null and void to the extent
of such invalidity without invalidating the remaining provisions hereof. The
Carrier or its Sub-contractor shall not be liable in any capacity whatsoever for any
delay, non-delivery or misdelivery, or loss of or damage to the Goods howsoever
caused occurring while the Goods are not in the actual custody of the Carrier.

(B) Responsibility for Port to Port Shipments. Where loss or damage has occurred
between the time of receipt of the Goods by the Carrier at the port of loading and
the time of delivery by the Carrier at the port of discharge, or during any prior or
subsequent period of carriage by Underlying Carriers or period of custody by
Sub-Contractors, the liability of the Carrier shall be determined in accordance
with the appropriate Hague Rules and /or other Legislation as provided in the
provisions of Clause 5A above of this Bill .

(C) Responsibility for Through Transportation. Where the place of receipt or
place of delivery as set forth herein are inland points or ports not directly served
by the Carrier the responsibility of the Carrier with respect to the Through
Transportation of the Goods shall be as follows:

(1) With respect to Through Transportation from, to or within the United States where the Goods are in the custody of a Sub-contractor such Through Transportation will be governed by the provisions of Clause 5B above.

(2) In the event Clause 5B is held inapplicable to such Through Transportation from, to or within the United States then Carrier's liability will be governed by and subject to the terms and conditions of the Sub-contractor's bill of lading or waybill and/or the ICC Uniform Bill of Lading together with the Subcontractor's Tariff which shall be incorporated herein as if set forth at length. Notwithstanding the foregoing, in the event there is a private contract between the Carrier and a Sub-Contractor, responsibility for such Through Transportation will be governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length and copies of said contract(s) shall be available to the Merchant at any office of the Carrier upon request.

    ****

(6) With respect to inland transportation of the Goods other than as provided in subparagraphs (1) through (5) supra, then according to the provisions of any International Convention or National Law which is compulsorily applicable in the country where the inland transportation took place or, if no such law or convention is applicable, then according to the Sub-contractor's tariff or any contract existing between the Sub-contractor and the Carrier.

(D) Extent of Liability for Through Transportation. In any event, the liability of the Carrier shall under no circumstances whatsoever be greater than that of the Sub-contractor under said Sub-contractors' contract with the Carrier, and the Carrier shall be entitled to all the rights, defenses, limitations and exemptions from liability contained therein.

(Maz. Aff. Ex. 13)

### **DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 16:**

16.    Undisputed that the text quoted above appears in the Evergreen Waybill at issue.  Disputed that the text is "fine print" or that it is "boiler plate."

Fact 17.    The following text is also included in the  Evergreen Sea Waybill:

**7. Amount of Compensation and Limitation of Liability.**
(1) All claims for which the Carrier may be liable shall be adjusted and settled on the basis of the net invoice value of the Goods plus freight and insurance. Notwithstanding the foregoing it is agreed that in no event shall this clause operate to increase the extent of the Carrier's liability beyond the applicable

market value at the port of discharge or place of delivery, if that be less than the net invoice value plus freight and insurance. In no event shall the Carrier be liable for any loss of profit or any consequential loss.

(2) In the event this Bill covers Goods moving to or from a port or final destination in the United States, the Carrier's limitation of liability in respect to the Goods shall in no event exceed US$ 500 per package or, when the Goods are not shipped in packages, US$500 per customary freight unit. In the event the foregoing would be held inapplicable under the local law of the jurisdiction in which legal proceedings are brought and if the Goods covered by this Bill are subject to the Hague Rules or any amendments thereto, including the Hague Visby Amendments, then Carrier's liability in no event shall exceed the greater of 2 SDRs per kilo of gross weight of the Goods lost or damaged or 667 SDRs per package. The Merchant agrees and acknowledges that the Carrier has no knowledge of the value of the Goods, and that higher compensation than that provided herein may not be claimed unless the nature and value of such Goods\ have been declared by the Merchant before shipment and agreed to by the Carrier and inserted in this Bill and any applicable Ad Valorem freight rate, as set out in Carrier's tariff, is paid.

(3) If the actual value of the Goods per package or per customary freight unit exceeds such declared value, the value shall nevertheless be deemed to be the declared value. Any partial loss or damage shall be adjusted pro rata on the basis of such declared value. In any case, if the declared value is higher than the actual value, the Carrier shall in no event be liable to pay compensation higher than the net invoice value of the Goods plus freight and insurance.

(Maz. Aff. Ex. 13)

### **DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 17:**

17.    Undisputed.

Fact 18.    Evergreen carried the shipment by ocean vessel, i.e. the M/V

EVER UNION, from Shimzu, Japan, to Los Angeles, California. (Maz. Aff. Ex. 5

Admissions No. 1-3; Maz. Aff. Ex. 12)

### **DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 18:**

18.    Undisputed.

Fact 19.    At the port of Los Angeles the shipment was transferred from

Evergreen's ship to Evergreen's designated rail carrier, UP,  for the railroad

transportation to North Carolina. (Maz. Aff. Ex. 4 Admissions No. 3-4; Ex. 5 Admissions No. 3-4)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 19:**

19.    Undisputed.

Fact 20.    The train assembled for the domestic land stage of the intermodal transport was a "dedicated" Evergreen train, i.e. although the locomotive units and rail cars were provided and/or operated by UP, the train was loaded by Evergreen and carried containerized shipments for Evergreen's customers. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 29-32)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 20:**

20.    Undisputed.

Fact 21.    UP formulated electronic waybills covering the interstate rail carriage of each container in the shipment to final destination. (Maz. Aff. Ex. 1 ¶ 15; Ex. 2 ¶ 15); Ex. 11 (Hartmann Dep.) pp. 50-52)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 21:**

21.    Undisputed.

Fact 22.    Copies of the waybills were stored in electronic form in UP's EDI system. However, the electronic waybills were internal UP documents and were not issued or otherwise transmitted to the actual shipper, consignee, or owner of the shipment. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 50-52)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 22:**

22.    Undisputed except that UP's EDI waybills were transmitted to Evergreen. (EV-M ¶ 3, TDS ¶-5.)

Fact 23.        Although Evergreen and UP contend that they were parties to an

Exempt Rail Transportation Agreement  ("ERTA"), a copy of which has been produced

in discovery, the terms of ERTA were not disclosed to the actual shipper, consignee or

owner the shipment. (Maz. Aff. Ex. 7 Admissions No. 3, 4, 7, 8; Ex. 8 Admission No. 47)

### DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 23:

23.        Undisputed that the ERTA terms were not provided to Asmo, the owner,

Evergreen's shipper, and consignee.  However, Evergreen was a party to, a signatory of,

and was in possession of the ERTA prior to the shipment.  Asmo never once requested a

copy of ERTA from Evergreen or UP before or during the shipment.  (EV-M, ¶ 3, TDS ¶

15)

Fact 24.        Similarly, the terms of a Master Intermodal Transportation

Agreement ("MITA-2A") were not disclosed to the actual shipper, consignee or owner of

the shipment. (Maz. Aff. Ex.  7 Admissions No. 1, 2, 5, 6)

### DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 24:

24.  Undisputed that the MITA 2-A terms were not provided to Asmo

(the owner, Evergreen's shipper, and consignee).  However, Evergreen agreed to the

application of MITA 2-A  and was in possession of the MITA 2-A prior to the shipment.

Asmo never once requested a copy of MITA 2-A from Evergreen or UP before or during

the shipment.  (EV-M, ¶ 3, TDS ¶ 15.)  The MITA 2-A, moreover, was at the time of the

shipment, and prior to this shipment, readily available for public viewing on UP's

website at www.up.com. (EV-M, ¶ 3, TDS ¶ 13.)

Fact 25.        Neither ERTA nor MITA-2A state that the shipper has the option

of full Carmack Amendment liability for international intermodal shipments such as the

subject shipment, i.e. shipments which originate outside the borders of the United States.

(Maz. Aff. Ex. 14 p. 7022, 7027)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 25:**

25.    Undisputed.

Fact 26.        In fact, UP's MITA provides that "Carmack liability coverage is

**not** available for shipments that originate outside the borders of the United States of

America." (Maz. Aff. Ex. 14  p.  7027  (MITA-2A, Item 320 ¶ D (emphasis added)).

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 26:**

26.    Undisputed.

Fact 27.        On or about April 5, 2006, while UP was transporting the shipment

by rail the subject motors and motor parts sustained damage as the result of a derailment

which occurred at or near Higginson, Arkansas. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp.

25, 28, 41-42; Maz. Aff. Ex. 4 Admissions Numbers 7, 8, 10, 11, 12)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 27:**

27.    Undisputed.

Fact 28.        As a result of the derailment the rail cars carrying containers

TRIU5559381 and UGMU8062288 left the tracks and the containers came to rest on their

sides. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 38-40)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 28:**

28.    Undisputed.

Fact 29.        As a result of the derailment containers TRIU5559381 and

UGMU8062288 sustained damage. (Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 38-40; Maz.

Aff. Ex. 4 Admission No. 1; Ex. 5 Admission No. 10)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 29:**

29.    Undisputed.

Fact 30.    The motors and motor parts carried in container TRIU5559381

sustained damage and loss as a result of the aforementioned derailment. (Maz. Aff. Ex.

11 (Hartmann Dep.) pp. 41-42)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 30:**

30.    Undisputed.

Fact 31.    The motor and motor parts carried in container UGMU8062288

sustained damage and loss as a result of the aforementioned derailment of the UP train.

(Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 41-42; Maz. Aff. Ex. 4 Admission No.8, 11, 12)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 31:**

31.    Undisputed.

Fact 32.    The derailment of the train was not caused by events which would

give rise to a defense or exception to liability under the Carmack Amendment. (Maz. Aff.

Ex. 4 Admissions No. 14-17)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 32:**

32.    Undisputed but irrelevant. The movement at issue was under a contract

entered into pursuant to 49 U.S.C. §10709.  (TDS, ¶ 7, Ex. C, Item 110(D), EV-M, ¶ 3,

Ex., 3, Item 110.)  As such, the Carmack Amendment did not apply.

Fact 33.    The derailment was not caused by events which would constitute

an "Act of God" defense or exception to liability.  (Maz. Aff. Ex. 4 Admission No. 14.)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 33:**

33.    Undisputed but irrelevant. The movement at issue was under a contract entered into pursuant to 49 U.S.C. § 10709.  (TDS, ¶ 7, Ex. C, Item 110(D), EV-M, ¶ 3, Ex., 3, Item 110.)  As such, the Carmack Amendment did not apply.

 Fact 34.    The derailment  was not caused by events which would constitute an "Act of Public Enemy" defense or exception to liability. (Maz. Aff. Ex. 4 Admission No. 15)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 34:**

34.    Undisputed but irrelevant. The movement at issue was under a contract entered into pursuant to 49 U.S.C. § 10709.  (TDS, ¶ 7, p. Ex. C, Item 110, EV-M, ¶ 3, Ex. 3, Item 110.)  Therefore, the Carmack Amendment did not apply.

 Fact 35.    The derailment  was not caused by events which would constitute an "Act of Public Authority" defense or exception to liability. (Maz. Aff. Ex. 4 Admission No. 16) (Maz. Aff. Ex. 4 Admission No. 16)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 35:**

35.    Undisputed but irrelevant. The movement at issue was under a contract entered into pursuant to 40 U.S.C. §10709.  (TDS, ¶ 7, Ex. C, Item 110(D), EV-M, ¶ 3, Ex., 3, Item 110.)  As such, the Carmack Amendment did not apply.

 Fact 36.    The derailment was not caused by the fault of the shipper or owner of the shipment. (Maz. Aff. Ex. 4 Admission No. 17)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 36:**

36.    Undisputed.

Fact 37.      As a result of the damage and loss caused by the derailment, part of the shipment in both containers was rendered unfit for intended usage. (Clifton Decl. ¶ 10; Yokoi Decl. ¶ 6 and Ex. 1 pp. 0102-0107)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 37:**

37.      Undisputed.

Fact 38.      As a result of the damage and loss to the shipment caused by the subject derailment, plaintiff's subrogor, Asmo-NC sustained damages in the amount of $382,415.06 based on the invoice value of the shipment. (Clifton Decl. ¶ 11; Yokoi Decl. ¶ 6 and Ex. 1 pp. 0104-0107)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 38:**

38.      Disputed.  The documents provided by plaintiff do not support this conclusion.  Also irrelevant since both Evergreen and UP are entitled to enforce the $500.00 per package limitation of liability in Evergreen's through bill and UP's MITA 2-A, or alternatively, the 2 SDR per kilo limitation of liability in Evergreen's through bill. (TDS, ¶ 13, Ex. B to EV-C Affidavit ¶ 7(2).)

Fact 39.      In addition, as a result of the damage and loss to the shipment caused by the subject derailment Asmo-NC incurred incidental expenses, including fees for storage, segregation, and X-Ray inspections, in the amount of $3,650.64. ((Clifton Decl. ¶ 11; Yokoi Decl. ¶ 6 and Ex. 1 pp. 0104-0107

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 39:**

39.      Disputed.  The documents provided by plaintiff do not support this conclusion.  Also irrelevant since both Evergreen and UP are entitled to enforce the $500.00 per package limitation of liability in Evergreen's through bill and/or UP's MITA

2-A, or alternatively, the 2 SDR per kilo limitation of liability in Evergreen's through

bill. (TDS ¶ 13, Ex. B. to EV-C Affidavit, ¶ 7(2).)

Fact 40.    Plaintiff Mitsui was the insurer of the shipment pursuant to an

open cargo policy which was in effect in 2006. At the time of the subject Shimuzu, Japan,

to Statesville, North Carolina, intermodal transportation, Mitsui insured the Shipment

against risk of loss and damage during transportation, including the type of damage and

loss caused by the subject derailment. (Clifton Decl. ¶ 12; Yokoi Decl. ¶ 3)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 40:**

40.    Undisputed.

Fact 41.    In or about April of 2006 Asmo-NC presented an insurance claim

to Mitsui for damage and loss to part of the shipment caused by the derailment. (Clifton

Decl. ¶ 12; Yokoi Decl. ¶ 4-5)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 41:**

41.    Undisputed.

Fact 42.    The insurance claim of Asmo-NC was paid by Mitsui in the

amount of $422,129.33.  (Clifton Decl. ¶ 12, Ex. 5; Yokoi Decl. ¶ 7-8 and Exs. 2, 3)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 42:**

42.    Undisputed.

Fact 43.    Mitsui, as subrogated cargo insurer, commenced this action against

Evergreen and UP. (Maz. Aff. Ex. 1)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 43:**

43.    Undisputed.

Fact 44.    Evergreen's defense was assumed by UP. (Maz. Aff. Ex. 10; docket No. 17 substitution of counsel)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 44:**

44.    Undisputed.

Fact 45.    UP has admitted liability to plaintiff.  (Maz. Aff. Ex 6 Admission No. 9; Ex. 7 Admission No. 9)

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 45:**

45.    Undisputed.

Fact 46.    UP  admitted Paragraph 18 of the complaint and  amended complaint which states that "plaintiff…sustained damages in the amount of $440,275.57, no part of which has been paid although duly demanded, and for which defendants are jointly and severally liable as common carriers, bailees, forwarders and/or warehouseman for hire." (Maz. Aff.  Ex. 1 ¶ 18; Ex. 2 ¶ 18; see also UP answer to initial Complaint  ¶ 18 (docket no. 6))

**DEFENDANTS' RESPONSE TO MITSUI'S FACT NO. 46:**

46.    Disputed.  UP's counsel, in drafting paragraph 18 of UP's Answer to Mitsui's initial and amended complaints, mistakenly stated "admits" but this was a drafting mistake as clearly borne out by the remaining portions of UP's and Evergreen's answers and their responses to discovery.  (BNG, ¶ 3.)  UP denied that it was liable for the damages sought in the complaint and amended complaint.  See UP's Answer to Plaintiff's initial complaint and its amended complaint at ¶ 26 (liability as carrier and freight forwarder denied); ¶28 (liability as bailee denied); ¶31 (liability for willful conduct and negligence denied); ¶33 liability for breach of contract denied).  (BNG, ¶ 3;

Maz. Aff. Ex. 2.)   Evergreen's answer to Plaintiff's initial and amended complaint

denied all of the same allegations and also those of paragraph 18 regarding joint and

several liability of UP and Evergreen for $440,275.57.  (BNG, ¶ 3, Evergreen's answers

to the complaint and amended complaint at ¶¶ 18, 26, 28, 33, Maz. Aff. Ex. 3.)   UP and

Evergreen, moreover, asserted as an affirmative defense in both of their Answers that

they are entitled to the benefit of any statutory or contractual limitations of liability and

that "plaintiff may not recover in excess of such limitations."  (UP's Answer at 5th

Affirmative Defense; Evergreen's Answer at Evergreen's First Affirmative Defense (that

COGSA and the limitations in the Waybill apply.) (Maz. Aff. Exs. 2 and 3.) Finally, both

UP and Evergreen jointly responded to Mitsui's Request for Admission number 11 with a

denial that they were jointly and severally liable for Mitsui's damages. (See Exhibit 7 to

Maz. Aff. at no. 11, page 5.)  As such, Mitsui cannot reasonably assert that joint and

several liability for the full damages claimed or for any amount, and under any theory,

has been admitted.

## II.

## UNDISPUTED FACTS PRESENTED BY DEFENDANTS UP AND EVERGREEN

47.    UP has admitted liability to plaintiff but has contested the amount of the damages.

   (TDS ¶14.)

48.    The shipment at issue ("the shipment") was an international shipment under an ocean

   carrier's through bill of lading. (TDS, ¶¶2-3,  EV-C ¶2, ¶3, Exs. A and B; Maz. Aff.

   Ex. 1, Mitsui's Amended Complaint at ¶ 1.)

49.    The through bill was comprised of Evergreen's Sea Waybill which incorporated

   Evergreen's Services Contract SC 20454.  (EV-C, ¶ 2, ¶ 5 and Exs. A, B, and C; TDS

¶2.)

50.    Evergreen carried the shipment by sea over 5400 miles from Shimizu to Los Angeles for its shipper Asmo Co., Ltd..  (TDS, ¶5, EV-M ¶4.)

51.    The ocean carriage portion of the shipment was substantial.   (EV-M, ¶4; TDS ¶5; Maz. Aff. Ex. 1, Mitsui's Amended Complaint at ¶ 1.)

52.    Evergreen asked UP to move the cargo from Los Angeles to Statesville under UP's Exempt Rail Transportation Agreement DER-UP-C-913A ("ERTA") by sending UP electronic data interchange ("EDI") instructions wherein Evergreen identified contract DER 000913. (TDS, ¶4, Ex. B, EV-M. ¶3.)

53.    The reference to contract DER 000913 refers to UP's Exempt Rail Transportation Agreement DER-UP-C-913A. (TDS, ¶ 4, Ex. B, EV-M. ¶3.)

54.    UP issued two electronic data interchange "EDI" receipts or waybills for UP' transport of the cargo from Los Angeles to Statesville under UP's Exempt Rail Transportation Agreement DER-UP-C-913A ("ERTA.")  (EV-M, ¶4; TDS ¶¶4 and 5, Ex. B.)

55.    The ERTA specified that UP's then applicable Exempt Circular 20 series would apply to the shipment.  (TDS, ¶6, Ex. A. ¶3. EV-M ¶3.)

56.    At the time of this shipment, the applicable Exempt Circular 20 series was Master Intermodal Transportation Agreement 2-A was the UP Circular (hereafter "MITA-2A") (EV-M, ¶ 3; TDS ¶ 6, Ex. C.)

57.    UP's MITA 2-A provides:

>    "This MITA and any agreements, price documents or contracts that reference this MITA have been made under 49 USC section 10709"

(TDS, ¶ 7, Ex. Exhibit C, Item 110(D); EV-M, ¶5, Ex. 3, Item 110 (D).)

58.   UP's MITA 2-A provides:

> "UPRR's maximum liability for US inland loss or damage
> shall be limited to $500.00 per package as described in the
> Ocean Bill of Lading on International Shipments where the
> Shipper has released the Shipment under an Intermodal or
> Ocean Bill of Lading to the ocean carrier with a per package
> or customary freight unit limitation of liability applicable by
> agreement and/or pursuant to 46 U.S.C. Section 1304(5)."

(TDS, ¶ 8, Ex. C, Item 310(C); EV-M. ¶ 5, Ex. 3., Item 310(C).)

59.   The MITA-2A was at the time of the shipment, and prior to this shipment, readily available for public viewing on UP's website at www.up.com  (TDS, ¶ 15, EV-C, ¶7)

60.   Evergreen is a signatory to ERTA. (EV-M ¶ 3.)

61.   Both the ERTA and the MITA 2-A were in Evergreen's possession prior to and at all times during the shipment.  (EV-M, ¶3.)

62.   Asmo Co. Ltd. ("Asmo"), Evergreen's shipper, never requested a copy of ERTA or MITA 2-A from Evergreen.  (EV-M, ¶ 3; TDS ¶15.)

63.   Evergreen did not provide the actual rail carriage of the shipment. (EV-M, ¶ 3.)

64.   Evergreen is not a rail carrier. (EV-M, ¶3.)

65.   Evergreen owns no railroad tracks. (EV-M, ¶3.)

66.   Evergreen owns no locomotives. (EV-M, ¶3.)

67.   Evergreen operates no trains. (EV-M, ¶3.)

68.   Evergreen is not licensed to operate as a railroad. (EV-M, ¶3.)

69.   The reverse side terms of the applicable Evergreen Sea Waybill include the following terms: Sub-contractors include "underlying carriers" including "any rail carrier." (EV-C, ¶7, Ex B, ¶ 1 (13), (14).)

70.    The reverse side of Evergreen's Sea Waybill includes the following terms:

"4. Sub-Contracting.  (1) The Carrier shall be entitled to sub-contract on any terms the whole or any part of the carriage…(2) In contracting for the following exemptions and limitations of and exoneration from liability, the Carrier is acting as agent and trustee for all other persons named in this clause.  It is understood and agreed that, other than Carrier, no …Sub-Contractor is, or shall be deemed to be liable with respect to the Goods as carrier, bailee or howsoever.  If, however, it shall be adjudged that any one other than the Carrier is carrier or bailee of the Goods or under responsibility with respect thereto, all exemptions and limitations of and exoneration from liability provided by law or by terms hereof shall be available to such other…."

(EV-C, ¶ 7, Exhibit B, ¶ 4 (emphasis added).)

71.    The reverse side terms of the applicable Evergreen Sea Waybill include the following

terms:

"…if the carriage called for in this Bill is a shipment to or from the United States, the liability of the Carrier or its Sub-contractor shall be exclusively determined pursuant to COGSA which is contractually incorporated into this Bill.  The provisions in the Hague Rules and COGSA (except as may be otherwise specifically provided herein) shall also govern before the Goods are loaded on and after they are discharged form the Ship, provided, however, that the Goods at said times were in the custody of the Carrier or any Sub-contractor."

(EV-C, ¶ 7, Ex. B, ¶ 5(A), emphasis added.)

72.    The reverse side terms of the applicable Evergreen Sea Waybill include the following

terms:

 "Responsibility for Port to Port Shipments.  Where loss or damage has occurred … during any prior or subsequent period of carriage by Underlying Carriers or period of custody by Sub-Contractors, the liability for the Carrier shall be determined in accordance with the appropriate Hague Rules and/or other Legislation as provided in the provisions of Clause 5A above of this Bill."

(EV-C, ¶ 7, Ex. B, ¶ 5(B), emphasis added.)

73.    The reverse side terms of the applicable Evergreen Sea Waybill include the following

terms:

"With respect to Through Transportation Where the place of receipt or place of delivery as set forth herein are inland points or ports not directly served by the

Carrier, the responsibility of the Carrier with respect to the Through Transportation of the Goods shall be as follows: (1) <u>With respect to Through Transportation from, to or within the United States where the Goods are in the custody of a Sub-Contractor such Through Transportation will be governed by the provisions of Clause 5B above.</u> (2) In the event Clause B is held inapplicable to such Through Transportation from, to or within the United States then Carrier's liability will be governed by and subject to the terms and conditions of the Sub-contractor's bill of lading or waybill and/or the ICC Uniform Bill of Lading together with the Subcontractor's Tariff which shall be incorporated herein as if set forth at length. <u>Notwithstanding the foregoing, in the event there is a private contract between the Carrier and a Sub-Contractor, responsibility for such Through Transportation will be governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length and copies of said contract(s) shall be available to the Merchant at the office of the Carrier upon request.</u>"

(EV-C, ¶ 7, Ex. B, ¶ 5, emphasis added).

74.    The reverse side terms of the applicable Evergreen Sea Waybill include the following

terms:

Clause 5(D) "Extent of Liability For Though Transportation… <u>In any event, the liability of the Carrier shall under no circumstances whatsoever be greater than that of the Sub-contractor under said Sub-Contractor's contract with the Carrier, and the Carrier shall be entitled to all the rights, defenses, limitations and exemptions from liability contained therein</u>."

(EV-C, ¶ 7, Ex. B, ¶ 5(D) (emphasis added).)

75.    The reverse side terms of the applicable Evergreen Sea Waybill include the following

terms:

"Amount of Compensation and Limitation of Liability…In the event this Bill covers Goods moving to or from a port or final destination in the United States, <u>the Carrier's limitation of liability in respect to the Goods shall in no event exceed $500 per package</u> or, when the Goods are not shipped in packages, U.S. $500 per customary freight unit. In the event the foregoing would be held inapplicable under the local law of the jurisdiction in which legal proceedings are brought and if the Goods covered by this Bill are subject to the Hague Visby Amendments, then Carrier's liability in no event shall exceed the greater of 2 SDRs per kilo of gross weight of the Goods lost or damaged or 667 SDRs per package. The Merchant agrees and acknowledges that the Carrier has no knowledge of the value of the Goods, and that higher compensation than that provided herein may not be claimed <u>unless the nature and value of such Goods has been declared by the Merchant before shipment and agreed to by the Carrier and inserted in this Bill and any applicable Ad Valorem freight rate, as set out</u>

in Carrier's tariff, is paid."

(EV-C, ¶ 7, Ex. B, Evergreen BOL, at ¶ 7(2), emphasis added.)

76.    Evergreen offered Asmo the opportunity to ship under a full value liability rate.  (EV-C, ¶ 8, Ex. B, ¶ 7(2).)

77.    Asmo declined the opportunity to ship under a full value liability rate. (EV-C, ¶8.)

78.    Asmo shipped its cargo with Evergreen under the cheaper freight rate that did not provide full value liability terms. (EV-C, ¶8.)

79.    Asmo protected itself from the risk of loss by procuring insurance from Mitsui. (EV-C, ¶8; Maz. Aff. Ex. 1, Mitsui's Amended Complaint, p. 2,¶ 3.)

80.    Asmo has been paid by Mitsui for its losses relating to the shipment.  (Maz. Aff. Ex. 1, Mitsui's Amended Complaint, p. 2,¶ 3.)

81.    UP did not issue a separate domestic bill of lading for the rail carriage in this case. (TDS ¶9, EV-C, ¶9.)

82.    165 packages of cargo specified on the face of the through bill for the subject shipment were damaged. (EV-C, ¶ 10, Ex A. Face page; TDS ¶ 11.)

83.    UP's damages are limited to $500 per package or $82,500 for the 165 packages specified on the face of the through bill of lading. (TDS ¶ 12.)

84.    The total weight of the cargo at issue according to the face of the through bill was 35,234 kilograms. (EV-C, ¶ 11, Ex A. Face page; TDS, ¶ 13.)

85.    As of 4/05/2006, 2 SDRs for 35,234 kilograms calculated to $102,129.27. (TDS, ¶ 13, www.imf.com (archived data).)

86.    Alternatively, plaintiff's damages are limited to 2 SDR per kilogram of damaged cargo or $102,129.27 (TDS ¶ 13.)

Dated:  New York, New York
    March 7, 2008

            /s/ Barry N. Gutterman
            Barry N. Gutterman (BG 6410)
            Robert Briere Esq. (RB6080)
            Barry N. Gutterman & Associates, P.C.
            60 East 42nd Street - 46th Floor
            New York, New York 10165
            (212) 983-1466
            BNGASSC@AOL.COM
            For Defendants Union Pacific Railroad
            Company and Evergreen Marine Corporation

To:  David L. Mazaroli (DM-2929)
    11 Park Place – Suite 1214
    New York, New York 10007-2801
    Phone: (212) 267-8480
    Fax: (212) 732-7352
    Attorneys for Plaintiff

UP.2718.UP Response to Plaintiff.56.1