Service Contract No.: 20454

Service Contract Essential Terms Publication No.: (Tariff of General Applicability No.):

Amendment No.: 1

EISU-170, HTML-003
EISU-311,301,193,HTML500,004,005,501
EISU-164,207,208, HTML002

**CARRIER NAME:** EVERGREEN MARINE CORP. (TAIWAN) LTD.
Carrier Address: 166, Min-Sheng East Road, Sec. 2, Taipei, Taiwan

**CARRIER NAME:** HATSU MARINE LIMITED.
Carrier Address: Evergreen House 160 Euston Rd, London. NW1 2DX, U.K.
(FMC Alliance Agreement Number: FMC-011745)

**MERCHANT NAME:** DENSO CORPORATION
Merchant Address: 1-1, SHOWA-CHO, KARIYA-SHI
AICHI-KEN, 448-8661 JAPAN

This is a service contract pursuant to the Ocean Shipping reform Act of 1998 and FMC rules at 46 C.F.R. 530 el, seq., between "CARRIER" and "MERCHANT" ( or, jointly, "PARTIES") parties named herein. The contract Parties declare that the terms set forth herein together with the essential terms as published in Carrier Service Contract Essential Terms Tariffs No. EISU170 and HTML003 , pursuant to 46 CFR 520.4(d), the rules published in the tariff in the Carrier Automated Publication which can be found at www.evergreen-america.com, and www.hatsu-marine.com constitute the true and complete copy of all aspects of this contract except as to confidential matters contained herein which, pursuant to the Ocean Shipping Reform Act of 1998, shall be included in the essential terms filing and publication.

Further, MERCHANT party named herein certifies its status and that of any affiliate(s)/subsidiary(ies) named herein as (check appropriate box(es)):

Bond no.:

NVOCC
MERCHANTS' ASSOCIATION
OWNER OF CARGO      X
OTHER (Please Specify)

Records maintained to support shipments under this Service Contract are: bills of lading, shipping manifests, and other related written correspondence between Contract Parties.

Contact person for records in the event of a request by the Federal Maritime Commission:

Manager of Tariff Department
One Evertrust Plaza,
Jersey City, NJ 07302
(201) 761-3361  FAX (201) 761-3005
e-mail : pidbcdtrf@evergreen-america.com

APR/18th/2005                                    Apr/18th/2005

Mr. Hiroshi Asanuma                              Mr. Toshiteru Sugiura
Junior Vice President                            General Manager
Evergreen Japan Corporation                      Sales Process Innovation & Logistics Department
Nagoya Branch As Agent of                        Denso Corporation
Evergreen Marine Corp.(Taiwan)Ltd
Hatsu Marine Limited

1

**Name and address of Affiliates: (Please see Appendix A )**

This Contract is made between the aforesaid Contract Parties for the transportation of the commodities as listed below covered by the following clauses and conditions.

**Commodity: (Please see Appendix B )**

1. CONTRACT PARTIES AND DURATION

   1.1 The Service Contract is only applicable to the Merchant identified herein and any affiliates, subsidiaries or third Parties which are specifically identified in writing in this Contract. This Contract shall not be used by any Party not specifically identified herein. Any use of this Contract by Parties other than those specified herein shall be grounds for termination of this Agreement.

   1.2 If, after execution of this Contract, the Merchant acquires a company that ships the commodities covered under this Contract, the newly acquired company's tonnage may be included under the Contract after the Merchant has submitted to the Carrier documentary proof of such acquisition and the Carrier has concurred in such inclusion. Also if, after execution of this Contract, the Merchant proposes to delete an entity from the list of its Affiliates, upon concurrence by the Carrier such entity shall cease to be a Party to this Contract.

   1.3 This Contract shall have effect from the date of **April 1, 2005** through **March 31, 2006**. 46 C.F.R. 530.12 requires that certain Essential Terms of Service Contract shall be published as a separate part in the Carrier Automated Tariff Publication. The Contract Rates and Terms shall not be implemented prior to the effective date of the tariff Essential Terms filing, made coincident with that publication with the U.S. Federal Maritime Commission.

   1.4 The Merchant whether he be a beneficial owner of the cargo, NVOCC or other is entering into this Service Contract as an independent contractor and in no event shall be considered an agent of the Carrier whether under this Service Contract or the Carrier's bill of lading/Sea Waybill. Notwithstanding anything to the contrary, the Merchant signing this remains fully responsible for the complete performance of this agreement regardless of whether any affiliates, subsidiaries or third parties are entitled to use the Agreement.

2. GENERAL APPLICATION:

   2.1 This Contract shall be governed by the prevailing and effective rules of Carrier's Service Contract tariff in effect at the time of shipment, including reissues and amendments thereto, unless otherwise specified in the Contract.

   Cargo covered by this Contract shall be carried by vessels owned, chartered, managed or operated by the Carrier under the provisions of the Carrier's Bill of Lading and the Rules and Regulations of the pertinent Tariff(s) of General Applicability. "Notwithstanding the foregoing, if a conflict of terms arises, the provisions as per the Bill of Lading shall prevail."

   2.2 For the purposes of this Contract, the term Merchant shall mean the owner of the cargo or the person for whose account the ocean transportation of the cargo is to be provided or the person to whom delivery is to be made.

2

2.3  As a condition to agreeing to enter into this Contract, the Carrier has assumed that the Merchant (and any Affiliates) has sufficient financial resources to meet its obligations hereunder. Specifically, as a measure of the adequacy of said resources, the Carrier reserves the right, either prior or subsequent to the effective date of the Contract, to require the posting of a surety bond equal to [50% of the maximum possible liquidated damages] in a form and by a surety acceptable to the Carrier. Such Bond shall be presented to the Carrier within fifteen (15) chronological days of Carrier's request. If the 15th day falls on a Saturday, Sunday or National Holiday, the time limit shall be extended to the next business day.

The Carrier also reserves the right to require the Merchant to provide a copy of its most recent audited financial statement (prepared by a certified public accountant or its equivalent). Such financial statement shall be provided to the Carrier within seven (7) business days of Carrier's request.

If after request by the Carrier, the Merchant fails to submit the bond and/or the financial statement pursuant to the provisions of this sub-paragraph 2.3, it shall be conclusively presumed that the Merchant does not have adequate financial resources to meet its obligations hereunder, and if the Contract has been executed by the Parties, it may be terminated by the Carrier without a penalty to either Party, provided that any cargo transported hereunder prior to termination shall be re-rated as per the Tariff rate of General Applicability rate applicable at time of shipment. (Or, if there is no applicable commodity rate, the cargo shall be re-rated at 130% of the applicable Service Contract rate together with all applicable surcharges).

2.4  The Carrier reserves the right to cancel this Contract immediately upon written notice to the Merchant upon occurrence of one of the following:

(1) The Merchant becomes insolvent.
(2) The Merchant files a Bankruptcy Petition.

The Merchant commits any act which defrauds or endangers the interests of the Carrier, including but not limited to: illegal movement of contraband or other commodities without proper legal license in the countries of origin or destination; improper stuffing, blocking or labeling of cargo in such a manner as to pose a danger to the Carrier, its agents, equipment or personnel.

2.5  The Carrier further reserves the right to cancel this Contract upon 30 days prior written notice to the Merchant upon occurrence of any one of the following:
The performance of the Merchant under the Contract indicates that it will be unable to meet the Minimum Volume Commitment set forth herein.

The Merchant is found to be mis-declaring commodities shipped, shipping goods under the Contract which are not included in the commodities listed in the Contract or is found to be allowing non-Contract Parties to use the Contract.

The Merchant is found to be improperly labeling hazardous, poisonous or dangerous goods in violation of Coast Guard regulations and International Conventions.

If this Contract is cancelled pursuant to this subparagraph 2.4, 2.5 all shipments shall be re-rated as per non-contract tariff rate applicable at time of shipment(s). (Or, if there is no applicable commodity rate, the cargo shall be re-rated at 130% of the applicable service contract rate together with all applicable surcharges).

3

3. SERVICE COMMITMENT:

3.1 During the term of this Contract, the Carrier agrees to make available vessel capacity adequate to carry (a) the Minimum Quantity Commitment of cargo as specified in Article 5, and (b) at the Carrier's option, any additional cargo tendered by the Merchant. The Merchant agrees that, insofar as possible, cargo committed under this Contract will be shipped evenly throughout the duration of the Contract. The Merchant agrees to give booking notice to the Carrier at least seven (7) working days in advance of sailing date for port-to-port cargo, and at least fourteen (14) working days in advance of the sailing date for cargo originating at an inland point for Carrier haulage (Intermodal cargo).

3.2 The Carrier and Merchant agree that in light of the fact that the volume and timing of cargo tendered hereunder for particular sailings is in the control of the Merchant, who cannot specify with certainty the amount of cargo which it will tender on any given date, and by virtue of the fact that the Carrier has a finite amount of space on its vessels in which to carry the Merchant's cargo as well as cargo carried pursuant to Service Contracts entered into with other Merchants in the trade, some flexibility is needed by the Carrier with respect to its service commitment to the Merchant hereunder. Accordingly, the parties hereto agree that in the event that the Merchant is unable to secure space on any particular vessel of the Carrier after giving timely booking notice to the Carrier defined in subparagraph 3.1, then, upon the Merchant's written request submitted within seven (7) working days of such occurrence together with essential supporting documents which are later confirmed to be accurate, the Merchant may elect one of the following options:

3.2.1 The Carrier will subtract the quantity of cargo tendered but not carried on Carrier's vessel from the Minimum Quantity Commitment. However, any such reduction of Minimum Quantity Commitment shall not exceed the quantity counted on a pro rata basis. Such pro rata basis shall be defined as the Minimum Quantity Commitment divided by the Carrier's total sailings from all ports of loading named in Article 4 (cumulatively) during the term of the Contract, or,

No. of TEUS (FEUS if applicable) deductible pursuant to Clause 3.2.1 = Maximum Number of Additional Sailings

The pro rata basis (as defined in Clause 3.2.1

3.2.2 If the Merchant does not elect to reconcile the shortage by reducing the Minimum Quantity Commitment set forth in Article 5, pursuant to subparagraph 3.2.1 above, then such shortage will be reconciled upon expiration of the Contract by extending the term of the Contract pursuant to the following formula:

Notwithstanding the above formula, in no event shall the extension exceed ten (10) consecutive sailings. The extension of the term of this Contract pursuant to this Section must be filed in writing on or before the expiration date with the FMC as per 46 C.F.R. 530.8.

4. SERVICE PERFORMED BY THE CARRIER - ORIGIN/DESTINATION:

4.1 Origin – Port **Ranges and Geographic Points**
    **(Please see Appendix D )**

4

4.2 Destination – Ports Ranges and Geographic Points
**(Please see Appendix D )**

4.3 Service Type

    4.3.1 Water and/or Intermodal Service.
Intermodal shipments will be received at or delivered to the terminal, ramp or depot designated by the Carrier, unless otherwise specified in Attachments hereto.

5. MINIMUM QUANTITY COMMITMENT:

In consideration of this Contract's rates, charges and terms specified herein, the Merchant agrees to tender to the Carrier, a minimum of **600 TEUS** FCL/FCL (LCL/FCL) containers loaded with commodities as specified herein, (hereinafter "Minimum Quantity Commitment"). For the purpose of this Contract, a 20' container is a dry cargo (8'6" high) standard container, without chassis attached, except as otherwise specified in this Contract for special equipment provided by the Carrier. For the calculation of the Minimum Quantity Commitment and liquidated damages under this Contract, the following shall apply:

20 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 TEU
40 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 FEU OR 2.00 TEU
40 - FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.125 FEU OR 2.25 TEU
45'- FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.266 FEU OR 2.53 TEU

6. CONTRACT RATES AND CHARGES:

6.1 In consideration of this Contract, the Carrier agrees that the following Contract Rates, Notes and Charges will apply: **(Please see Appendix E,F)**

Surcharges, Additional Charges Clause:

Except as specifically provided in this Article 6, all charges, surcharges, arbitraries, origin and destination delivery charges, add-ons and other additional charges, and all rules in the Carrier's pertinent Tariff of General Applicability, which would thereunder be applicable to the movement of the commodities covered by this Contract shall be assessed in full at the time of shipment.

7. FORCE MAJEURE CLAUSE:

In the event that the execution of obligations entailed by this Contract are prevented by Force Majeure circumstances, including work stoppages, strikes, accidents, casualties, lockouts, fire, transportation disasters, acts of God, governmental restraints (including governmental import restrictions and voluntary quotas arising from the threat of governmental restraints), war or hostilities, embargoes or other similar conditions except commercial contingencies (e.g., changing markets, business declines, etc.), or civil commotions, the Merchant or the Carrier shall notify the other party in writing of the existence of such circumstances within seven (7) working days of such occurrence and of the effect on its ability to perform its obligations hereunder. Upon receipt of such written notice and establishment of the existence of Force Majeure conditions, as supported by essential documentation, the parties shall be excused from their obligations under this Contract to the extent of and for the duration of the disability. Upon cessation of the disability, the Contract obligations shall be reinstated, and the Minimum Quantity Commitment in Article 5 shall be adjusted by 1/ **365** per day of the actual effectiveness of the disability rounded upwards

to the next full container. (The Merchant and the Carrier agree that publication by the Carrier of appropriate paid notices in widely distributed trade publications shall constitute notice to the Merchant in writing under this Article 7).

8. LIQUIDATED DAMAGES CLAUSE:

8.1 The Carrier and the Merchant agree that breaches of this Contract cause not only loss of freight but also instability and adverse impact on Carrier marketing, logistics and stowage planning, and accordingly, agree that in lieu of all damages which are difficult to calculate, liquidated damages shall be assessed if the Merchant fails to tender either the Minimum Quantity Commitment or any other sub-Minimum Quantity Commitment(s) wherever specified in this Contract. Upon the occurrence of such failure by the Merchant, the Carrier shall invoice the Merchant and the Merchant agrees to pay liquidated damages on the difference between the quantity of cargo actually shipped and the Minimum Quantity Commitment, or where applicable any other sub-Minimum Quantity Commitment(s), at the rate of US$250 per FEU. The total of any amounts due hereunder shall be paid directly to the Carrier within thirty (30) days following issuance of written notification by the Carrier. The amount is hereby acknowledged and agreed upon as reasonable liquidated damages and not as a penalty. In the event that liquidated damages pursuant to this clause are not paid by the Merchant within thirty (30) days, the Merchant shall be liable to the Carrier for all costs incurred in collecting said liquidated damages including but not limited to court costs, expenses and attorney's fee incurred in the collection thereof.

8.2 If the Carrier fails to fulfill its Service Commitment in Article 3 hereof during the Contract term, the Merchant's remedy shall be either (1) reduction of the Minimum Quantity Commitment by the quantity of cargo tendered but not carried as provided in subparagraph 3.2.1 or, (2) the extension of the Contract term as specified in Clause 3.2.2. The Carrier shall not be liable to the Merchant for any direct, consequential or other damages under this Contract, except as set forth in Article 3, nor shall any liabilities or obligations of the Merchant to the Carrier be subject to any offset or credit by virtue of any monies which the Merchant may claim are due him under this Contract or otherwise.

9. AUDIT AND RECORD RETENTION:

The Carrier and the Merchant shall maintain records and conduct audits in accordance with the requirements of the Federal Maritime Commission and the Shipping Reform Act of 1998. The Merchant agrees to provide the Carrier's Record Keeper with all the pertinent records, bill of lading or other shipping documents that it has in its possession, which may be required to substantiate the proper application of the Service Contract rates. The records shall be available for Commission's inspection at the following address:

Evergreen America Corporation
One Evertrust Plaza,
Jersey City, NJ 07302
Contact Person: Manager of Tariff Department.
(201) 761-3361

10. ASSIGNMENT CLAUSE:

The Merchant may not assign this Contract, including any or all of its right or liabilities hereunder, or otherwise permit any other person or entity, directly or indirectly, to utilize service rates or other terms provided by the Carrier hereunder, without the prior written consent of the Carrier. Without limitation of the foregoing, the Merchant agrees that it will not permit any other person or entity to co-load or otherwise include such other person's or entity's cargo in containers or other cargo

6

carrying equipment tendered by the Merchant to the Carrier hereunder. If the Carrier, in its exclusive discretion, has reason to suspect that the Contract has been assigned, in whole or in part, by the Merchant, or that the Merchant has otherwise violated this provision, the Carrier may require the Merchant to produce documentation evidencing the Merchant's compliance therewith. In the event that the Merchant does not provide such documentation within thirty (30) days of the Carrier's request for same, the Carrier shall be entitled to conclude that the Merchant has violated this provision. Any container or other cargo carrying equipment tendered in violation of this provision shall be re-rated at twice the otherwise applicable rates and charges set forth in the Carrier's governing tariff(s), and the Carrier may also, at its option, terminate this Contract.

11. TERMINATION:

After the Minimum Volume has been achieved and before the expiration date of this Contract, either party shall have the right to unilaterally terminate this Contract by providing a written notice of such termination to the other party.

12. SEVERABILITY:

The Parties agree that if any clause of this Contract is held to be unenforceable, the remainder of the Contract shall remain in full force and effect.

13. INTEGRATION:

This Contract constitutes the entire agreement between the Parties. Any Amendment to the Terms of this Contract may only be made by written agreement signed by both Parties (and, such agreement shall be filed with the Federal Maritime Commission and, if the Amendment is not subject to confidentiality and per the Ocean Shipping reform Act the Essential Terms shall likewise be updated).

14. ARBITRATION AND CHOICE OF LAW:

Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall at Carrier's option be subject to litigation in the United States District Court for the Southern District of New York or, alternatively, at Carrier's option shall be referred to a committee of three persons, one to be appointed by each of the Parties hereto and the third by the two so chosen. Their decision or that of any two of them shall be final, and, such award shall be enforceable pursuant to the Convention of the Recognition and the Enforcement of Foreign Arbitral Awards. In the event the Carrier chooses to exercise its option to arbitrate any dispute involved with the Contract, such arbitration shall take place pursuant to the Rules and Regulations of the Society of Maritime Arbitrators of the United States. This Contract is to be governed by and construed in accordance with the laws of the United States and the State of New York. In any such litigation or arbitration, the prevailing party shall be entitled to its cost of litigation and/or arbitration as applicable together with attorney's fees and expenses.

15. MARITIME PORT SECURITY ACT OF 2002:

Shipper certifies that it will adhere to the provisions of the Maritime Transportation Security Act of 2002 and that in the event of any failure to do so it will indemnify, defend and hold Carrier

7

harmless in the event of any claims, delays or penalties resulting from Shipper's failure to comply with the provision of said Act.

Notwithstanding any provision to the contrary in this Service Contract or any governing publication, including any limitation or restriction on the application of new surcharges during the term of this Contract, the parties agree that the following charges shall apply to the extent published in a publication governing this Contract at any time during the term of the Contract:

Any charge or surcharge relating to costs incurred in connection with newly-established security requirements (whether established by law, statute, regulation, or by a service provider to Carrier) applicable to or relating to any portion of the transportation and related services provided under this Contract.

8

Affiliates

## APPENDIX A

### Affiliates/Subsidiaries/Association Members

| No. | COMPANY NAME | COMPANY ADDRESS |
|---|---|---|
| 1 | Asmo Co., Ltd. | Umeda, Kosai-shi Shizuoka |
| 2 | Tokai Rika Co., Ltd. | 1 Aza Noda, Oaza Toyoda Oguchi-cho, Niwa-gun Aichi |
| 3 | Denso Sales California, Inc. | 3900 Via Oro Avenue Long Beach, CA 90810 |
| 4 | Denso International America, Inc. | 24777 Denso Drive Southfield, MI 48086-5133 |
| 5 | Denso Manufacturing Michigan, Inc. | One Denso Road, Battle Creek, MI 49015 |
| 6 | Asmo North Carolina, Inc. | 470 Crawford Road, Statesville, NC 28625-8504 |
| 7 | Denso Manufacturing Tennesse Inc. | 1720 Robert C. Jackson Drive Maryville, TN 37801 |
| 8 | Michigan Automotive Compressor Inc. | 2400 North Dearing Road Parma, MI 49269 |
| 9 | Purodenso Company | 1410 Highway 70 Bypass Jackson, TN |
| 10 | Associated Fuel Pump System Corporation | 1100 Scotts Bridge Road Anderson, SC 29621 |
| 11 | American Industrial Manufacturing Service, Inc. | 28780 Single Oak Drive Temecule, CA 92390 |
| 12 | Asmo Manufacturing, Inc | 500 Fritz Keiper Blvd. Battle Creek, MI 49015 |
| 13 | North Carolina Asahi Inc. | 5400 NE, Greenville Blvd. Greenville, NC 27834 |
| 14 | Asmo Greenville of North Carolina Inc. | 1125 Sugg Pkwy. Greenville, NC 27834 U.S.A. |
| 15 | NWB USA, Inc. (Nihon Wiper Bl USA, Inc.) | 25651 Simpson Road Petersburg VA 23803 |
| 16 | Denso Wireless Systems America Inc. | 3250 Business Park Drive Vista CA 92069 |
| 17 | USCO Distribution Service Inc. | 13144 South Pulasky Road Alsip, IL 60658 |

1