UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

MITSUI SUMITOMO INSURANCE CO. LTD. : ECF CASE

    Plaintiff, : 07 Civ. 3874 (CM)

 - against - :

EVERGREEN MARINE CORPORATION; :
UNION PACIFIC RAILROAD COMPANY;
     :
    Defendants.

------------------------------------------------------------------x


**PLAINTIFF'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT AND IN
OPPOSITION TO DEFENDANTS' CROSS MOTION**


**Law Office**
# DAVID L. MAZAROLI
**11 Park Place – Suite 1214
New York, NY 10007
Tel. 212-267-8480
Fax: 212-732-7352
e-mail: dlm@mazarolilaw.com**

**Table of Contents**

Table of Authorities………………………….………………………………………i

References to the evidentiary record…………………………………………………..iii

Preliminary Statement……………………………………………………………1

Summary of Argument……………………………………………………………1

Reply and Opposition Argument:

Point I:    Defendants' various arguments have already been
            rejected by courts in this circuit……………………………...……….2

            A.    The secret contract between UP and Evergreen is
                  not binding on plaintiff – defendants' quintuple
                  incorporation by reference argument should be rejected………….2

            B.    Even if  § 10709 applies limitation is precluded
                  because defendants did not offer full Carmack liability…………..5

            C.    There is no offer of Carmack liability in the sea waybill,
                  electronic waybills, ERTA or MITA 2-A  –
                  COGSA is not the same as Carmack……………….…………….6

            D.    Defendants' "no separate bill of lading" argument
                  conflicts with the evidence and has been renounced by
                  the Second Circuit……………………………………………7

Point II:   Evergreen fits the statutory definition of a rail carrier……………………7

Point III:  Defendants' admission that the entire shipment sustained damage
            allows for entry of judgment in full for plaintiff…………………….……8

Conclusion…………………………..….……………………………………9

Addendum:

*Sompo Japan Insurance Co. of America v Norfolk Southern Railway* Co.,
07-2735(DC), 2008 WL 732011 (S.D.N.Y.  March 20, 2008)

**Table of Cases**

**Cases:**                                                                                            **Page**

*American Orient Exp. Ry. Co. LLC v. Suface Transp. Bd.,*
484 F. 3d 554 (D.C. Cir. 2007)…………………………………………………………..8

*Austracan (U.S.A.) Inc. v. Neptune Orient Lines, Ltd.,*
612 F. Supp. 578 (S.D.N.Y. 1985)…………………………………………………………..9

*See Carmana Designs Ltd. v. North American Van Lines Inc.,*
943 F.2d 316 (3 Cir. 1991)…………………………………………………………………9

*Commercial Union v. M/V Bremen Express,*
16 F. Supp. 2d 403 (S.D.N.Y. 1999)…………………………………………………………..9

*Hartford Fire Ins. Co. v. Novocargo USA, Inc.,*
2003 AMC 851 (S.D.N.Y. 2003)……………………………………………….………..8

*Radut v. State Street Bank,*
03 Civ. 7663(SAS), 2004 WL 2480467 (S.D.N.Y. Nov. 24, 2004)……….……………8

*Rexroth Hydraudyne B.V. Ocean World Lines, Inc.,*
2007 WL 541958 (S.D.N.Y. Feb. 14, 2007)……………………………………...……7

*Sompo Japan Insurance Co. of America v Norfolk Southern Railway* Co.,
07-2735(DC), 2008 WL 732011 (S.D.N.Y. March 20, 2008)…………..………..1, 2, 4

*Sompo Japan Ins. Co. of America v. Union Pacific R. Co.,*
456 F.3d 54 (2 Cir. 2006)……………………………………………………….….…passim

*Sompo Japan Insurance of America v. Union Pacific Railroad Co.,*
02-9523(DAB), 2007 WL 4859462 (SDNY Sept. 26, 2007) (appeal filed)…………....2, 6

*Sompo Japan Insurance Co. of America v. Union Pacific Railroad Co.,*
*No. 03-1604(CM),* 2007 WL 2230091(S.D.N.Y. Aug. 2, 2007)
(McMahon, J)(appeal filed)………………………………………………..…….……2, 5

*St. Paul Fire and Marine Insurance Co. v. Thypin Steel Co.,*
No. 95 Civ. 4439 (MBM), 1999 WL 639718 *6 (S.D.N.Y. 1999)……………..………..4

*Tamini Transformatori S.R.I. v. Union Pacific Railroad,*
2003 WL 135722 (S.D.N.Y. Jan. 17, 2003)……………………………….….………2, 6

**Statutes:**

Carmack Amendment to the Interstate Commerce Act of 1887,
Act of June 29, 1906, ch. 3591, 34 Stat. 584 (1906) (49 U.S.C. § 11706)……….*passim*

Carriage of Goods by Sea Act, 46 U.S.C. §§ 30701 *et seq.*
(previously codified at 46 U.S.C. app. §§  1301-1315)……………….……..……..2, 6

Staggers Rail Act of 1980,
Pub.L. No. 96-448, 94 Stat. 1895 ………..………..………..………………………………….2

49 U.S.C. § 10709…………………………………………………………………1, 2, 3, 5

49 U.S.C. § 10502……………………………………………………………………………2

Fed. R. Civ. P. 56………………………………………………………………………9

**References to the Evidentiary Record**

References to the evidentiary record are preceded the following abbreviations:

Affidavit of  Patrick Chen ("Chen Aff.")

Affidavit of  Livia Kuo ("Kuo Aff.")

Affidavit of Terry D. Sheldon ("Sheldon Aff.")

Affidavit of David L. Mazaroli sworn February 4, 2008 ("Maz. Aff")

Reply Affidavit of David L. Mazaroli sworn March 25, 2008 ("Maz. Reply Aff.")

Deposition of Daniel Hartmann ("Hartmann Dep.")

Defendants' Response to Plaintiff's Rule 56.1 Statement ("Def. Rule 56.1 Resp.");

Defendants' Rule 56.1 Statement ("Def. Rule 56.1 Stat.")

Exempt Rail Transportation Agreement dated  January 15, 2002 ("ERTA")

UP Master Intermodal Transportation Agreement MITA 2-A ("MITA 2-A")

## Preliminary Statement

Plaintiff Mitsui Sumitomo Insurance Co. Ltd. ("Mitsui") respectfully submits this memorandum of law in further support of its motion for partial summary judgment in opposition to the cross-motion of defendants Union Pacific Railroad Company ("UP") and Evergreen Marine Corp. ("Evergreen"). Also submitted is the Reply Affidavit of David L. Mazaroli and plaintiff's response to defendants' Rule 56.1 statement.

## Summary of Argument

Defendants' arguments have been swept aside by a fast-moving jurisprudential current. On March 20, 2008 Judge Chin issued an opinion holding that even under a 49 U.S.C. § 10709 contract rail carrier limitation of liability is precluded if full Carmack Amendment[1] coverage and alternative terms are not offered to the cargo shipper. *See Sompo Japan Insurance Co. of America v Norfolk Southern Railway* Co., 07-2735(DC), 2008 WL 732011 (S.D.N.Y. 2008)("*Sompo v NSR*")(copy in addendum). UP's various arguments have now been rejected in whole or in part by the Second Circuit and by four Southern District of New York judges (Judge McMahon, Judge Batts, Judge Chin and previously by the late Judge Schwartz). Because the undisputed facts confirm that UP and Evergreen did not offer full Carmack coverage and alternative terms (but instead tried to deny Carmack's application to foreign origin shipments) limitation of liability is precluded and plaintiff's motion should be granted.

---

[1] Carmack Amendment to the Interstate Commerce Act of 1887 ("Carmack"), Act of June 29, 1906, ch. 3591, 34 Stat. 584 (1906) (current version at 49 U.S.C. §11706).

## POINT I

## DEFENDANTS' VARIOUS ARGUMENTS
## HAVE ALREADY BEEN REJECTED
## BY COURTS IN THIS CIRCUIT

There is no need for the Court to consider defendants' rendition of the history of

the Carmack Amendment and the Staggers Act[2] or their less-than-candid contention that

the Carmack strict liability regime is similar to the negligence regime of COGSA.[3] The

Second Circuit thoroughly addressed these issues in *Sompo Japan Insurance Co. of*

*America v. Union Pacific Railroad Co.*, 456 F.3d 54, 58-70, 76 (2d Cir. 2006). The

Honorable Denny Chin has also made a detailed analysis of the statutes and the interplay

between Carmack and 49 U.S.C. § 10502 and § 10709. *See Sompo v. NSR*, 2008 WL

732011 at *5-12; *see also Sompo Japan Insurance Co. of America v Union Pacific*

*Railroad Co.,* No. 03-1604(CM)*, 2007 WL 2230091(SDNY August 2, 2007); *Sompo*

*Japan Insurance Co. of America v. Union Pacific Railroad Co.,* 02-9523(DAB), 2007

WL 4859462 (SDNY Sept. 26, 2007); *Tamini Trasformatori S.R.L. v. Union Pac. R.R.,*

No. 02 Civ.129(AGS), 2003 WL 135722 (S.D.N.Y. Jan. 17, 2003). Other than the issue

of Carmack's application to Evergreen, which is moot if an unlimited liability judgment

is entered against UP, each of the arguments put forth by defendants have already been

rejected by various courts and should be rejected in this action.

**A.    The secret contract between UP and Evergreen**
**is not binding on plaintiff -- defendants' quintuple**
**incorporation by reference argument should be rejected.**

Defendants argue that their relationship is governed by ERTA, a confidential

contract between UP and Evergreen which included a nondisclosure stipulation and a

---

[2] Staggers Rail Act of 1980 ("Staggers"), Pub.L. No. 96-448, 94 Stat. 1895.
[3] Carriage of Goods by Sea Act ("COGSA"), Pub. L. No. 74-521, 49 Stat. 1207 (1936) (codified at 46 U.S.C. app. §§1301-1315).

$500,000.00 "signing bonus" paid to Evergreen. (Sheldon Aff. Ex. A  ¶¶ 26, 32)   There is no evidence that Evergreen shared the signing bonus with its customers or that the confidential ERTA transportation rates were disclosed to them.  When plaintiff requested the ERTA transportation rate documents,   UP raised a confidentiality objection and refused production without redaction.  (Maz. Aff. Ex. 11 (Hartman Dep.) pp. 64-67).

There is no specific mention of MITA 2-A in ERTA.  Although ERTA refers to a UP  Exempt Circular 20-Series,  that document was not disclosed by defendants and is not part of the evidentiary record. (Sheldon Aff. Ex. A ¶ 3; Maz. Aff. Ex. 11 (Hartmann Dep. ) pp. 82-83)  The Evergreen sea waybill does not expressly refer to  ERTA,  MITA 2-A, Carmack, or 49 U.S.C. §10709. (Kuo Aff. Exs. A, B).  Defendants have admitted that they did not disclose the terms of  ERTA or MITA 2-A to the actual shipper, consignee or owner of the cargo. (Def. Rule 56.1 resp. Nos. 23, 24).  This is a fatal admission because Evergreen was obligated to give notice to its customers of the terms and conditions of MITA 2-A.  (Sheldon Aff. Ex. A, Item 110 ¶ O)  UP's Mr. Hartmann testified as follows in this regard:

(Mazaroli)        Q.        Paragraph O states, Shipper agrees to notify any and  all parties involved in this transaction of all the provisions, restrictions, and limitations contained in this MITA.

(Hartmann)        A.        Yes.

                          Q.        Who does the word shipper refer to?

                          A.        Shipper is the party tendering a rail waybill to Union Pacific.

                          Q.        And that would be – in the context of this court case, would that be Evergreen?

                          A.        That's correct.

(Maz. Aff. Ex. 11 (Hartmann Dep.)  pp. 84-85).    MITA 2-A further provides that Evergreen is required to "indemnify UPRR for any and all costs associated with Claims or lawsuits alleging a lack of knowledge of the terms and conditions of the provisions of this MITA." (Sheldon Aff. Ex. A ¶ O).   Thus UP and Evergreen were cognizant of their obligations to give pre-shipment  notice to cargo interests of the terms and conditions they now rely on.   Defendants' disingenuous suggestion that the shipper in Japan was required to ask Evergreen for the terms and conditions of defendants' contract should be rejected.   By its terms ERTA was confidential.    Moreover, the Second Circuit and Judge Chin have made clear that the burden to offer full Carmack liability terms is on the carrier.   *See Sompo*, 456 F. 3d at 60;  *Sompo v NSR,*  2008 WL 732011 at *12.

Evergreen's sea waybill does not even disclose the existence of  a contract between Evergreen and UP.    The sea waybill's boilerplate term  "**in the event there is a private contract** between the Carrier and a Sub-Contractor…"  is the type of vague and ambiguous "contingent reference" which courts in this circuit have held to be unenforceable.  *See St. Paul Fire and Marine Insurance Co. v. Thypin Steel Co*., No. 95 Civ. 4439 (MBM),   1999 WL 639718 *6 (S.D.N.Y. 1999).   (Kuo Aff. Ex. B ¶ 5). Defendants' quintuple  incorporation by reference argument (sea waybill to service contract to EDI waybill to ERTA to UP  Exempt Circular 20-Series to MITA 2-A) should be rejected for the reasons stated in the previous Southern District of New York decisions addressing this specific issue. *See  Sompo,* 2007 WL 2230091 at *5 (comparing UP's incorporation argument to the "Twelve Days of Christmas"); *Sompo,* 2007 WL 4859462 at *5 (agreeing that UP "reli[ed] on too many incorporation by  reference steps to properly charge the shipper with notice"); *Sompo v. NSR,*  2008 WL 732011 at *12

4

("there are too many steps incorporated by reference to properly charge the shippers with notice"). In these circumstances even if the contract between UP and Evergreen is subject to § 10709, that contract is not binding on plaintiff.

**B.      Even if  §10709 applies,  limitation is precluded
         because  defendants did not offer full Carmack liability.**

Even assuming *arguendo* that defendants intended to apply § 10709 to the shipment through ERTA and MITA 2-A, defendants' liability is still unlimited because they did not comply with the affirmative duty, as defined by the Second Circuit, to "offer the shipper the option of full Carmack coverage, which includes both the Carmack version of strict liability and full coverage for loss." *Sompo*, 456 F. 3d at 60. Judge Chin's decision makes clear that even if  Evergreen and UP contemplated a §10709 contract, defendants were obligated to comply with the same conditions precedent for limitation of liability which were enunciated in *Sompo. See Sompo v NSR*, 2008 WL 732011 at *10-12.   Judge Chin stated as follows:

> Even if I were to conclude that the [intermodal transportation agreements] were…§ 10709 contracts, they must be subject to the same requirements as § 10502 contracts when they govern the domestic rail leg of a continuous intermodal movement of cargo.
>
> …[R]equiring [intermodal transportation agreements] to make an initial offer of full Carmack liability…comports with the Second Circuit's holding in *Sompo*.
> * * *
> Rail carriers who enjoy the financial benefits of doing business with insureds are required, in conjunction with the shipping companies, to ensure that a full offer of Carmack liability is made to enjoy any contractual limit on liability.

*Id.* at *11, 12**.** This ruling comports with Judge Schwartz's holding that "a 49 U.S.C. § 10709 contract can be entered into only if the carrier also offers the shipper Carmack terms."  *Tamini Trasformatori S.R.L. v. Union Pac. R.R.,*  2003 WL 135722 at *7. The

5

evidentiary record herein confirms that defendants failed to fulfill this condition precedent. As a result defendants' primary argument is invalid.

**C.     There is no offer of Carmack liability in the sea waybill, electronic waybills, ERTA or MITA 2-A --- COGSA is not the same as Carmack.**

There is no mention of Carmack in the Evergreen sea waybill. There are no terms or conditions on the UP electronic waybills. (Sheldon Aff. ¶5 Ex. B)  It is undisputed that neither ERTA nor MITA 2-A provided an option of full Carmack liability. (Def. Rule 56.1 Resp. No. 25) It is also undisputed that MITA 2-A excludes application of Carmack to the subject international shipment by stating "Carmack liability coverage is not available for shipments that originate outside the borders of the United States of America." (Def. Rule 56.1 Resp. Nos. 26)    Faced with similar facts Judge McMahon held as follows: "As UP has conceded that the tractors were part of an international shipment……I must conclude that no Carmack liability was offered for the shipment in question." *Sompo*, 2007 WL 2230091 *5.  In a case involving similar facts, Judge Batts also held that UP did not offer Carmack liability for international shipments.  *Sompo,* 2007 WL 4859462   at *6.[4]

There is no merit to defendants' suggestion that COGSA is the same as Carmack. The Second Circuit invalidated this argument when it concluded that "COGSA and Carmack create two different liability standards"… "COGSA liability is grounded in negligence while Carmack liability is rooted in strict liability."  *Sompo*, 456 F. 3d at 76. The Evergreen sea waybill's reference to COGSA does not comply with the Second

---

[4] The *Sompo* line of cases  held that a subrogated cargo insurer was entitled to unlimited  recovery from the railroads. This renders nugatory   the suggestion at page 18 of defendants' brief that the existence of cargo insurance somehow deprives a plaintiff of certain recovery rights.

Circuit's directives in *Sompo* and does not fulfill the Carmack conditions precedent for limitation.

### D. Defendants' "no separate bill of lading" argument conflicts with the evidence and has been renounced by the Second Circuit.

The argument at pages 9-12 of defendants' brief is legally and factually incorrect. The Second Circuit held that Carmack applies to the domestic land stage of a foreign origin intermodal movement even if a separate bill of lading or waybill is not issued for the land transport. *Sompo*, 456 F. 3d at 62-63. Defendants' survey of prior case law in other circuits is superfluous since the Second Circuit's decision is binding precedent.

The Second Circuit did made clear that even if a separate bill of lading were required, Carmack would still have applied in *Sompo* based on UP's electronic waybill. *Id.* 456 F.3d at 56 & n. 4, 69 n. 14. Defendants have admitted that UP generated separate waybills for the transport of the cargo from Los Angeles to Statesville. (Def. Rule 56.1 Stat. No. 54; Def. Rule 56.1 Resp. Nos. 21, 22; Maz. Aff. Exs. 1, 2 ¶ 15). Thus, Carmack's application herein is uncontrovertable whether or not the statute is interpreted to require a separate bill of lading or receipt.

### POINT II

### EVERGREEN FITS THE STATUTORY DEFINITION OF A RAIL CARRIER

The facts herein are distinguishable from the undeveloped records in *Rexroth Hydraudyne B.V. Ocean World Lines, Inc.,* 2007 WL 541958 (S.D.N.Y. Feb. 14, 2007)(appeal pending) and *Indemnity Ins. Co. of No. America v K-Line*, 06 Civ. 0615(BSJ), slip. op. (S.D.N.Y. Feb. 27, 2008). For compensation Evergreen provided multimodal transportation, including rail carriage services. (Def. Rule 56.1 Resp. No. 6)

The train which derailed was a dedicated Evergreen train loaded by Evergreen at its intermodal rail facility. (*Id.* No. 20; Maz. Aff. Ex. 11 (Hartmann Dep.) pp. 29-32; Maz. Reply Aff. Ex. 17). Evergreen holds itself out to the public as providing intermodal rail carriage and advertises its intermodal rail facilities in the United States. (Maz. Reply Aff. Exs. 17, 18; Maz. Aff. Ex. 11 (Hartmann Dep.) p. 73, lines 23-25; p. 74, lines 1-8). Defendants' arguments overlook the fact that (a) Evergreen fits within the statutory definition of a rail carrier. *See* 49 U.S.C. § 10102(5); (b) Evergreen's intermodal rail terminal and containers fit the definition of a railroad. *Id.* § 10102(6)(A)(C); and (c) the interchange of the containerized shipments at the Evergreen intermodal facility qualifies as rail transportation. *Id.* § 10102 (9)(B). UP's ownership of the locomotives and rail tracks does not preclude rail carrier status for Evergreen. *See American Orient Exp. Ry. Co. LLC v. Suface Transp. Bd.,* 484 F. 3d 554, 556 (D.C. Cir. 2007).

## POINT III

### DEFENDANTS' ADMISSION THAT THE ENTIRE SHIPMENT SUSTAINED DAMAGE ALLOWS FOR ENTRY OF JUDGMENT IN FULL FOR PLAINTIFF

The previous liability admission by UP has been amplified by defendants' concessions in their motion papers that the entire shipment sustained damage as a result of the derailment. (Def. Rule 56.1 Stat. No. 82; Def. Rule 56.1 Resp. No. 45). In view of these undisputed facts, and those outlined in plaintiff's Rule 56.1 statements 27 thru 37 and 40 thru 45, the evidentiary record is ripe for entry of judgment in favor of plaintiff on liability and damages. *See Radut v. State Street Bank*, No. 03 Civ. 7663(SAS), 2004 WL 2480467(S.D.N.Y. Nov. 4, 2004) (courts may decide summary judgment issues *sua sponte*). The evidence presented in the declarations of David Clifton and Chikara Yokoi proves the invoice value of the shipment ($382,415.06), the amount of the incidental

expenses incurred ($3,650.64) and the salvage proceeds ($10,777.20) deducted from the claim.  (Clifton Decl. ¶¶ 11, 12 Exs. 1-3; Yokoi Decl.   ¶¶ 7, 8 Exs. 1-3). The invoice value of cargo is sufficient to establish an amount for the calculation of damages and summary judgment should be entered for this amount plus incidental expenses and prejudgment interest at the statutory rate. *See Commercial Union v. M/V Bremen Express,* 16 F. Supp. 2d 403 (S.D.N.Y. 1999). *Austracan (U.S.A.) Inc. v. Neptune Orient Lines, Ltd*.,  612 F.Supp. 578, 583 (S.D.N.Y. 1985).

### Conclusion

Defendants' dogmatic arguments ignore the well-reasoned directives of a federal appeals court and four federal district judges.   Limitation of liability is not an inherent right. Rather it is "a carefully defined exception to the Carmack Amendment's general objective of imposing full liability for the loss of shipped goods." *See Carmana Designs Ltd. v. North American Van Lines Inc.,* 943 F.2d 316, 319  (3 Cir. 1991). It is  defendants who seek a windfall by attempting through  adhesion contract clauses to apply a blue-water ocean carriage state to the derailment of a train and by seeking to camouflage their admitted failure to comply with statutory conditions precedent.

Plaintiff's motion pursuant to Rule 56 (a) Fed. R. Civ. P.  should be granted in its entirety  and defendants' motion should be denied.  Plaintiff respectfully requests that an order be entered striking and dismissing all limitation defenses   and allowing for judgment against defendants jointly and severally on the issue of liability pursuant to Rule 56(d)(2).  In addition, plaintiff requests that judgment be entered against defendants for the amount of damages outlined in Point III,  *supra.*  Plaintiff respectfully requests such other and further relief as warranted by justice, including an order   establishing

specific findings of fact pursuant to Rule 56(d)(1) as supported by the undisputed facts,

including Plaintiff's Local Rule 56.1 statements no. 1 thru 7, 9, 11, 12, 13, 14,15, 18 thru

37 and 40 thru 45.

Dated:  New York, New York
        March 25, 2007

           LAW OFFICES,
          DAVID L. MAZAROLI

          *s/David L. Mazaroli*
          _____
          David L. Mazaroli (DM 3929)
          Attorney for Plaintiff
          11 Park Place - Suite 1214
          New York, New York 10007
          Tel.: (212)267-8480
          Fax.: (212)732-7352
          E-mail:  dlm@mazarolilaw.com
          File Nos.: 7MSI-1491

ADDENDUM

Westlaw.

--- F.Supp.2d ----                                                          Page 1
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Sompo Japan Ins. Co. v. Norfolk Southern
Ry. Co.
S.D.N.Y.,2008.
Only the Westlaw citation is currently
available.
United States District Court,S.D. New York.
SOMPO JAPAN INSURANCE
COMPANY of America and Sompo Japan
Insurance, Inc., Plaintiffs,
v.
NORFOLK SOUTHERN RAILWAY
COMPANY et al., Defendants.
**No. 07 Civ. 2735(DC).**

March 20, 2008.

Maloof Brown & Eagan LLC by David T.
Maloof, Esq., Thomas M. Eagan, Esq., Rye,
NY, for Plaintiffs.
Keenan Cohen & Howard P.C., by Charles
L. Howard, Esq., Jenkintown, PA, and
Gutterman & Associates by Barry N.
Gutterman, Esq., New York, NY, for
Defendants.

*OPINION*

CHIN, District Judge.
**\*1** In March 2006, four companies arranged
to have their goods-including tractors,
automotive components, ice makers, sushi
cases, and copying machines-shipped from
Asia to Long Beach, California by boat, and
then transported across the United States by
train to Georgia. The train, however,
derailed in Texas on April 18, 2006, and the
cargo aboard was damaged. Sompo Japan
Insurance Company of America and Sompo
Japan Insurance Inc. (together, "Sompo"),
which insured the companies' cargo, filed

this action against the railroad carriers to
recover for the damage.

Before the Court is plaintiffs' motion for
partial summary judgment. Plaintiffs ask the
Court to decide one issue-whether their
recovery is limited by various contracts
among the railroad defendants, shipping
companies, and insureds, or whether they
may recover the full value of the damaged
cargo. The answer hinges on whether certain
contracts between the railroad carriers and
the shipping companies were entered into
pursuant to 49 U.S.C. § 10709, and, if so,
whether the rail companies were required to
offer the insureds an option for full liability
under 49 U.S.C. § 11706, popularly known
as the Carmack Amendment.

Plaintiffs' motion for partial summary
judgment is granted. For the reasons set
forth below, I hold that the rail carrier
defendants' liability is not limited by its
contracts with the shipping companies or the
insureds' contracts with the shipping
companies, and plaintiffs may seek recovery
for the full value of the damaged cargo.

*BACKGROUND*

**A.** *The Facts*

The facts are drawn from the pleadings,
declarations, exhibits, and the parties' Rule
56.1 statements. For purposes of this
motion, the facts are construed in the light
most favorable to defendants as the parties
opposing partial summary judgment, and
conflicts in the evidence have been resolved
in their favor.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 2
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

The damaged cargo at the center of this case was shipped by boat from various points in Asia in late March 2006 to the Port of Long Beach, California, and then transported by a train owned and/or operated by defendants. The cargo owners-plaintiffs' insureds-arranged for transport of the cargo with shipping companies, who in turn contracted for the rail transportation leg of the trip with the defendant rail carriers. On April 18, 2006, that train carrying the insureds' cargo derailed in Texas and the containers aboard were damaged.

### 1. *The Bills of Lading*

On March 31, 2006, Yang Ming Transport Corporation ("Yang Ming") issued sixteen waybills for the carriage of Kubota New Agricultural Tractors shipped by Kubota Corporation from Tokyo aboard the M/V Cherokee Bridge to the Port of Long Beach, California, and from there to Jefferson, Georgia. (Eagan Decl. Ex. 3). The Yang Ming bill of lading standard terms provided that the carrier's liability was limited with respect to the goods to $500 per package or, when the goods were not shipped in packages, to $500 per customary freight unit, subject to various other provisions. (*Id.* Ex. 9 ¶ 23).

**\*2** On March 31, 2006, Nippon Express issued a bill of lading for the carriage of 7,570 cartons of automotive component parts shipped by Hitachi, Ltd. from Tokyo aboard the M/V Cherokee Bridge to the Port of Long Beach, California, and from there to Monroe, Georgia. (*Id* . Ex. 5). Nippon Express engaged Yang Ming to perform the carriage, and Yang Ming issued a waybill for the carriage of the 7,570 cartons. (*Id.* Ex.

4). The Nippon Express bill of lading provided that the carrier's liability would not exceed $500 per package or unit unless the merchant declared a higher value for the goods with the consent of the carrier, in which case the higher value would be the limit on liability. The bill of lading further specified that damages claimed could not exceed actual loss. (*Id.* Ex. 11 ¶ 7).

On March 28, 2006, Sumitrans issued a bill of lading for the carriage of 495 cartons of ice makers and sushi cases shipped by Hoshizaki Electric Co., Ltd. from Tokyo aboard the M/V Cherokee Bridge to the Port of Long Beach, California, and from there to Griffin, Georgia. (*Id.* Ex. 7). The Sumitrans bill of lading "Terms and Conditions" stated that the carrier's liability would not exceed $500 per package or unit unless the merchant had declared a higher value with the consent of the carrier. (*Id.* Ex. 7 ¶ 6).

On March 26, 2006, NYK Line issued a waybill for the carriage of a container of copying machines and accessories shipped by Canon Finetech Industries Development Co., Ltd. from Yantain, China aboard the M/V OOCL Ningbo to the Port of Long Beach, California, and from there to Georgia.[FN1](*Id.* Ex. 8). The NYK Line bill of lading provided that carrier liability was limited to $500 per package or customary freight unit. (*Id.* Ex. 10 ¶ 26).

> FN1. The parties' Rule 56.1 statements indicate that the final destination for the shipment was Georgia. The bill of lading, however, identifies Long Beach, California as the "place of delivery." For purposes of this motion, it is assumed that the cargo was on the train when it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                        Page 3
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

derailed in Texas.

None of the bills of lading for any of the shipments mentioned the option of electing full "Carmack Liability."

## 2. *Other Waybills*

The cargo described above was transported by ship, discharged in the Port of Long Beach, California, and placed on rail lines owned and operated by the BNSF Railway ("BNSF"). (Luebbers Decl. ¶ 7). BNSF generated its own waybills when it accepted the containers from the ocean carriers in Long Beach. (*Id.* ¶ 3). For all the containers except one, Yang Ming Marine Line was identified as shipper and consignee of the containers. (*Id.* ¶ 4). For the remaining container, NYK International was identified as the shipper and consignee.(*Id.* ¶ 5).

The Yang Ming bills of lading standard terms and conditions from its website state:

Notwithstanding the foregoing, in the event there is a private contract of Carriage between the Carrier and any Underlying Carrier, such Multimodal Transportation will be governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length and copies of such contract(s) shall be available to the Merchant at any office of the Carrier upon request.

**\*3** (Eagan Decl. Ex. 9 ¶ 7(2)(B)).

In Dallas, Texas, the containers were interchanged from BNSF to Norfolk Southern Railway Corporation ("NSR") for the final leg of carriage inland.[FN2] (Luebbers Decl. ¶ 7). NSR produced "Miscellaneous

Waybills" when the containers were interchanged in Dallas. (Eagan Decl. Ex. 12). These "Miscellaneous Waybills" did not mention the option of electing full "Carmack Liability" or 49 U.S.C. § 10709. (*Id.*)

> FN2. The cargo was technically loaded on a train operated by Kansas City Southern Railway Company ("KCSRC") in Dallas, Texas. KCSRC was to transport the containers to Meridian, Mississippi, where they were to be loaded onto a train operated by NSR. Pursuant to an agreement between KCSRC and NSR, KCSRC was transporting the containers on behalf of NSR, and NSR was therefore responsible for the containers while they were in KCSRC's possession. (*See* Defs .' Rule 56.1 Counter-Statement ¶ 29 & n. 1).

## 3. *The Intermodal Transportation Agreements*

Prior to arranging this shipment, the shipping companies-Yang Ming and NYK International-had entered into general agreements for the transport of goods with NSR. In August 2004, NSR executed an Intermodal Transportation Agreement ("ITA") with Yang Ming that addressed the shipment of all intermodal containers tendered by Yang Ming to NSR for rail transport. (Howard Decl. Ex. B). This agreement, which expires in May 2009, provides for specific services at specific rates and conditions for whenever NSR provides rail services to Yang Ming. (*Id.*). The Yang Ming ITA section addressing "Loss and Damage" states that Yang Ming

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 4
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

will be held harmless for loss occurring by NSR's fault (including derailment), and that NSR's "liability for freight loss and damage will be subject to the dollar limitation set forth in the Rules Circular at the time a claim for freight loss and damage is made."(*Id.* Ex. B at 8). It also states that the agreement is "intended for the sole benefit of NS and Yang Ming."(*Id.* Ex. B at 11).

In April 2003, NSR entered into an ITA with NYK Line which addresses the shipment of intermodal containers tendered by NYK Line to NSR for rail transport. (*Id.* Ex. C). That contract, which was extended through October 2007, provides for specific services at specific rates and conditions for whenever NSR provides rail services to NYK Line. (*Id.*). The NYK Line ITA purports to incorporate NSR's "Rules Circular No. 2" by reference. (*Id.*). It does not contain a section addressing loss and damage. (*Id.*). It states that the agreement "is intended for the sole benefit of NS and NYK."(*Id.*).

**4.** *The Rules Circulars*

NSR's Intermodal Rules Circular # 2, which is available on the company's website, provides that NSR's liability for loss, damage, or delay to any shipments under the circular would be limited to the lesser of the value of the cargo at the destination and $250,000. (Eagan Decl. Ex. 14 ¶ 8.3.3). The Rules Circular # 2 further states that "Carmack liability is offered only for shipments which would have been subject to [Carmack] if intermodal traffic were not exempt from [Carmack], and not for any foreign, ocean or other movement to which the Statute is otherwise applicable."(*Id.* Ex. 14 ¶ 8.4.1). KCSRC also published a Rules

Circular which provided a Carmack liability option, but only for shipments originating domestically. (*Id.* Ex. 19 at 3).

**\*4** NSR never entered into any transportation contracts with the insureds Kubota Corp., Hitachi, Ltd., Hoshizaki Electric Co., Ltd., or Canon Finetech Industries Development Co., Ltd. (*See* Tr. 31-32).[FN3]

> FN3. "Tr." refers to the transcript of the November 21, 2007 oral argument.

**B.** *Procedural History*

On April 4, 2007, Sompo filed the instant complaint against defendants NSR, KCSRC, and Norfolk Southern Corporation. On August 30, 2007, plaintiffs moved for partial summary judgment, and on August 31, 2007, defendants moved to transfer the case. The Court received opposition and reply papers for both motions.

On October 4, 2007, defendants submitted a letter to the Court requesting leave to file a sur-reply in connection with plaintiffs' partial summary judgment motion. On October 5, 2007, plaintiffs submitted a letter requesting leave to file a sur-reply in connection with defendants' motion to transfer, appending a sur-reply memorandum of law to their letter. I denied both requests on October 22, 2007, and notified the parties that I would disregard plaintiffs' sur-reply and that oral argument was scheduled for November 21, 2007.

The Court held oral argument for both motions on November 21, 2007. I denied defendants' motion to transfer from the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 5
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

bench and reserved decision on plaintiffs' motion for partial summary judgment. Following oral argument, the parties submitted letters that addressed two questions raised at oral argument: (1) what constitutes a "10709 contract" and (2) whether a recent decision by Judge Batts in the matter *Sompo Japan Insurance Co. v. Union Pacific Railroad Co.* provides authority for the Court's decision on related issues in this case. Pursuant to my order dated January 15, 2008, I accepted final letter submissions on these two issues until January 24, 2008.

## DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party."*See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).

### B. *The Statutory Scheme*

Congress passed the Interstate Commerce Act (the "ICA") in 1887 and created the Interstate Commerce Commission (the "ICC"). 24 Stat. 379. The ICA empowered the ICC to regulate railroad rates. Under the ICA, freight rates were established by tariff filings with the ICC, and the ICC had the ability to declare a rate discriminatory and unreasonable. *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126-129 (1990). Later, Congress shifted the regulatory responsibility to the Surface Transportation Board (the "STB").*See* ICC Termination Act of 1995, Pub.L. No. 104-88, 109 Stat. 803.

### 1. *The Carmack Amendment*

**\*5** Congress added the Carmack Amendment ("Carmack") to the ICA in 1906.[FN4] Carmack created " 'a national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading.' " *Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.,* 456 F.3d 54, 58 (2d Cir.2006) (quoting *Ting-Hwa Shao v. Link Cargo (Taiwan) Ltd.,* 986 F.2d 700, 704 (4th Cir.1993)). One purpose of Carmack was to prevent transportation companies from undermining the ICC's regulatory tariff scheme by setting off damages as a method of discounting shipping rates to favored customers.*Consol. Rail Corp. v. Primary Indus. Corp.,* 868 F.Supp. 566, 576 (S.D.N.Y.1994) (citing *Chicago & N .W. Ry. Co. v. Lindell,* 281 U.S. 14, 16 (1930)). Carmack permits a shipper to recover for the actual damage or loss from either the delivering carrier or the carrier issuing the bill of lading or receipt.[FN5]*Sompo,* 456 F.3d at 59.

> FN4. Originally codified at 49 U.S.C. § 20(11), Carmack was recodified in 1978 at 49 U.S.C. § 11707 and then recodified again in 1996 at 49 U.S.C. § 14706. *See DiPaolo Mach. Works, Ltd. v. Prestige Equip. Corp.,* 998 F.Supp.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229, 233 n. 1 (E.D.N.Y.1998). The current version of Carmack is codified at 49 U.S.C. § 11706. *See Jessica Howard Ltd. v. Norfolk S. R.R. Co.,* 316 F.3d 165, 166 n. 3 (2d Cir.2003).

FN5. Bills of lading are contracts that record that a carrier has received goods from the shipping party, state the terms of carriage, and are evidence of a contract for carriage. *Norfolk S. Ry. Co. v.. Kirby,* 543 U.S. 14, 18-19 (2004). Intermodal through bills (or intermodal bills of lading) are those that contemplate multiple modes of transportation. *See Sompo,* 456 F.3d at 56.

Accordingly, Carmack requires that a rail carrier providing transport issue a receipt or bill of lading for property it receives and makes it liable for the actual loss or injury to the property it transports by rail. 49U.S.C. § 11706(a). Carmack specifically covers "the inland [rail] leg of an overseas shipment conducted under a single 'through' bill of lading.'" *Neptune Orient Lines, Ltd. v. Burlington N. & Santa Fe Ry. Co.,* 213 F.3d 1118, 1119 (9th Cir.2000).

**2. *The Staggers Act***

A series of statutes passed in the 1970s and 1980s deregulated the railroad industry. One example of this deregulation was the Staggers Rail Act of 1980 ("Staggers"), Pub.L. No. 96-448, 94 Stat. 1895.Staggers provided mechanisms for rail carriers to transport goods at negotiated contract rates rather than at prescribed common carrier rates. *See Sompo,* 456 F.3d at 59. Carriers moving cargo under common carrier

arrangements are still required to quote and make common carrier rates available, but the dissemination and availability of rates to shippers can be accomplished by means other than tariff filing, including by electronic transmission. *See*49 U.S.C. § 11101. In 2004, the House Subcommittee on Railroads estimated that 40% of rail traffic moved under common carrier rates and 60% moved under contract rates. *See* Subcommittee on Railroads, *Hearing on the Status of Railroad Economic Regulation,* Mar. 31, 2004, *available at* http://www.railcure.org/pdf/033104 househearing.pdf.

**a. *Exemption under § 10502***

Staggers gave the ICC the ability to exempt rail carriers providing transportation subject to the jurisdiction of the ICC-including "transportation that is provided by a rail carrier as part of a continuous intermodal movement"-from regulation under "this part," including rate regulation. 49 U.S.C. § 10502(a), (f). "This part" refers to 49 U.S.C. Subtitle IV, Part A, which encompasses 49 U.S.C. §§ 10101-11908. Pursuant to its authority under § 10502, the ICC exempted rail carriers that operate one leg of a continuous intermodal movement. *See*49 C.F.R. § 1090.2. [FN6]

FN6. This regulation provides:
Exemption of rail and highway TOFC/COFC service. Except as provided in 49 U.S.C. 10505(e) and (g), 109229(1), and 10530, rail TOFC/COFC service and highway TOFC/COFC service provided by a rail carrier either itself or jointly with a motor carrier as part of a continuous intermodal freight movement is exempt from the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requirements of 49 U.S.C. subtitle IV.... Tariffs heretofore applicable to any transportation service exempted by this section shall no longer apply to such service. The exemption does not ... operate to relieve any carrier of any obligation it would otherwise have, absent the exemption, with respect to providing contractual terms for liability and claims.

**\*6** Section 10502(e) further provides: "Nothing in this subsection or [Carmack] shall prevent rail carriers from offering alternative terms nor give the Board the authority to require any specific level of rates or services based upon [Carmack]." Courts have interpreted this provision to permit carriers and shippers to contract out of Carmack's provisions in whole or in part, including contracting for lower rates not subject to tariff filing requirements. *See Sompo,* 456 F.3d at 59-60;*Tamini Trasformatori S.R.L. v. Union Pac. R.R.,* No. 02 Civ. 129(AGS), 2003 WL 135722, at \*4 (S.D.N.Y. Jan. 17, 2003); *Ferrostaal, Inc. v.. Union Pac. R.R. Co.,* 109 F.Supp.2d 146, 149 (S.D.N.Y.2000).

With respect to liability, the exemption authority granted under Section 10502 is not boundless. Section 10502(e) also provides: "No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title."Courts have concluded that, despite the ability of exempt contracts to offer non-tariff rates for particular services, "the combined effect of § 10502(e) and § 11706(a) is that rail carriers that wish to limit their liability must

offer the shipper the option of full Carmack coverage, which includes both the Carmack version of strict liability and full coverage for loss."*Sompo,* 456 F.3d at 60;*see Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc.,* 996 F.2d 874, 879 (7th Cir.1993) ("rail carriers still must offer full rates, but they may offer alternative terms as well"); *Tamini,* 2003 WL 135722, at \*4 ("Section [10502(e) ] requires carriers to provide terms consistent with Carmack in the first instance.... [U]nless the shipper affirmatively elects the alternative limited liability terms, the Carmack terms should apply."); *Consol. Rail Corp. v. Sobiech,* 710 F.Supp. 988, 990 (S.D.N.Y.1989) (carriers must initially provide liability terms consistent with Carmack and then may offer alternative terms).

While non-exempt rail contracts are subject to Carmack rules for liability (that is, carriers are liable for the full cost of any damage or loss), exempt rail contracts may include alternative liability terms and lower shipping rates, so long as a shipper first is presented the option of selecting full Carmack liability terms (and presumably higher prices).*Tamini,* 2003 WL 135722, at \*7. "If an exempt rail carrier fails to offer the shipper the option of coverage for the actual loss or injury to the property, then the shipper may sue the carrier under Carmack."*Sompo,* 456 F.3d at 60.

**b.** *Section 10709*

Title 49, Section 10709-also a part of Staggers-provides that "[o]ne or more rail carriers providing transportation subject to the jurisdiction of the Board under this part may enter into a contract with one or more purchasers of rail services to provide

specified services under specified rates and conditions."49 U.S.C. § 10709(a). This section, like § 10502, permits parties to contract for specific rates. Section 10709 further provides that a "party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract."49 U.S.C. § 10709(b).Section 10709(c)(1) provides that a "contract that is authorized by this section, and transportation under such contract, shall not be subject to this part.""This part" refers to 49 U.S .C. Subtitle IV, Part A, which includes Carmack. Most courts have concluded that this language indicates that § 10709 contracts are not subject to Carmack, and need not offer a full Carmack liability option before properly limiting carrier liability. *See, e.g., Am. Rock Salt Co. v. Norfolk S. Corp.,* 387 F.Supp.2d 197, 200 (W.D.N .Y.2005) ("Contracts entered into pursuant to § 10709, then, are not subject to the Carmack Amendment."); *Siemens Power Transmission & Distrib., Inc. v. Union Pac. R.R. Co.,* No. Civ. A. H-03-0298, 2005 WL 2647977, at *2 (S.D.Tex. Oct. 17, 2005).

**\*7** How one identifies a § 10709 contract is not entirely clear. In 1986, a regulation was promulgated requiring that contracts entered into under § 10713 (the predecessor to § 10709) state so on their face. That regulation, 49 C.F.R. § 1313.1, provided that contracts "entered into by one or more rail carriers and one or more purchasers of rail service, to provide specified services under specified rates, charges and conditions" under that section were required to "specify that the contract is made pursuant to" the statute. 51 Fed.Reg. 45898 (Dec. 23, 1986).

The current version of the regulation, which has been in force since 1996, does not specifically require that § 10709 contracts identify themselves as such on their face. This regulation, however, now applies only to the transport of agricultural products. *See*49 C.F.R. § 1313.1 ("For purposes of this part, the term contract means an agreement, including any amendment thereto, entered into by one or more rail carriers and one or more purchasers of rail services to provide specified transportation of agricultural products ... under specified rates and conditions."); *see also*61 Fed.Reg. 68668 (Dec. 30, 1996).

In April 2007, the STB acknowledged that the question of how to identify a § 10709 contract is unsettled by requesting comments on a proposal to interpret the term "contract" in § 10709 for the purpose of revising the regulations. *See*72 Fed.Reg. 16316 (Apr. 4, 2007).[FN7] In its request, the STB noted "there is no clear distinction in the statute or our precedent between a contract and a common carrier rate," and expressed "serious concerns about the lack of any clear demarcation between contract and common carrier rates."*Id.* Just last week, after facing opposition from both shippers and carriers, the STB announced it would not to adopt the proposed rule. STB Ex Parte No. 669, 2008 WL 657934 (Mar. 12, 2008). The STB instead instituted a new rulemaking proceeding to

> FN7. The STB sought comments "on a proposal to interpret the term 'contract' in 49 U.S.C. 10709 as embracing any bilateral agreement between a carrier and a shipper for rail transportation in which the railroad agrees to a specific rate for a

specific period of time in exchange for consideration from the shipper, such as a commitment to tender a specific amount of freight during a specific period or to make specific investments in rail facilities."72 Fed.Reg. 16316 (Apr. 4, 2007).

consider imposing a requirement that each rail carrier provide a full disclosure statement when it seeks to enter into a rail transportation contract under 49 U.S.C. 10709. The statement would explicitly advise the shipper that the carrier intends the document to be a rail transportation contract, and that any transportation under the document would not be subject to regulation by the Board.

73 Fed.Reg. 13523 (Mar. 13, 2008). The carrier would also provide the shipper with an opportunity to sign an informed consent where the shipper affirmatively elects to forgo its regulatory options. *Id.*

Courts have also noted that there is little guidance on how to identify a § 10709 contract. *See, e.g., Babcock & Wilcox Co. v. Kansas City S. Ry. Co.,* Civ. No. 06-6015(DRD), 2007 WL 4440163, at *3 & n. 1 (D.N.J. Dec. 17, 2007). Even after the revision of 49 C.F .R. § 1313.1 in 1996, several courts have still held that a § 10709 contract must specifically state on its face that it is entered into pursuant to 49 U.S.C. § 10709. *See e.g., PCI Transp., Inc. v. Fort Worth & W. R.R. Co.,* 418 F.3d 535, 541 (5th Cir.2005) (citing STB decision that contracts are governed by § 10709 when the "contract affirmatively stated that it was made pursuant to § 10709"); *Babcock,* 2007 WL 4440163, at *2 ("[O]ne would expect to find at least an implicit indication in such a

contract of the parties' intention to invoke § 10709."); *Schoenmann Produce Co. v. Burlington N. & Santa Fe Ry. Co.,* 420 F.Supp.2d 757, 761 (S.D.Tex.2006) ("Nothing in the transportation documents nor the Rules Book stated that the shipments at issue were under section 10709. Contracts entered into under section 10709 specifically cite the statute."); *see also Glenn Hunter & Assocs. v. Union Pac. R.R. Co.,* 135 Fed. App'x 849, 854 (6th Cir.2005) (noting that the contract at issue expressly stated "This CONTRACT is made pursuant to 49 U.S.C. § 10709" and therefore "49 U.S.C. § 11706, with its distinct set of rights and remedies, did not apply"); *Am. Rock Salt,* 387 F.Supp.2d at 201 (concluding that Carmack applied despite the fact that the contract stated that it was "made pursuant to 49 U.S.C. § 10709" because other provisions in the contract provided for Carmack's application).*But see Tokio Marine & Fire Ins. Co. v. Mitsui O.S.K. Lines, Ltd.,* No. CV 02-3617(ER), 2003 WL 23181013, at *1 (C.D. Cal. June 27, 2003) ("The Agreement provides for rail transportation pursuant to specified rates and conditions, so it falls within those contracts exempt from the Carmack Amendment under § 10709(a).").

### 3. *The Interplay Between § 10709, § 10502, and Carmack*

**\*8** Courts have varied wildly on how these sections of Staggers and Carmack work together. In *Schoenmann Produce Co. v. Burlington Northern & Santa Fe Railway Co.,* a Southern District of Texas court addressed the interplay between a particular § 10502 exemption-the exemption for the shipment of potatoes-and § 10709, concluding that the contract for alternative terms at issue in the case fell under § 10502

--- F.Supp.2d ----                                                                                    Page 10
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

and not § 10709. *Schoenmann Produce Co.,* 420 F.Supp.2d at 757. The court rejected plaintiff's argument that the contract for rail transportation at issue was a § 10709 contract (and therefore not subject to Carmack) simply because it offered contract terms. Rather, it concluded that it was a § 10502 contract (with the requirement that it initially offer the option of full Carmack liability) because it was a type of contract specifically exempted by the STB:

> Plaintiffs presented no evidence to support their argument that the potato shipments at issue were governed by section 10709. As noted, that section by its terms applies only to 'transportation subject to the jurisdiction of the Board under this part.'49 U.S.C. § 10709(a).Section 10502 granted the Board authority to exempt certain rail services from Subtitle VI of Title 49, which includes section 10709.... The Board exempted rail shipments of certain agricultural commodities, including potatoes.

*Id.* at 760-61.The court ultimately concluded "section 10709 by its terms does not apply to exempt shipments."*Id.* at 761.

The most detailed discussion of the interplay between § 10709, § 10502, and Carmack from this district appears in *Tamini Trasformatori S.R.L. v. Union Pacific Railroad,* 2003 WL 135722. In *Tamini,* defendant Union Pacific argued that its liability was validly limited by contract even though it did not initially offer full Carmack liability, in part because the contract at issue was a § 10709 contract. Judge Schwartz rejected the § 10709 argument, concluding that it could not prevail when the contract was exempted by the STB under § 10502.

UP is certainly correct to the extent that

*if* [the contract] is a valid contract under 49 U.S.C. § 10709, then the Carmack protections (including full liability) do not apply. However, UP reads 49 U.S.C. § 10709 in a vacuum, without regard to the other statutes concerning common rail carriers. Specifically, UP ignores the fact that 49 U.S.C. § 10502(e) mandates that before an alternative contract is agreed to, the statutory Carmack terms must be offered.... [A] § 10709 contract can be entered into only if the carrier also offers the shipper Carmack terms. If the shipper chooses the Carmack terms (and ostensibly pays a higher shipping rate), then the Carmack terms govern. If the shipper chooses the alternative terms (and a corresponding lower shipping rate), then those terms govern and, under the terms of 49 U.S.C. § 10709, the shipper loses the protections of Carmack. Thus, while it is true that Carmack protections do not apply to 49 U.S.C. § 10709 contracts, the existence of such a contract presupposes that the shipper turned down Carmack terms. That never happened in this case, because, as UP concedes, it never offered ... Carmack terms.

**\*9***Id.* at \*7.

At least one district court has concluded that contracts can be construed as § 10709 contracts simply because they are for specific rates and conditions, regardless of the fact they are subject to a § 10502 exemption. *See Tokio Marine & Fire Ins. Co.,* 2003 WL 23181013, at \*1 ("[T]ransportation undertaken pursuant to a contract entered into under § 10709(a) is not subject to Carmack.").

**C. *Application***

I conclude that defendants may not limit their liability under any of the contracts in this case for the following reasons:

### 1. *The Bills of Lading Fail to Initially Offer Full Carmack Liability*

There is no evidence that defendants or the shipping companies made an initial offer of full Carmack liability to the merchant insureds in the bills of lading. In fact, defendants do not argue-in their briefs, at oral argument, or in their supplemental letter briefs-that they offered full Carmack liability to the insureds in *any* of the contracts. At oral argument, they conceded this point:

> Mr. Howard [counsel for defendants]: Norfolk Southern never-none of the railroads ever made an offer of full Carmack liability to any of Sompo's insureds. Never.

> The Court: I see....

> Mr. Howard: No, didn't happen. None of the railroads ever had any contact, any business dealings with any of Sompo's insureds. They are strangers to the rail portion of this movement.

> The Court: But must an offer have been made to them; is that what the Second Circuit holds [in *Sompo* ]?

> Mr. Howard: That's certainly what counsel has argued, that the offer has to be made to the insureds.

> The Court: Okay. So you concede that there was no offer made to the insureds.

> Mr. Howard: We concede that, yes....

(Tr. 31-32).

Rather, defendants' position is that they made such an offer to the shipping companies, but could not have made the offer to the insureds because (1) the waybills do not identify the insureds, (2) the rail carriers did not contract directly with the insureds, and (3) for the shipping companies, who contracted with defendants, to go back and notify the insureds that their terms had changed in light of an offer of full Carmack liability would be impracticable. They instead argue that the ITAs they had in place with the shipping companies relieved them of the requirement to offer full Carmack liability to the insureds.

Pursuant to §§ 10502 and 11706, an initial offer of full Carmack liability had to have been made to the insureds for the limits on liability contained in the bills of lading to be effective. Because no evidence has been presented that the insureds were offered an initial option of full Carmack liability in the bills of lading, the limits on liability contained therein are not effective.

### 2. *The ITAs Are Not § 10709 Contracts*

Defendants hang their hats on one argument in this motion: that the ITAs between the shipping companies and defendants are the operative agreements in this case, those agreements are § 10709 contracts, and therefore defendants were not required to offer full Carmack liability to the insureds for the contractual liability limit to apply. The NSR Rules Circular # 2, which is incorporated by reference into the ITAs, limits NSR's liability to $250,000 per

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

container. Defendants urge the Court to adopt the holding of the California district court in *Tokio Marine* that § 10709 contracts are entirely exempt from Carmack, regardless of the requirements of § 10502 and Carmack.

**\*10** It is not clear, however, that the ITAs were entered into pursuant to § 10709. Defendants argue that their contracts with the shipping companies are § 10709 contracts simply because the terms are such that "one or more rail carriers" is providing "specified services under specified rates and conditions" to "one or more purchasers of rail services."This argument, however, must fail. Section 10709 is not mentioned in the ITAs. It is not mentioned in the bills of lading, the Miscellaneous Waybills, the NSR Rules Circular # 2, or the KCSRC Rules Circular. Defendants have not offered any evidence that these contracts were entered into pursuant to § 10709 or that there was a meeting of the minds between the contracting parties that § 10709 governed the agreements.

Absent (1) a statement as to the statutory authorization for the contracts on their face or (2) evidence of such an understanding between the parties, and because (3) the previous regulations required this statement, (4) the current regulations do not affirmatively exempt this statement, and (5) the STB has noted confusion on this issue, there is no basis for concluding that the ITAs are § 10709 contracts. Furthermore, plaintiffs submitted compelling evidence that NSR has included a § 10709 statement on the face of its contracts in the past. (*See* Eagan Dec. 11, 2007 Letter Ex. 25). Plaintiffs have also offered compelling evidence that peer rail carriers include such

a statement. (*Id.*).

In light of the above, I hold that no reasonable factfinder could conclude that the ITAs are § 10709 contracts. Accordingly, these agreements are subject to the requirements of Carmack, and defendants' failure to make an initial offer of full Carmack liability to the insureds negates any stated limitations on liability. Therefore, the $250,000 limit on liability contained in the NSR Rules Circular # 2 is not effective.

**3. *Full Carmack Liability Must Be Offered to the Insureds Regardless of Whether the ITAs are Interpreted as % § 10709 Contracts***

Because I conclude that the ITAs are not § 10709 contracts, I need not reach the question of whether § 10709 contracts covering the rail leg of a continuous intermodal movement must offer full Carmack liability. Nonetheless, given the muddled state of the law and the close attention paid to this and similar cases, and because resolution of the issue provides an additional, independent ground for the disposition of this motion, I address the issue. [FN8]

> FN8. Several courts have noted that this issue has not been adequately addressed. *See, e.g., Gateway, Inc. v. Burlington N. & Santa Fe Ry. Co.,* No. 01 C 9482, 2002 WL 1822919, at \*3 n. 2 (N.D.Ill. Aug. 8, 2002) (noting defendant's argument that the transportation at issue was exempt under § 10502 and therefore not subject to § 10709, but that the court was "not able to find any cases that dealt with this exact situation, or that

discussed § 10709 in the context of § 10502"); *M.R. Swanson, Inc. v. Burlington N. & Santa Fe Ry. Co.,* No. CVF995496AWISMS, 2001 WL 201378, at *6 n. 5 (E.D.Cal. Feb. 21, 2001) ("Because Circular 2-A was also authorized under section 10502 and 49 C.F.R. 1313, it is unclear what effect section 10709 has on Circular 2-A. In addition, section 10709(c)(2)'s limitation on jurisdiction provision is uncertain in light of cases that have required disputes over products shipped pursuant to a contract to be litigated under the Carmack Amendment.").

As a preliminary matter, I agree with the numerous courts that have held that § 10709 contracts are not, standing alone, required to initially offer full Carmack liability for a contractual limitation on liability to be effective. The plain language of the statute-that these contracts may "provide specified services under specified rates and conditions" with "no duty in connection with services provided under such contract other than those duties specified by the terms of the contract"-makes this clear. *See Community for Creative Non-Violence v. Germain,* 490 U.S. 730, 739 (1989) ("The starting point for [the] interpretation of a statute is always its language.")

**\*11** What is not clear from the statutory language or the case law, however, is how to read § 10502 and § 10709 in tandem. I conclude that rail contracts for the movement of cargo traveling on the domestic rail leg of a continuous intermodal movement, such as the ITAs in this case, should be read as § 10502 and not § 10709 contracts.

First, the comparative language of the statutory sections and their placement within the statutory scheme compel this conclusion. Section 10709 does not specify that it applies to exempted rail carriers that operate one leg of a continuous intermodal movement. By its own terms, it merely applies to "one or more purchasers of rail services."Section 10502, on the other hand, specifies its application to this particular class of rail services purchasers under this specific type of movement. In arguing that Staggers segregated rail transportation provided under contract from rail transportation provided pursuant to a common carrier tariff rate, defendants fail to recognize that a third category-exempt contracts-are also at play. Additionally, § 10709 falls under the "rates" section of the statute. Its predecessor, § 10703, clearly addressed rates and whether they had to be filed with the ICC. Nothing in § 10709 indicates that it is intended to alter the statutory liability scheme specifically.

Second, this conclusion is necessary to prevent a conflict between § 10502 and § 10709. Both § 10502 and § 10709 permit parties to contract for specific rates. Both were included in Staggers. It would be nonsensical for (1) § 10502 to permit a certain category of rail contracts to offer specific rates and terms but require an initial offer of full Carmack liability and (2) § 10709 to permit the *same category of rail contracts* to offer specific rates and terms with no such requirement of an initial offer of full Carmack liability. I agree with the *Schoenmann* court that § 10709 contracts cannot be used for exemptions under § 10502. Contracts exempt under § 10502 are exempt from rate regulation like § 10709

contracts, but are still subject to the rules of Carmack liability. Section 10709 simply cannot be used as a tool to extract contracts governing exempted rail carriers that operate one leg of a continuous intermodal movement from the regulatory demands of § 10502 and Carmack.

The generic ITAs at issue here covered all movement between the shipping companies and the defendants. They were not entered into for purposes of this particular shipment and were drafted years before the bills of lading for these shipments were generated. Presumably, the ITAs have been applied to transportation other than one leg of a continuous intermodal movement. Even if I were to conclude that the ITAs were, standing alone, § 10709 contracts, they must be subject to the same requirements as § 10502 contracts when they govern the domestic rail leg of a continuous intermodal movement of cargo.

Third, requiring ITAs to make an initial offer of full Carmack liability to the insureds comports with the Second Circuit's holding in *Sompo.In Sompo Japan Insurance Co. of America v. Union Pacific Railroad Co.,* 456 F.3d 54 (2d Cir.2006), the Court held that "Carmack applies to the domestic rail portion of an international shipment originating in a foreign country and traveling under a through bill of lading."[FN9]*See Sompo,* 456 F.3d at 75. While the *Sompo* court did not directly address the § 10709 argument, the contracts in that case and the instant case are substantially similar. Both shipments involved nearly identical set of documents-intermodal through bills of lading, separate rail waybills, rail transportation agreements between the shipping companies and the rail carriers, and

rail circulars published by the rail carriers. (*See* Eagan Decl. Ex. 17, 21). In both cases, the intermodal bills of lading were issued for shipments traveling from abroad to the United States and cargo that was damaged during the inland domestic rail leg of the shipment. The rail transportation agreements between the shipping companies and the rail carriers were similar to those in this case. The Second Circuit did not qualify its *Sompo* holding. Furthermore, defense counsel in this case conceded that in *Sompo,* the "Second Circuit had before it an intermodal movement of freight which under 10502 has been exempted from STB regulation. When you have that circumstance, then, yes, the rail carrier has to make an offer of full Carmack liability under those circumstances because of what is says in 10502."(Tr. 32). That is precisely the situation we have here.

> FN9. The Second Circuit decided *Sompo* after *Tokio Marine* and other cases cited by defendants.

**\*12** Judge Batts recently examined intermodal through bills of lading and associated shipping contracts that offered specified services under specified rates, charges, and conditions in an unrelated case, *Sompo Japan Insurance Co. v. Union Pacific Railroad Co.,* No. 02 Civ. 9523(DAB), 2007 WL 4859462 (S.D.N.Y. Sept. 26, 2007). The facts of that case closely mirror the facts in this case. Relying on the Second Circuit's decision in *Sompo,* Judge Batts concluded that the rail carrier were required to make an initial offer of full Carmack liability before liability could properly be limited by contract, without discussing a possible exception for § 10709 contracts between the shipping company and

--- F.Supp.2d ----                                                          Page 15
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

the rail carrier.[FN10]Judge Batts also raised an ancillary concern that I share: First, it is not clear that the shippers in these cases are on actual notice of either the ITAs or the rail carrier circulars or have the opportunity to review them and, second, there are too many steps incorporated by reference to properly charge the shippers with notice of their terms. *Id.* at *5.

> FN10. The defendant in Judge Batts's case briefed its § 10709 argument on October 16, 2006. It argued: "In its entirety, the shipping contract is comprised of the aforementioned documents, along with the K-Line waybill/bill of lading, which contains the actual $500 per package limitation of liability."(Eagan Dec. 21, 2007 Letter Ex. 27 at 3). It went on to argue that the Circular limited liability to $500 per package, and because it was a § 10709 contract, outside of Carmack's purview, it could effectively limit liability. (*Id.* Ex. 27). Judge Batts issued her decision on September 26, 2007 without mention of this stance.

Rail carriers who enjoy the financial benefits of doing business with insureds are required, in conjunction with the shipping companies, to ensure that a full offer of Carmack liability is made to enjoy any contractual limit on liability. But I am not unsympathetic to defendants' position. They were not in a position to make an offer of full Carmack liability to the merchants, as they had no contracts or direct contact with them. It is not lost on the Court that the parties contracting directly with the insureds and the rail carriers and the entities best

suited to make the full Carmack offer-the shipping companies-are not parties in this case. Yang Ming is the defendant in a related case before me, but that case was not filed until December 14, 2007, months after this motion was made.

In *Norfolk Southern Railway Co. v. Kirby,* 543 U.S. 14 (2004), the Supreme Court faced an analogous situation. In that case, the subcontractor carrier of a non-party intermediary freight forwarding company invoked a limitation on liability to which the merchant did not itself agree. The merchant's insurer retained the ability to sue the freight forwarding company with whom the merchant contracted. The Court noted, "It seems logical that the [freight forwarder]-the only party that definitely knew about and was party to both of the bills of lading at issue here-should bear responsibility for any gap between the liability limitations in the bills."*Id.* at 399.In the instant case, NSR may have alternative options for enforcing the terms of their ITAs with the shipping companies.

### CONCLUSION

Defendants have failed to properly limit their liability under the requirements of the statutory scheme. Accordingly, plaintiffs are free to pursue damages in excess of the limits on liability set forth in any of the contracts.

SO ORDERED.

S.D.N.Y.,2008.
Sompo Japan Ins. Co. v. Norfolk Southern Ry. Co.
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 16
--- F.Supp.2d ----, 2008 WL 732011 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.